

2024 JUN 28 PM 2: 44

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

David Anthony Babb,           )     C/A No. 2:23-03218-RMG-MHC
      Plaintiff,              )
                            )
v.                            )
                            )
David Isom, et al.,           )
      Defendants.             )     **PLAINTIFF'S OBJECTIONS TO**
                            )     **THE MAGISTRATE'S FINAL**
                            )     **REPORT AND RECOMMENDATIONS**
_____     )     **(Dkt. No. 51)**

### PLAINTIFF'S OBJECTIONS TO FINAL (R&R)

COMES NOW the Plaintiff, David Anthony Babb, as above captioned and hereby sets forth his objections to the Magistrate's Final Report and Recommendations (R&R) and states as follows: Plaintiff has set forth his set of facts within the four corners of his Second Amended Complaint (SAC) with the information that is available to him at the present, and within his continual filings for his Emergency Motion For Temporary Injunctive Relief (ETRO); wherein he has filed a civil action pursuant to 42 U.S.C. § 1983 action in admiralty by alleging claims against certain law enforcement officers for acts of theft against the public and/or this Plaintiff from using federal public use lands, and against, a former Mayor, including at least two unknown officers: one from South Carolina (SC) Department of Natural Resources (SCDNR) and another which is said to be employed with the SC Department of Health and Environmental Control (DHEC), and two private citizens acting as proxies or intermediaries for the law enforcement; to

wit: Rudy Socha (Socha) and/or Wounded Nature-Working Veterans (WN-WV)[1] and David Isom (Isom) General Manager of Safe Harbor Marina (SHM). SC law mandates that when an ordinance is attacked for its unlawfulness and/or unconstitutionality that the Attorney General has to be made a party. Defendant Sarah Reed (Reed), also a DHEC agent, however, she is with the SC Coastal Zone Management Council (SCCZMC).[2]

## PLAINTIFF'S OBJECTIONS

**Page one (1) of R & R.**

Plaintiff objects to the following statements in the magistrates R&R dated May 8, 2024 (Dkt. No. 51):

1.     Page one footnote one (1) "Plaintiff fails to provide a 'Facts' section in his Second Amended Complaint."

Plaintiff's SAC is filled with facts from within his SAC as are set forth in numbered paragraphs in (Dkt. No. 40, CLAIMS ONE-SEVEN) pursuant to the Federal Rules of Civil Procedure, Rule 8, FRCP. More importantly however is that Rule 8(a)(2) , FRCP, requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed. 2d 929 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Nevertheless, Plaintiff's SAC should be liberally construed.

---

[1]     Socha is the registered agent and CEO of his 501(c)(3) non-profit WN-WV and thereby the entities actions are that of Socha's and Socha's involvement is through his entity; thus, the inclusivity of the joined agreement makes that one does not operate without the work of the other. Therefore, throughout this Plaintiff's Objections to the Final R&R the combined agreement between Socha and his non-profit WN-WV will be referred to as; Socha. Nevertheless, each are SC state actors.

[2]     Without discovery it is not confirmed as to whether Reed is the unknown agent mentioned in (Dkt. No. 40 CLAIM ONE at paragraph  No. 3 ).

2.      Page one of  **"I. BACKGROUND"**.

Plaintiff has apprised this Court that a land grab of federal public use land is being removed from the public's use and that the present Defendants are moving to convert public use lands into private corporate expansion for profit.  Discovery is mandatory in order for Plaintiff to determine who all of the Defendants will be.  All across the U.S. the rivers which are, and/or were, available for public use have been developed by adjacent landowners who have moved through their state laws to develop the rivers adjacent to their lands; thus, eroding the Public Trust Doctrine's (PTD) purpose and the rivers usage for the public by altering such U.S. navigable waters and/or anchorage areas; whereby such has been  converted into corporate holdings.  The Ashley River in Charleston, SC, is being prepared for a corporate expansion by and through the Defendants acts; some Defendants move knowingly and others perhaps unknowingly.

**A.          (Dkt. No. 40, CLAIM THREE)**

The disruption of the liveaboards way of life commenced when Socha published on his social media page that to have a mooring ball (m-b) affixed to an anchoring system was and/or is a violation of DHEC and/or SCCZMC's Reg.  -30 [3] and that failure to remove such would result in confiscation; see (Dkt. No. 40, CLAIM THREE).  Socha, following his notice to the public, went on a cutting spree throughout the U.S. navigable waters including the federal anchorages

---

[3]        SCCZMC Reg. 30 (B) states, "Permit Application: Except for those exemptions as specified in the 1977 Coastal Zone Management Act, as amended, any person wishing to alter a critical area must receive a permit from the Department. Section 48-39-140(B) directs that certain information be included in the permit application submitted to the Department.  The following minimum information shall ordinarily be required before a permit application is considered complete: (1) Name and address of the applicant; (2) A plan or drawing showing the applicant's proposal and the manner or method by which the proposal shall be accomplished; (3) A plat or copy of a plat of the area in which the proposed work will take place; (4) A certified copy of the deed, lease or other instrument under which the applicant claims title, possession or permission from the owner of the property to carry out the proposal; (5) A list of all adjoining landowners and their addresses or a sworn affidavit that witch due diligence such information is not ascertainable...(7) a copy of the newspaper public notice:"

wherein he began collecting the personal property of others.[4]  Most importantly is that of the safety factors in not only removing the m-bs, which assists in strong weather conditions, but that when Socha dislodged the complete rode system to the riverbed that such became anchoring hazards.[5]  Last, is that Socha's acts of vandalism to that of Ed Bulger's vessel , *TITI IV*, caused extreme safety issues by the negligent handling of anchoring it after unlawfully moving it; see footnote three (3) above on pg. three (3). Socha misused Reg. 30 for his own agenda; Reg. 30 is for adjacent landowners beside navigable waters and that such has no applicability within a federal anchorage and/or whether someone chooses to use a m-b during anchoring.

**B.**          **(Dkt. No. 40,  CLAIM FOUR)**

In (Dkt.No. 40, CLAIM FOUR) Plaintiff apprises this Court on Merrill's creation and enactment of an ordinance; to wit: 2023-097 and/or Merrill's Laws[6] which makes the act of anchoring a crime after an extended stay of fourteen days.  On April 2, 2024, Merrill issued the Plaintiff five citations; two were for algae, and the others were for failing to pay a tax[7] to the City of Charleston (CCHS) as shown in (Dkt. Nos. 36, Attachment 4/ Exhibit D). Merrill's boating permit plan, which exceeds $5,000 in fines and/or 150 days of incarceration and/or both which accrue daily[8] is not just unconstitutional but that it violates the rights of all who are unable to pay

---

[4]      Socha forwarded letters (Dkt. Nos. 37 and 48) to the Court wherein he admits to such acts; and Plaintiff filed a Motion for the Court to take Judicial Notice of such (Dkt. No. 61).

[5]      See (Dkt. No. 12, Ex. G paragraph no. 27 ), (Dkt. No. 42 ), (Dkt. No. 59 pg. 36 paragraph no. 4), and (Dkt. No. 38).

[6]      Prior to May 9, 2024, Officer Mike Merrill, Defendant Merrill in the case at hand (Merrill) acquired a copy of the ordinance in which the Town/City of Folly Beach SC (CofFB) had constructed for their use; see (Dkt. No. 36, Attachment 2/Exhibit B (Charleston City Council Board Members (Board) Meeting of May 9, 2023, at pg. 11 of minutes transcript/ pg. 19 of exhibit).  From Merrill's rationale, as stated in Exhibit B, at pg. 12 of transcript/20 of exhibit  he interpreted that SC Legislation made it possible that anyone could make up their own set of laws and enforce such.  Thus, Merrill created his own set of laws; 2023-097 is properly referred to as Merrill's Laws at (§ 20-70).

[7]      The PTD provides that the rivers are forever free and outright without tax or impost.

[8]      On June 17, 2024, Merrill informed this Plaintiff, while under his Body Cam Video that the CCHS prosecutor, Ms. Mallery Sheer, instructed him to fine this Plaintiff $3,300 daily.  Plaintiff is seeking a copy of the video through Rule 5 and 8 SCCrimP in the CCHS Livability Court.

to enjoy the rivers.[9] During the issuance of such citations, all the while being video recorded by Merrill's body cam video, Plaintiff asked Merrill if he wrote the laws in 2023-097; Merrill answered in the affirmative. As a result of Merrill's admittance, Plaintiff filed discovery motions in the CCHS Livability Court for a copy of Merrill's body cam video recording of the above mentioned conversation, see **Exhibit A, (Email correspondence from Ms. Mallery L. Scheer and an excerpt from the flashdrive transcript)**; thus, Merrill admits to writing portions of the Ordinance at (16:34) of the transcription. The evidence supports that he wrote the addendums, lobbied the laws, delivered such to the Board without adequate notice to the public,[10] enacted such without ever actually having read the ordinance into the record of the Board's minutes, and with only one event wherein the Board motioned on its acceptance, without reading it into the minutes, he then enforced the laws by way of threatening the owners of vessels that they would either go to jail or that their vessels would be impounded or both if they did not sign up for his onerous boating permit plan; see **Exhibit B (Corresponding text between Merrill and one Russell Bronski)**. Plaintiff's Eighth Amendment Rights are violated for excessive fines, presently at $3,000 every two weeks, for allowing Celeste and her  duck friends  to eat algae

---

[9]     Hypothetically, should the fictional character Tom Sawyer,  of author Mark Twain's Novel <u>Adventures of Tom Sawyer</u>, arrive on his raft in the Ashley River then he would be disallowed because Merrill's Laws command $300,000 in liability insurance; thus, the indigent would never be allowed to use the rivers of the U.S. thereby the Equality Act should include the less financially stable, regardless if they are black, pregnant, or a sufferer from a mental disability as indigence can affect all walks of life.  Billionaire Richard Hampton Jenrette mentioned to Plaintiff in conversation while walking along the East Battery high wall that had he not placed 40 percent of his wealth into war bonds that he would have gone broke in the financial collapse of 2008. He informed Plaintiff that he lost 27 million, however, many who were wealthy lost all that they had.  Indigence can attack one without notice by way of economic situations, improper financial investments, health reasons, etc; indigence is like the thief found in Alzheimer's.

[10]     Both Merrill and Socha were aired live on Grey Inc. television boasting about removing vessels with their new law.

(Dkt. No. 18 ) [11],   and for not paying a tax to CCHS for the river's use; see **Exhibit C  <u>(June 17,</u>**

**<u>2024 Merrill's daily citations at $3,300/day)</u>.**

The May 9, 2024, Board meeting transcript (Dkt. No. 36, Attachment 2/Exhibit  B at pg.

8 on transcript, or 16 in order of exhibit) supports that the Board met a day prior to go over their

agenda's:

> "Councilmember Shadid said, 'Thank you.  The next item that we brought up was an
> Ordinance to amend Division 4 regarding abandoned boats and watercraft.  If you looked
> at your agenda, you would notice the strikeouts and highlights associated with that.  This
> is an ordinance that we are hoping will make it a whole lot easier to identify abandoned
> boats in the waterways, our two officers who are mainly responsible for patrolling this.
> This also is an update and, hopefully, we will have much more teeth in identifying the
> owners of these abandoned boats and getting them out of our waterway, so we also made a
> recommendation that we approve that, as well."

However, it does not support that they ever discussed Merrill's Laws.  Without discovery, there is

no way to determine whether or not any Board members actually read the material, including

Merrill's addendums and the scratched out words "abandoned" as was the intent of the SC

Legislature during their 124th Session for Bill 77.   Incidentally, the readings in that session is

what became the statute allowing for municipalities to enact an ordinance for a permit.[12]  The

omissions of certain words from the CCHS legal team, and the broadening addendums from

Merrill  create laws that the SC Legislators did not approve.  It is unclear on whether the Board

saw the final  altered version with Merrill's addendums; nothing indicates that they even saw it at

all as the May 9, 2024, transcript supports that there was confusion amongst Board

Councilmember Gregg; (Dkt. No. 36, Attachment  2 /Exhibit B at pg. 9 of transcript, or pg. 17 of

exhibit).   Moreover, without discovery, there is no way to determine if Merrill had added his

---

[11]     The neighboring marsh is under Bill 777 as a SC Harbor Wildlife Bird Sanctuary SC Code § 50-11-980 and
their food source, algae,  is a crime (§ 21-70 ).  The penalty for molesting the fowl is $1,000-5,000.  Is removing
their food source a form of molestation?  To remove the algae vessels are scrapped, brushed, and others use a
chemical, HullClean that is FDA approved; it's a diluted toilet bowl cleaner.  Pre-1970 raw sewage poured directly
into the Ashley River, including toilet bowl cleaning products.
[12]     Does not allow for anything under the sun to become law.

addendums prior or after the Board's acts of motioning to constitute their first and only **mentioning** of the ordinance.[13] It is possible that Merrill altered the SC Legislators intent by adding his addendums after the Board motioned on such; thereby broadening the ordinance with: debris, algae, and a liability insurance policy of $300,000 minimum despite that the State of SC nor the federal regulations require for such an absurd amount.[14] Presently the State of SC does not require any amount of insurance on sailboats; nor does the federal law or regulations.

SC automobile liability insurance minimum is $25,000. Automobiles in use along the SC highways are far more dangerous than a vessel at anchorage. The mere fact that such provisions were inserted into law suggest that the person was of limited intelligence; and that he had a malicious agenda to eradicate a certain financial status group of citizens from enjoying the rivers. The constitutional provisions within the PTD specifically provide for the rivers to remain free. Plaintiff's rights of use of the rivers are being violated because his financial status disallows him to meet Merrill's unlawful and unconstitutional conditions which not only disallow use of the river for failing to pay into his permit plan, but that Plaintiff's rights of liberty are violated for not being able to pay the $3,300 per day fines; incarceration is inevitable to include loss of property as the vessel then become impounded.

---

[13]     The ordinance was never actually read into the record; thus, the Board's motion to adopt skipped: reading and notice requirements, and the additional readings as is required by law; SC statute § 5-7-270. This ordinance, 2023-097, if facially unconstitutional and this Plaintiff, including others and transient boaters who live in other states, is and/or are subjected to harassment of loss of liberty, property, and rights to use the rivers as the Constitutional provisions of the PTD provides.

[14]     On June 17, 2024, Merrill issued to this Plaintiff over $15,000 in fines concerning a boating permit which is mandatory by the issuance of his laws and/or the CCHS. During the issuance of such, Plaintiff questioned him as to whether he wrote the insurance policy requirement and Merrill answered in the affirmative. Then Plaintiff questioned him as to whether or not he was aware that SC Law does not require any insurance for sailboats and Merrill answered in the affirmative. Merrill further stated that by creating his laws he has been able to get rid of a bunch of "junk boats"; and he stated that he did not scratch out the words on the ordinance explaining that those acts were performed by CCHS legal department. He further stated that the prosecutor of the Livability Court, Ms. Mallory Scheer, instructed him to issue this Plaintiff over $3,000 in fines daily. Plaintiff has motioned the Livability Court for a copy of Merrill's Video Cam Recording Device to be able to provide this Court a transcribed copy of this conversation.

A law enforcement officer's educational requirements mandate that one have a highschool level of graduation in order to become qualified to be accepted with the CCHS. The former Mayor of CCHS, John J. Tecklenburg (Tecklenburg) is known for removing the John C. Calhoun Monument, despite that John C. Calhoun, (1782-1850) was not even alive during the Civil War.[15] Tecklenburg was further described by his political opponents as having instructed the CCHS police to stand down during the May 30, 2020, CCHS riots so as to allow for the rioters to have free run.  Thus, lack of intelligence may be the cause for their acts of violating this Plaintiff's constitutional rights of "enjoying" the rivers "free and outright forever for all without tax or impost".  See <u>Malley v. Briggs</u>, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) wherein the court held, "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." <u>Id.</u> at 1096.  Making algae a crime and requiring $300,000 in liability insurance with full knowledge that the State of SC does not require any insurance supports a malicious indifference to those who are not financially stable; thereby Merrill's acts discriminates[16] against this Plaintiff's rights of continual use of the rivers within the boundary in which the CCHS and/or Board chose to expand their corporate jurisdiction to the center of the rivers; despite that SC Code § 5-7-140(B) stops the CCHS jurisdiction at the low tide mark.

Without discovery Plaintiff cannot determine facts sufficient to state what precisely transpired in the enactment of Merrill's Laws, however, notice was clearly not adequately provided to the public (Dkt. No. 36, Attachment 5 /Exhibit  E) and the Board's and the State of SC's regulations were violated in that the Board never conducted  the three readings as is

---

[15]     Plaintiff does not hold the opinion that slavery in the U.S. was an issue for those who fought, but that the truer intent for those who fought was for that of State's rights and/or for the intrusion of federal taxes and control.
[16]     As a matter of first impression, indigence has to become one of the protected provisions of the Equality Act as Merrill's Laws only allow for the wealthy to use the rivers.

required; see **Exhibit D** (**CCHS Regulations for getting an ordinance passed**). Without any legal force, SC Code § 5-7-270, Merrill has been issuing citations to many through this set of laws as the Livability Court's Docket Sheet supports; moreover, **Exhibit B** supports that Merrill threatens impoundment and incarceration. The people affected do not possess the legal understanding that they could have demanded a trial and fought the unlawful and unconstitutional provisions in Merrill's Laws; which violates both U.S. and SC constitutions and the Doctrine of Arbitrariness, Vagueness Doctrine, and the PTD.

This case, based on overwhelming evidence, is separate from all published cases which the Magistrate relies on wherein other areas of the U.S. may have enacted legitimate laws for boating and/or mooring permits. Here, according to Merrill as mentioned above in footnote 7 on pg. 5, the CCHS legal team took SC Legislator's intent and commenced with removing and adding words to take on an entirely new meaning; thus, altering SC Legislative intent and thereby creating an avenue which allows for the CCHS to eradicate the indigent from ever being able to use and/or enjoy the rivers in the Charleston area, in opposition as to the PTD's protection was so intended. The Defendants act(s) supports that a land grab is inextricably intertwined with the federal public use lands removal for corporate expansion with Socha's acts of m-b removal to Merrill's Laws mentioned in (Dkt. No. 40 CLAIMS TWO through FOUR). The underlying agenda of Merrill's Laws was to force vessels to flee the area as supported in Merrill's communications of the May 9, 2023, Board transcript; (Dkt. No. 36, Attachment 2 / Exhibit B at pg. 11 in transcript or 19 in exhibit); see footnote no. 7 and 8 above on pg. 6.

**Page two (2) of R & R.**

3.    Page two (2) footnote two (2) wherein the Court states, "Plaintiff's petition (with exhibits) submitted to the United States Coast Guard and the Secretary of the Interior requesting the designation of a special federal anchorage area (ECG Nos. 40-6, 40-7, 40-8, 40-9),".

Plaintiff is aware that a federal anchorage exists; see (Dkt. No. 12, Exhibit W) and as a result of such Ashley River Federal Anchorage No. 1 reduction, the USCG enacted a Special Anchorage. Plaintiff has witnessed boaters come ashore carrying: blind people, infants under two months, elderly people above 80 yrs of age, strong people but suffering indigence and thus having to row ashore.[17] Plaintiff realized that nowhere in the U.S. has the USCG issued a Special Needs Anchorage Area (SNAA). The eastern side of the Ashley River is the only suitable place of anchoring for such conditions to allow for certain people to come ashore. This Plaintiff and the neighboring vessel's owner Daryl Davis (Dkt. No. 46) cannot make safe travel to the far away anchorages nor can many others who travel to the CCHS as transient boaters which meets the diversity jurisdiction codified at 28 U.S.C. § 1332.

**Page four (4) of R & R.**

### 4. "III. DISCUSSION/ RECOMMENDATION FOR SUMMARY DISMISSAL"

On page four (4) the Magistrate states that:

i.    "Plaintiff fails to state a cognizable federal claim;"

a.    Plaintiff has stated a cognizable federal claim. Plaintiff has a federal right to use the U.S. rivers to include the Ashley River and the U.S. PTD provides that such usage is "free for all forever without tax or impost" and that such use is not to suffer act(s) of vandalism from Socha nor from loss of liberty due to algae and ludicrous insurance requirements set by

---

[17]    The strongest people alive cannot row ashore from the Ashley River Federal Anchorage No. 1 in strong currents and wind conditions with the eb and flow in opposition to their direction of travel. Coming ashore rowing has to be timed perfectly to effectuate a safe journey.

Merrill's Laws; § 20-70. Moreover, Plaintiff is entitled to enjoy a public parking lot and make payments as everyone else is allowed to do without harassment from Isom for his willfully conspiring acts in planning to purposely cause harm to plaintiff in an effort to cause Plaintiff to move his vessels as was Isom's conspiring role as an intermediator for "DNR and CCHS".

    ii.     "Plaintiff fails to assert facts to indicate that this Court possess jurisdiction in admiralty as to this case;"

        b.     This Court does possess jurisdiction in admiralty. To determine whether a federal court has admiralty subject matter jurisdiction courts apply a two-part test requiring a party to satisfy conditions of both maritime location and also a connection with maritime activity; See Grubart v. Great Lakes Dredge & Dock Co., 513 U.S. 527 (1995). The "location" portion focuses on whether the issue occurred on navigable waters or, alternatively; whether an injury suffered on land was caused by a vessel on navigable water. The "connection" inquiry further requires the court to address whether 1) the incident at issue has a potentially disruptive impact on maritime commerce, and 2) whether the general character of the activity giving rise to the incident shows a substantial relationship to a traditional maritime activity. Federal Courts have jurisdiction involving diversity of citizenship, raising federal questions, and/or sounding in admiralty.

Admiralty and maritime Subject Matter Jurisdiction relates to subject matter which the U.S. Constitution states in Article III, Section 2 that "[t]he judicial Power shall extend....to all cases of admiralty and maritime Jurisdiction...." The first statute defining the boundaries of admiralty jurisdiction was enacted in 1789 (known as the First Judiciary Act; Chapter 20, section 9, 1 Stat. 73). The current statutory grant of admiralty jurisdiction, however, can be found at 28 U.S.C. § 1331 (1), which gives federal district court's original jurisdiction over "any civil case of

admiralty or maritime jurisdiction; saving to suitors in all cases all other remedies to which they are otherwise entitled." In rem remedies against a vessel are subject to the exclusive jurisdiction of the federal courts; thus, this Court has jurisdiction.[18]

    iii.    "Defendant Tecklenburg is entitled to legislative immunity;"

    c.    This statement is in error because Tecklenburg knowingly moved to deceive others by pushing Merrill's Laws in an enactment status on May 23, 2023, without adhering to both State and Board regulatory provisions. By placing his signature on an ordinance which had only one mentioning, as opposed to reading, removed him from any immunity; (Dkt. No. 12, Exhibit J). The protection extends to "all but the plainly incompetent or those who knowingly violate the law." Malley, supra. Again, the rhetoric of 2023-097 was actually never read into the record; thus, enactment infringes upon every boaters' constitutional rights.

    iv.    "Plaintiff fails to state any claim against Defendant Wilson;"

    d.    SC law requires that when an ordinance is attacked in a complaint for its unlawfulness/ being unconstitutional that the Attorney General has to be made a party. Plaintiff's legal work was taken from his bicycle and he has lost the statute from his file which supports this statement; however, it exists.

    v.    "Defendants Isom, Socha, and Wounded Nature are not state actors under § 1983."

    e.    Both Socha and WN-WV are surely state actors; (Dkt. No. 12, Exhibit Q) which is Socha's/WN-WV's m-b which has "LAW ENFORCEMENT" painted on the side, and (Dkt. No. 36, Attachment 2 / Exhibit B at pg. 14 of transcript or 22 in the motion). Also, Plaintiff's

---

[18]    The area in which Plaintiff's vessels are anchored (Dkt. No. 12, Exhibit A) provides that no SC land attached to the U.S. navigable waters. The only land is U.S. land used by the USCG. The SC land alongside the State road, Lockwood Drive, is a section of marsh that is classified as UNDEVELOPABLE in the register of deeds office and that it is a protected bird wildlife sanctuary; nevertheless, it's all submerged at high tide and is therefore in the confinement of the PTD; and because the waters are federal the U.S. PTD, which the SC PTD mimics, is controlling.

Motion for this Court to take Judicial Notice of (Dkt. No. 37 and 48), at (Dkt. No. 61) wherein Socha's letters provide evidence that he is indeed a state actor. CCHS Board Member Mike Seekings (Seeking) apprised Plaintiff on May 9, 2023, prior to Seeking entering Stellas for dinner that he knew that Socha was vandalizing the m-b's but that the CCHS law enforcement were in close proximity viewing such (Dkt. No. 12, Ex. G at paragraph no. 30). In (Dkt. No. 40, CLAIM ONE of, paragraphs nos. 3-8) it states that a SCDNR agent along with a female DHEC agent met with Isom and Socha to discuss ways on how to get rid of Plaintiff's vessels. Their agenda is to remove Plaintiff's vessels and grab the land for their purposes of corporate expansion. Without discovery it is impossible to assert facts of Isom filing for permits to expand SHM in a SE direction; or anyone else. Nevertheless, the Defendants PLAN, including the two unknown agents of the State of SC, went into motion as soon as Isom instructed Ms. Hamilton to no longer allow for the Plaintiff to utilize the parking lot, which is owned by the CCHS and leased out to both the Beach Co. and to SHM of which all of the public is able to enjoy. In Adickes v. S. H. Kress & Co., 398 U.S. 144, 152 (4th Cir. 1970) at headnote no. 6, pg. 149 "(1) 'to deprive [her] of her right to enjoy equal treatment and service in a place of public accommodation.'" The court further held that, "Proof of an evil motive or of a specific intent to deprive a person of a constitutional right is generally not required under § 1983. Monroe v. Pape, supra, 365 U.S. at 183-187, 81 S.Ct., at 481-484." Id. at 1642.

Last, in further support that Socha is a State Actor, see **Exhibit E (Text between Socha and Russell on April 8, 2024)**. Also, Plaintiff's (Dkt. No. 40, CLAIM SEVEN, and Exhibit 6v, image of *Cirrhosis of the River/Garbage*- art installation as mentioned at 6 xxvii (ha)) provides the theory that the Defendants, in their efforts to remove land from the public, developed their PLAN to remove Plaintiff's vessels, including the art installation which reflects the realism art

being sold in Charleston as Angela Mack, Director of the Gibbes Museum, has sold electronic aided paintings and drawings to the public as paintings and drawings without disclosing that the product was not by way of natural talent and instead done by way of electronic-aided devices. In National Rifle Association of America v. Maria T. Vullo, 602 U.S. ____ (2024) Justice Jackson, concurring held "Coercion of a third party can be the means by which the government violates the First amendment rights of another." In Vullo Id. Vullo coerced various regulated entities to cut business ties with the National Rifle Association (NRA).

> "The existence of an allegation of government coercion of a third party thus merely invites, rather than answers, the question whether that coercion indirectly worked a violation of the plaintiff's First Amendment rights. Whether and how government coercion of a third party might violate another party's First Amendment rights will depend on the facts of the case. Indeed, under our precedents, determining whether government action violates the First Amendment requires application of different doctrines that vary depending on the circumstances. Different circumstances–who is being coerced to do what, and why— may implicate different First Amendment inquiries." second and third page of Justice Jackson's concurring opinion; presently not published.

Socha's cellphone communication and text; see **Exhibit F  (Excerpt of a letter dated May 12, 2022,Certified Mail Receipt Number 7021 1970 0000 3084 8817  forwarded to Isom and received by Isom)** states that he met with a SCDNR agent and a DHEC agent along with Isom to discuss ways on how to get rid of Plaintiff, and they conspired with ill will against this Plaintiff causing for him to become disengaged from a public parking lot in which he uses as many others do. In their conspiracy to remove federal public use lands their agenda was to cause harm to Plaintiff so as to force him to move away completely. In Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, at 489 "'As to civil remedies, for a violation of theses privileges, we know that when the courts of a State violate the provisions of the Constitution or the law of the United States there is now relief afforded by a review in the Federal Courts. And since the 14th

amendment forbids any State from making or enforcing any law abridging these privileges and immunities, as you cannot reach the Legislatures, the injured party should have an original action in our Federal courts, so that by injunction or by the recovery of damages he could have relief against the party who under color of such law is guilty of infringing his rights. As to the civil remedy no, I think, can object.'" (quoting Senator Frelinghuysen).

      vi.    "Defendants Wilson and Reed are entitled to Eleventh Amendment immunity in their official capacities,"

      f.    Again, SC law requires that the Attorney General is to be made a party when challenging the legality of an ordinance. Reed provided or conveyed approximately 12 acres of U.S. navigable waters to Socha who in turn moved to condemn the area. Generally, qualified immunity operates to protect law enforcement and other government officials from civil damages liability for alleged constitutional violations stemming from their discretionary functions. Anderson v. Creighton, 483 U.S. 635, 638-639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Fourth Circuit held that "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." S.P. v. City of Takoma Park, Md., 134 F.3d 260, 266 (4th Cir. 1998) (quoting Maciariello v. Sumner, 973 F.wd 295, 298 (4th Cir. 1992)). With absolutely no SC land in the vicinity, Reed provided a permit to Socha, who owns no land along the area in which he placed his development; despite that he used an address some one half mile away. Reed could not legally issue a permit under these conditions as SCCZMC must have land adjacent to the navigable water in order to pull a permit from. Here she pulled from the ICW, or federal channel, but she could not pull from an area that specifically designates "UNDEVELOPABLE" which is marsh below the U.S. navigable waters at high tide; see above at footnote no. 11. These individuals all moved in a conspiracy against this Plaintiff and the public to prevent use of

federal public use lands' FOR THEIR OWN AGENDA TO EXPAND A CORPORATE EMPIRE.[19]

       vii.   "and this Court should not exercise supplemental jurisdiction over any state law Claims."

       g.   This Court should exercise supplemental jurisdiction over the state law claims because the CCHS Livability Court does not have jurisdiction over U.S. Federal Navigable waters except by and through Merrill's Laws. The CCHS jurisdictional boundary ends at the low tide mark 5-7-140(B). The corporate jurisdictional enlargement was for abandoned vessels; for purposes of tagging those vessels and not for the harassment of liveaboards. The chopshop tactics of conversion have altered a legitimate law and have bastardized what SC Legislators intended. 28 U.S.C. 1331, and 1367 provides for supplemental jurisdiction. See Pape, supra, at 476, "The question with which we now deal is the narrower one of whether Congress, in enacting § 1979, meant to give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position. Cf. Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774; Screw v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed.1495; United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368." The court held that it did so intend.

     5.    "**A.**   **Failure to State a Claim**"

       "1.   Claim One"

          "In his first claim, Plaintiff alleges that 'according to texts and communications from [Socha and Wounded Nature]," (footnote omitted) At footnote 5, "Plaintiff has not provided such texts…"

---

[19]   Are these mentioned state actors, Socha and Isom, receiving payment from these corporations and/or job promotions? Only admittance of this action accompanied by service of process and discovery will answer such.

a.     When ruling on a motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.    And Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Bell Atlantic Corp., supra, at 555-556.    Nevertheless, if the Court finds it incredulous that Socha is of that degree of intelligence that he would not disclose the evidence and rat out his associates, then Plaintiff having provided **Exhibit** F above may alter this Court's opinion. Riding around in a watercraft/motorboat all day, occasionally stopping to piss in the river before setting out to vandalize others personal property does not require much intelligence; it only requires that for one to commit such vigilante acts that he/she must have law enforcement clearance.    These are portions of the texts, as Plaintiff would like to be able to question the Defendants in discovery without having to provide all of his evidence up front. The verbal communications (Dkt. No. 40 at CLAIM ONE No. 4) between Socha and this Plaintiff in May of 2022 concerned Socha commenting that Plaintiff would be disallowed at SHM due to his past criminal drug charge in 1992 wherein government supplied drugs, cocaine,  were being supplied to the streets of the U.S.;[20] see **Exhibit G (<u>case law supportive of the U.S. federal agents supplying the narcotic-drug supply</u>).**    During the Congressional hearings on the Iran-Contra guns for drugs exchange the question was presented to North on what was being exchanged for the guns, and North stated that he could only answer off record in the judge's chambers as it would be too embarrassing for the country.[21]    However, Socha communicated to Plaintiff that his prior conviction causes a

---

[20]     Socha posted on his social media page that all the boaters at anchor cannot rent from landlords because they are convicted felons; Plaintiff resided at 71 Church St. and  8 South Battery before living at 13 East Battery for eight years wherein he had the entire second-fourth floors to himself; including the rooftop platform.

[21]     In or around 1958 diplomats from the U.S. entered into an agreement with the country of Columbia for a supply of cocaine.  The purpose was to boost the U.S. economy as European Countries did during the opium wars whereas  Kings and Queens would saturate their countries streets with narcotics in order to acquire convictions and a workforce.  Here in the U.S. our government wanted full force factories, UNICOR, and to control the distribution of schedule I narcotics. Prior to the Reagan Administration the Courts ruled against government saturation of schedule one narcotics to the streets, however, Reagan's Administration enacted the policy to flood the streets with drugs with the rationale, so as to catch the bad guys.  This exploded the drug use from  the availability of such; and the U.S.

security risk for both the USCG and SHM; thus, he would soon no longer be allowed at the marina.

Plaintiff objects to most all of pg. 5 as Plaintiff's SAC provides in (Dkt. No. 40, CLAIM ONE at paragraphs 8-11) that Plaintiff used to pay Ms. Hamilton at her parking lot booth as many others did and still do. Plaintiff did list both Isom and Socha as State Actors as they met with law enforcement officers to devise a PLAN to get rid of the Plaintiff. At (Dkt. No. 40, CLAIM ONE at paragraph no. 15) it states that their acts were conducted under "color of law". If a choice of words of State Intermediator is more proper as the Supreme Court recently ruled on in 22-842 <u>National Rifle Association of America v. Vullo</u>, 602 U.S. _____ (2024) wherein it was unanimously held that Vullo's conduct was coercive, then Isom is a State Intermediator and Socha is a State Actor.

**Page five (5) of R & R.**

Pg. five (5) second paragraph leaves out that there are two unknown law enforcement agents.

a)    "Plaintiff appears to be attempting to assert an equal protection claim against Isom, Socha, and Wounded Nature as to his inability…"

The Magistrate omitted the law enforcement against which conspired with Socha and Isom, thus making their conspiracy to bring harm to this Plaintiff within the confines of "state actor" as set forth in <u>Kress, supra</u>. Perhaps the term "Equal Protection" is misleading and

---

economy strengthened, due to the change in policy which incidentally created millions of jobs. The similarities and difference of present day U.S. slave labor, which is allowed through our 13th Amendment, differs from that of the National Socialist Party's methods in that the NAZI's acquired their workforce by and through armed forces; whereas the American D.E.A. fills UNICOR up by way of acts of trickery as the D.E.A. generally targets the poorest areas to allow for the drugs to become distributed across to both middle and upper class neighborhoods. DAB's drawing, **see Exhibit H (<u>DAB's drawing Predetermined Incarceration</u>)** provides a clearer understanding as it depicts the similarities and differences on how governments gather their slave workforce; one at gunpoint and the other through trickery and/or the supply of narcotics of which must get distributed.

improper under the given set of facts, however, the Seventh Circuit held in <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 that a second way of equal protection class is a "class one" where the plaintiff does not allege membership in a class group. Plaintiff need only show that he/she was treated differently, not a member of a protected class, and identify that others are treated differently. (Dkt. No. 40 CLAIM ONE) provides that a group of people met, two of which are SC State Law Enforcement Officers, presently unknown as Socha's text does not identify them, wherein they formulated a PLAN to get rid of Plaintiff's vessel, including his art installation *Garbage,* whereby Isom instructed Ms. Hamilton to eject Plaintiff's vehicle from ever being allowed to continue parking as others are allowed to do; however, when asked, due to Ms. Hamilton and this Plaintiff having a good rapport, Ms. Hamilton uttered the statement, "I don't know, it has something to do with DNR and the city." Plaintiff immediately texted Socha informing Socha that this Plaintiff had been removed from the parking lot and began questioning Socha as to whether or not he falsely identified himself as a DNR agent. This communication led Socha to respond explaining that they all had met to discuss a plan on how to get rid of this Plaintiff. Socha further stated that "that was his [Isom's] doing if he went through with it; that's on him." (emphasis of name added). Dissatisfied with being discriminated against for the unlawful land grab, Plaintiff bombarded Isom with certified written letters wherein Isom threatened to terminate Ms. Hamilton's employment due to her acts in apprising this Plaintiff that the DNR and city participated in attacking this Plaintiff. The Equality Act has many provisions and due to Isom's instructions Ms. Hamilton, to date, has adhered to Isom's instructions which causes this Plaintiff to be treated differently than all other attendants who are allowed to conveniently pay monthly dues at her booth.

      b)     "He claims that SMH parking manager…"

The abbreviations for Sare Harbor Marina are: SHM as opposed to "SMH".

c)    "...Hamilton refused to accept cash payment from him, but she is not named as a defendant to this action."

Ms. Hamilton is a single mother with a teenage daughter; she will not be named a Defendant as she was and is only following the instructions from Isom. "Cash" payment isn't the issue; being able to pay at her booth is the issue. Payment can come from a multitude of different methods.

d)    "Nor has Plaintiff alleged facts to indicate that Defendant Isom is a state actor, as discussed further below."

In Monroe v. Pape, 365 U.S. 167, 5 L.Ed.2d 492, 81 S.Ct. 473 (1961), United States v. Classic, 313 U.S. 299, 326 (1941). In Adickes "Private persons, jointly engaged with state officials in the prohibited action, are acting under color of law for purposes of the statute. To act under color of law does not require that the accused be an officer of the state. United States v. Price, 383 U.S. 787, 794 (1966) 16 L.Ed. 2d at 267, 272, 86 S.Ct. 1152 (1966)." In footnote seven (7) Although price concerned a criminal prosecution involving 18 U.S.C. 242, we have previously held that under color of law means the same thing for § 1983. Monroe v. Pape, supra, at 185. § 1983 annotations: private parties may be liable under 42 U.S.C. § 1983 where the willfully participate in joint action with state officials to deprive others of their constitutional rights; to prove conspiracy between private parties and government under § 1983 agreement or meeting of the minds to violate constitutional rights must be shown. Ducy v. Meyers, 144 Fed Appx. 619 (9th Cir. 2005).

The facts specifically provided in (Dkt. 40 CLAIM ONE) support that Isom was a State Actor/Intermediator; see Vullo, supra.

e)     "Plaintiff fails to state an equal protection claim."  citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, at 439 (1985).

This case is about a special use permit being filed but denied.  The following litigation was over whether or not the city violated the applicant's equal protection rights.  "The Court of Appeals reversed, holding that mental retardation is a 'quasi-suspect' classification; that, under the applicable 'heightened-scrutiny' equal protection test, the ordinance was facially invalid because it did not substantially further an important governmental purpose; and that the ordinance was also invalid as applied."

In the case at hand no social or economic legislation is at issue.  This case is of federal public land use being converted into corporate expansion and that Plaintiffs' vessels are anchored in federal waters in which the Defendants want to possess for financial gain for others; the acts of conveying federal public use lands for private enterprise.  The Defendants conspired with an ill-will against Plaintiff with a purposeful intent to bring harm to this Plaintiff by causing for Plaintiff's vehicle to relocate so that this Plaintiff would have to relocate his vessels; the PLAN in which both Isom and Socha were State Actors to the unknown SCDNR agent and the said to be DHEC agent. Preventing Plaintiff the right to use a federal public use lands area by way of ejectment from a parking lot is a direct violation of Plaintiff's equality rights; which are protected through the Fourteenth Amendment.  Although there are no supportive cases which reach such absurdity, this Plaintiff is not suggesting that he is in a recognized protected class; see Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961). Plaintiff merely asserts that the Equality Act extends further than that of the available case law.

Human rights are rights inherent to all human beings, regardless of race, sex, nationality, ethnicity, language, religion, or any other status.  Human rights include the right to life and

liberty freedom from slavery and torture, freedom of opinion and expression, the right to work and education, and many more. The Defendants conspiracy to cause harm to this Plaintiff was with willful intent of a malicious indifference to Plaintiff's rights of not being inconvenienced of having to walk for miles to get to his vehicle, had the Defendants been successful; incidentally, the nearest lot suitable for Plaintiff's box van truck is approximately four miles away from 17 Lockwood Drive. That daily excursion would be torture. The PLAN however was formulated under the agreement that such a hardship would cause Plaintiff a degree of misery to such heightened level that Plaintiff's only option would have been to remove his vessels to a more convenient location.

In Village of Willowbrook et al. v. Olech, 528 U.S. 562, the Seventh Circuit held that "The Equal Protection Clause gives rise to a cause of action on behalf of a 'class of one' where the plaintiff does not allege membership in a class or group, but alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for such treatment. The Clause secures every person within a State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by a statute's express terms or by its improper execution." (citations omitted). Plaintiff has never stated that he is in a protected recognized class of being black, mentally disabled, and/or crippled. He merely stated that the acts of the Defendants caused for Ms. Hamilton to communicate to this Plaintiff that he could no longer park at 17 Lockwood Drive; Plaintiff's multitude of written certified letters to Isom and to the Ninth District Court Solicitor put a different tone in Isom's instructions as Plaintiff still remains being able to park in the public lot; however, he is treated differently due to how he has to make payment which differs from how he used to pay and how others are allowed to pay in a more convenient manner.

Isom's instructions to Ms. Hamilton disengaged equal treatment as Ms. Hamilton accepts payment from others for their monthly dues, however, she remains to this day refusing to accept this Plaintiff's payment. The Supreme Court Justin Harlan held that, "The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.' This second element requires that the plaintiff show that the defendant acted 'under color of law.'" Id. at 150. The Supreme Court further held that, "Although this is a lawsuit against a private party, not the State or one of its officials, our cases make clear that petitioner will have made out a violation of her Fourteenth Amendment rights and will be entitled to relief under § 1983 if she can prove that a Kress employee, in the course of employment, and a Hattiesburg policeman somehow reached an understanding to deny Miss Adickes service in the Kress store,". Id. at 152. Ms. Hamilton's response to the Plaintiff was that it has something to do with "DNR and the City."

Plaintiff completely disagrees that he has not stated some form of discrimination. (Dkt. No. 40 CLAIM ONE) meets a conspiracy to harm by way of harassment to prevent Plaintiff from enjoying life under the constraints as he is so forced to choose from limited options as he is under an economic financial state of indigence; his choices are limited to residing on his vessel in federal waters wherein the USCG has allowed. Moreover, Plaintiff is in an area where he has petitioned the U.S. Department of Interior (Secretary) for a SNAA, which all of the Defendants were informed of such by Plaintiff during their previous visits to his vessel; such act(s) as described in (Dkt. No. 40 CLAIM ONE) meets a conspiracy to harm Plaintiff by way of :

economically, personal injury, reputational, and even emotional which discriminates against Plaintiff's right to choose which public parking lot he wishes to enjoy. These acts invoke the Fourteenth Amendment and this Court's Jurisdiction since the Defendants PLAN of harming the Plaintiff had an ulterior motive of vessel removal from federal waters for a land grab.

f)     "Plaintiff has not identified any persons who are similarly situated that were allowed to pay for monthly parking in 'currency'".

The form of payment whether by credit/debit card, or by U.S. postal Money Order, or bank check is not the issue. The issue is that prior to Isom's instructions that Plaintiff can no longer park in the parking lot which caused Ms. Hamilton to stop receiving payment is the issue. Ms. Hamilton received payment from all others at her booth;[22]  which is convenient. Isom's instructions of disallowance or ejectment caused for the acts of Ms. Hamilton to no longer receive payments and thereby Plaintiff has to expend an entire morning of his time dealing with both the bank and postal staff, at a greater expense, in order to secure payment. Payment by way of a check or cash is not the inconvenience. For ten years this Plaintiff enjoyed the convenience, as all other parking customers are allowed to do, of paying his monthly parking bill at Ms. Hamilton's booth.   Ms. Hamilton's acts against this Plaintiff are from direct threats of terminating her employment from Isom; thus Isom is properly labeled a Defendant and Ms Hamilton is properly not listed a Defendant. If the operative language to be used is deprived as opposed to denied, then each has similar meanings both abridging the Plaintiff from enjoying the use of the parking lot through paying in person as others are allowed to do. Disallowing Plaintiff to perform the same, stopping at the parking booth and paying the monthly dues, is a violation of

---

[22]     The booth is owned by the Beach Co., however, it sits on land owned by the CCHS which has a lease agreement between both the Beach Co. and SHM. The booth is at the entrance/exit to the parking lot which is Ms. Hamilton's office space.

his rights of equality as the Defendants PLAN was to get Plaintiff removed as a means to cause

for Plaintiff to move his vessels so as to allow for the Defendants to condemn federal public use

lands for themselves, or for corporate expansion; which can only be proven with discovery.

Plaintiff's pleading does mention that he used to pay his monthly parking dues at the

parking booth window as all other parking customers are allowed to do, and that all others, who

chose to do so, remain being allowed to pay at the window (Dkt. No. 40 CLAIM ONE at 11).

Plaintiff is the only paying customer being violated per Isom's instructions and not from Ms.

Hamilton's choice; she either adheres to the provided instructions or else she gets terminated

from her employment. Plaintiff will not under these set of facts include her as a defendant. All

parking attendees who have vessels in the river or who work elsewhere and park at this location

pay Ms. Hamilton at her booth; Rule 8, FRCP, does not require that Plaintiff stand and gather

their names.

g)     "Nor has he alleged any facts to indicate that the alleged treatment was the
result of intentional or purposeful discrimination."

(Dkt No. 40, CLAIM ONE paragraphs no. 3-9) provide sufficient facts that indicate that

the conspiracy amongst the Defendants was willful and with a purposeful discrimination to cause

harm to Plaintiff so that he would have to move his vessels; thus, allowing for them to acquire

the federal public use lands for their agenda.


**Page six (6) of R &R.**

2.     Claim Two

Plaintiff objects to the first paragraph on page six (6) as:

**i).**    "that Defendants conspired to not allow the use of federal public land and in doing so violated his equal protection rights.  ECG No. 40 at 12-15".

The Defendants are robbing the public of federal public use lands. Reed, without providing any notice to the public as is required by SCCZMC's regulations, conveyed twelve acres of federal public use land  by way of providing  a permit  to Socha; thereafter, Socha moved by way of civil action to condemn the land.[23]   The USCG established two federal anchorages in the Ashley River, however, when the Department of Transportation provided the Beach Company with a permit to expand westerly a Special Anchorage was created SW of the International Coastal Waterway (ICW); see (Dkt. No. 51 footnote no. 9 on pg 7) also (Dkt. No. 12, Exhibit W).

**ii).**    "Plaintiff may be attempting to allege that the passage of the Ordinance and actions by Defendants somehow violates the Federal Public Trust Doctrine or impinges on the federal government's jurisdiction by taking away federal anchorage area."

Plaintiff's response is a simple yes, but in support Plaintiff states as follows:

Maritime Law allows for: one to anchor, the PTD has no time restrictions on such acts of anchoring, and  that a vessel at anchorage has rights over all encroaching vessels. Following the acts mentioned in (Dkt. No. 40 CLAIM ONE), the Defendants conveyed approximately 12 acres of U.S navigable waters to Socha who then moved to condemn the area.  The overwhelming acts of the Defendants supports that of a corporate expansion into federal public use lands; see (Dkt. No. 30 Attachment 2/Exhibit B,  newspaper article).  (Dkt. No. 40 CLAIM TWO) does discuss the various acts of the Defendants of how they moved in an effort to condemn public used lands to convert to private benefit and/or corporate gain.

---

[23]    See footnote one above.

Following Reed's acts of conveying 12 acres of U.S. navigable waters to Socha, he then moved through vigilante tactics against Ed Bulger's vessel (Dkt. No. 38), but thereafter moved through a court order against this Plaintiff to condemn the land. Once shown that it was no longer of public use the door would be open for corporate structure.

**iii).**     "Although Plaintiff claims that the USCG 'allows' anchorage on the eastern side of the Ashley, he has presented no facts to indicate that there is a federal anchorage in that area."

Plaintiff has petitioned the Secretary and is on appeal with the USCG in both SECTOR SEVEN and in Washington D.C for the area to be converted into a SNAA; (Dkt. No. 12, Ex. K ).

**iv).**     The Magistrate's statement in the Court's footnote number nine (9) is misleading.

The Plaintiff never stated that any federal anchorage had been designated on the eastern-side of the Ashley River where his vessels are anchored. Plaintiff petitioned the USCG in an effort to have the government recognize a SNAA for the disabled boaters (Dkt. No. 46 Attachment 1 /Exhibit A ); no SNAA exists anywhere in the U.S; [24] (Dkt. 12, Exhibit K ). Plaintiff petitioned the USCG and then appealed their denial to both SECTOR SEVEN and to Washington, D.C. Plaintiff also forwarded a copy of such and a separate petition to the Secretary and when Plaintiff apprised the Defendants and the CCHS they retaliated by way of Reed conveying the land/U.S. navigable waters to Socha.

The U.S. PTD provides for one to use the rivers "free and outright forever without tax or impost" and Plaintiff certainly argues that the Ordinance 2023-097 and/or Merrill's Laws are in

---

[24]     A Special Needs Anchorage area is different from a Special Anchorage and/or a Federal Anchorage; it would accommodate those who fall into disabilities, such as: elderly, blind passengers being brought ashore, or those carrying infants, or boaters with physical disabilities, and for motorless dinghies who row ashore. It would be located near a marina as opposed to a mile away.

conflict with such as Merrill's Laws require a tax to be collected every 60 days in order to use the river for anchoring purposes. Moreover, Merrill's Laws were designed to eradicate the less financially blessed from being able to enjoy the Ashley River which is evident in Merrill's addendums (§ 20-70) wherein algae is a crime for those he targets and mandating $300,000 in liability insurance despite that neither the federal regulations nor the state of SC require any amount.

It is Plaintiff's opinion that a conspiracy was formed to eradicate a certain class, the less financially stable,[25] in order to encroach upon the Federal Anchorage Area No. 1, Ashley River, so as to allow a turn around spot for large vessels; see **Exhibit I (NEEDED SPACE FOR TURNING VESSELS)**.[26]

**Page seven (7) of R & R.**

Plaintiff objects to the first sentence of page seven (7) as again the Magistrate is misrepresenting Plaintiff's Complaint.

v).     "...that the Ordinance reduced the federal anchorage area...".

Plaintiff never stated that the Ordinance reduced the anchorage as the Magistrate states, The law enforcement has used Merrill's Laws to cause boaters to flee the Charleston Ashley River Federal Anchorage No. 1 by using the Ordinance 2023-097/Merrill's Laws to evacuate

---

[25]     Increasing costs of living, unlawful and unconstitutional provisions (§ 20-70) in 2023-097, designed for the sole purpose to eradicate a certain class of people, including their vessels. Mandating a tax to use the rivers all the while creating a liability insurance policy requirement of $300,000 with daily fines in excess of $1,000/day including impoundment of one's personal property and incarceration meet the extraordinary circumstances to find inclusivity for indigence recognition within the provisions of the Act of Equality.

[26]     Recall the January 9, 2024 storm where out of the blue five vessels ended up at the Harborage Ashley Marina with one thing in common; they arrived without anchors. All vessels were located in close proximity to the large vessel in Exhibit I; the cut rodes to each was not an accident, it was by way of a vigilante who is a state actor and has a pass from law enforcement to do as he so chooses. SC Law Enforcement officers chose not to view any early morning footage of the security cameras, and if they did then they chose not to prosecute; (Dkt. No. 30 Attachment I/ Exhibit A )

boaters by threatening fines, impoundment, and incarceration see **Exhibit B.** Plaintiff opines
that due to the acts of vandalism which occurred in the early morning hours of January 9, 2024,
that such acts were orchestrated to **reduce the vessels** in that area for corporate expansion as the
engineers who designed the expanded MegaDock back in or around 2012 never considered that
the large 350' vessels needed a turning space. It's only logical that Socha was used as  a State
Intermediator or proxy for law enforcement as he cut many m-b's from vessels and their entire
rode systems to disrupt their prolonged anchoring in the federal anchorage. The actions of
Merrill in creating his own set of laws made it possible that he could **reduce the population of
boaters** by causing for a tax and other unlawful conditions; such as $300,000 in liability
insurance. Thus, a marina in desire to expand could point out to the United States Army
Corporation of Engineers (USACE)  that the space is not being utilized and that there is enough
room for their further encroachment into federal public use lands for a navigable cul de sac.

The exhibits support that the SC Legislators created a law, see **Exhibit J (SC Legislators
124th Session Bill 77);** however, the CCHS legal team removed keywords by way of scratching
through certain words in the provided for ordinance in order to give 2023-097 an entirely
different meaning than that in which SC Legislators approved. These alterations allow for
Merrill to attack the vessels in which he chooses to assault; (Dkt No. 36 Attachment 2/ Exhibit
B at pg. 11 in transcript/ 19 in exhibit ).


    **vi).**     "...and thus it is unclear what federal constitutional or statutory right was
violated."

Plaintiff does not have a seaworthy dinghy which would allow for him to make the
journey to the Federal Anchorage No. 1, however, if he did, the acts of the Defendants in

destroying anchoring systems causes for snares along the riverbed and if the anchorage is going to be reduced in size, which is Plaintiff's opinion of the overwhelming evidence above stated, that corralling boaters into a smaller area becomes a life threatening scenario in severe storm conditions. Plaintiff has  a right to use the federal waters and if he is forced to move into the federal anchorage No. 1 then he should be allowed to "enjoy" a safe anchorage as opposed to a sabotaged anchorage from Socha's acts.

Plaintiff objects to the third sentence on page seven (7) wherein the Magistrate states,

**vii).**    "However, he has alleged no facts that any ownership has transferred to these Defendants."

Blocking federal use lands does not require a title deed.  Socha moved for a State Court order to cause this Plaintiff to move his vessels so as to allow for himself to put WN-WV's m-bs in place; despite that he went around cutting and apprehending everyone else's m-bs. The Defendants' intent was to acquire this area to block others from using the federal public use lands so that they, whoever "they" are,  can eventually either expand the SHM in that direction and/or to develop a corporate mooring field; or some other corporate development. Regardless of what "they" may do with the federal public use land, their acts were in retaliation towards Plaintiff's acts in trying to get  the area designated into a SNAA; thus, Plaintiff's First Amendment rights to petition the government were violated.

Ownership can come in different forms.  Clearly DHEC is not going to deed land not theirs to give out; however, Reed conveyed the federal public use lands, approximately 12 acres of area of U.S. navigable waters, to Socha for his non-profit.  Under common sense an area that is not being used would stand for a greater chance of being approved for development; thereby,

Socha's blocking federal public use lands through the conspiring acts of Reed allows for a corporate giant to step in at a later time. See (Dkt. No. 12, Ex. W) wherein the notice for expansion of the Mega Dock was posted at federal reg. 26,149.

Plaintiff objects to the second paragraph on page seven (7) as Merrill's Laws omitted words in which SC Legislators went by in creating their statute over abandoned vessels.

**viii).** "Additionally, Plaintiff may be attempting to allege that his constitutional rights were violated based on citations he recently received from Defendant Merrill that carry penalties of over $5,000 in fines. ECG No. 40 at 15."

The words abandoned were crossed out and addendums were made so as to allow for Merrill to enforce his unconstitutional laws onto this Plaintiff and others. SC laws for the municipalities provides that their jurisdiction ends at the low tide mark as is established in 5-7-140(B); Title 50 regarding abandoned vessels extends to the center of the river which is what the 124th Session and Bill 77 of SC Legislators enacted. Liveaboard vessels are not abandoned, and the CCHS legal teams acts of omitting choice words allowed for 2023-097 to supersede SC Legislators roles in law making whereby Merrill's acts of enforcing 2023-097 is violating the rights of this Plaintiff over federal waters; in which the SC Livability Court has no jurisdiction to entertain commanding a tax to use the rivers after a fourteen days period and/or for algae offenses.[27] Neither the State of SC nor the CCHS has ever purchased the riverbeds from the Secretary as the State of Florida and California have; there those State entities had standing to legally adopt boat permit legislation. The State of SC, nor the CCHS do not have that right.

---

[27] Merrill issued Plaintiff over $15,000 in fines for the same offenses and was instructed by Ms. Mallery Shreen to fine Plaintiff daily at $3,000/day. During the issuance of such on June 17, 2024, Plaintiff questioned Merrill if he scratched through the words which thereby alters the SC Legislators intent, and Merrill stated that the CCHS legal team did the chopshop tactics on the approved rhetoric in 2023-097; and that he merely created the addendums including making it a law to have $300,000 in liability insurance.

Plaintiff objects to the second paragraph on page seven (7) as to the conclusion drawn from the Magistrate.

**ix).** "Any such claims concerning these pending citations should be dismissed. Federal courts, absent extraordinary circumstances, are not authorized to interfere with a State's pending criminal proceedings. See <u>Younger v. Harris</u>, 401 U.S. 37, 44 (1971); <u>Cinema Blue of Charlotte, Inc. v. Gilchrist</u>, 887 F.2d 49, 50-53 (4th Cir. 1989)."

Plaintiff objects as this Court should find that extraordinary circumstances do exist to enable this Court to enter judgment on a 28 U.S.C. § 2283 MOTION. Since the SC criminal Livability Court has no jurisdiction then this Federal Court is the only Court with jurisdiction and therefore this creates the extraordinary circumstances found in <u>Younger v. Harris</u>, 401 U.S. 37, 44 (1971). No adequate remedy at law exists in the state courts and this Plaintiff will surely suffer irreparable injury if this Court denies relief.

In <u>Younger</u> at footnote five [5] it states, "We have already held that § 1983 requires no exhaustion of state remedies. <u>McNeese v. Board of Education</u>, 373 U.S. 668." Further in Justice Stewart and Harlan's concurring opinion they hold that intervention into a state action through 28 U.S.C. § 2283 is proper under "Such circumstances exist only when there is a threat of irreparable injury 'both great and immediate.' A threat of this nature might be shown if the state criminal statute in question were patently and flagrantly unconstitutional on its face, ante, at 53-54; <u>cf</u>. <u>Evers v. Dwyer</u>, 358 U.S. 202, or if there has been bad faith and harassment —official lawlessness — in a statute's enforcement, ante, at 47-49. In such circumstances the reasons of policy for deferring to state adjudication are outweighed by the injury flowing from the very

bringing of the state proceedings, by the perversion of the very process that is supposed to provide vindication, and by the need for speedy and effective action to protect federal rights. Cf. Georgia v. Rachel, 384 U.S. 780."

In further support in Younger Justices Brennan, White, and Marshall join by providing Dombrowski v. Pfister, 380 U.S. 479, 487. "Dombrowski governs statutes which are a blunder buss by themselves or when used en masse- those that have an 'overbroad' sweep." The other matters mentioned of "'chilling effect upon the exercise of First Amendment rights' caused by state prosecutions," (omitted period and substituted with comma) are overbroad, narrow, or unconstitutional on its face; relying on Justice Butler in Terrace v. Thompson, 263 U.S. 197, 214:

> "'Equity jurisdiction will be exercised to enjoin the threatened enforcement of a state law which contravene the Federal Constitution wherever it is essential in order effectually to protect property rights and the rights of persons against injuries otherwise irremediable; and in such a case a person, who as an officer of the State is clothed with the duty of enforcing its laws and who threatens and is about to commence proceedings, either civil or criminal, to enforce such a law against parties affected, may be enjoined from such action by a federal court of equity.'"

"The 'anti-injunction' statute, 28 U.S.C. § 2283, is not a bar to a federal injunction under these circumstances." Id. at 60.


## OVERVIEW OF 2023-097

a)      S.C. Legislators 124th Session Bill 77 adopted certain addendums to abandoned vessels; **see Exhibit J (SC Legislators 124th Session Bill 77).**

b)      House of Representative Elizabeth Spencer Wetmore acquired an inclusion for entities to adopt an ordinance for permitting abandoned vessels.

c)      Merrill acquires a copy of City of Folly Beach's (CoFB) ordinance wherein the CCHS legal department performed a hack job on its intent by omitting words by and through scratching them out; thus altering its intent (Dkt. No. 12, Exhibit J ).

d)      Merrill then added his addendums (§ 20-70) criminalizing: Algae, debris, and mandating a liability insurance policy of not less than $300,000; despite that neither federal nor state regulations require such.

e)      On May 9, 2023, the Board motioned on 2023-097.  The Board never had a proper reading and no notice was ever provided to the public; except inadequate notice of putting the word "Safety" in the Post and Courier on May 8, 2023; (Dkt. No. 36  Attachment  5 / Exhibit E).

f)      On May 23, 2023, Tecklenburg enacted 2023-097 without ever having a single reading of the ordinance; see **Exhibit K (Tecklenburg's counsel's Answer To Plaintiff's Amended Complaint (Dkt. No. 14 and 15))**,  **Exhibit L (Ordinance 2023-097)**, **Exhibit M (Chp. 21 Division IV § 20-70)**, **and Exhibit N (Minutes of May 23, 2023)**.

g)      Merrill commenced with threatening impounding the personal property, peoples homes-their vessels, and threatening their rights of liberty by way of incarceration.

SC Code § 5-7-270 Form and procedures for introducing and passing ordinances.

> "Every proposed ordinance shall be introduced in writing and in the form required for final adoption.  Each municipality shall by ordinance establish its own rules and procedures as to adoption of ordinance.  No ordinance shall have the force of law until it shall have been read two times on two separate days with at least six days between each reading."

"A municipal ordinance may be amended at the time of a second reading." 1986 Op Atty Ge, No. 86-117,  pg. 343.

It's noteworthy to mention that during the 143rd Board meeting of May 9th, 2023, that the proposed ordinance was never actually read into the record. The opening reflects that no one even read it, "to amend Division 4 regarding **abandoned boats** and watercraft. **If you looked at your agenda,** you would notice the **strikeouts** and highlights associated with that. **This is an ordinance** that we are hoping will make it a whole lot easier **to identify abandoned** boats in the waterways, our two officers who are mainly responsible for patrolling this. This also is an update and, hopefully, we will have much more teeth in **identifying** the owners of these **abandoned boats** and getting them out of our waterway, so we also made **a recommendation that we approve that,** as well." (emphasis added), (Dkt. No. 36 Attachment 2 / Exhibit B).

Clearly this is for "abandoned" vessels and it has nothing to do with transient and/or liveaboards. However, it is facially unconstitutional and law enforcement is going around issuing excessive fines and threatening arrests against those who do not comply with Merrill's demands; See (Dkt. No. 59 pgs. 17-19, 33-34 paragraphs nos. 1-4) regarding Merrill verbally threatening arrest to a transient boater's wife over the telephone who was in the State of Michigan. This act alone is supportive of Diversity of Citizenship.

h)    Plaintiff attempted to stop 2023-097 by way of filing with the Board his objections on June 1 and 7, 2023; see (Dkt. No. 12, Exhibit T). However Tecklenburg had already provided his signed approval of endorsement despite that no reading had every actually been held. The Board acts of monkeying around with the document and then after discussing how fast Merrill's vessel would travel merely motioned to accept it; however, nothing was ever read into the record which supports complete monkey business. There is no way without

discovery to determine if Algae , during the May 9th hearing, had been made a crime; Plaintiff now has over $20,000 in fines which violates his Eighth Amendment Rights of excessive fines.[28]

    i)    Merrill began threatening impounding vessels and arresting those who would not agree to sign up for his boating permit plan; including getting insurance that is not required by any law but his own made up provisions; see **Exhibit B (Corresponding text between Merrill and one Russell Bronski)**.[29]

## 28 U.S.C. § 2283

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."  Merrill's Laws should be void for vagueness and overbreadth in violation of the First and Fourteenth Amendments."

The CCHS and/or Merrill extended its corporate jurisdiction by omitting the word "Abandoned" from SC Legislators intent and thereby target all vessels; commanding a tax to be paid to CCHS and to contact an insurance company.  CCHS municipal jurisdiction ends at the low tide mark; SC Code § 5-7-140(B).  Before a federal court will enjoin a pending state court proceeding there must be some reason to believe that there will be an abuse of power; not just a mere allegation.  Wilson b. Simon, N.D. Ill., 299 F. Supp 305 (1969).  Federal injunction is proper here in this case as 2023-097, Merrill's Laws, are on its face vague and overly broad in violation of the First Amendment.  Moreover, bad, faith, and harassment exist as the ordinance

---

[28]    As mentioned above in footnote no. 8, Merrill stated that the prosecutor has instructed him to issue $ 3,300/day against this Plaintiff.

[29]    Many boaters have informed this Plaintiff that Merrill either threatened them with arrest and/or that he would impound their vessel(s), however, they remain too afraid to provide an affidavit. See (Dkt. No. 59 at pgs. 33-35)  wherein Socha acquired title to a vessel by threatening arrest. That communication from Socha is further supportive that he is a State Actor.

was actually never read and it moves outside the corporate boundary of Charleston by way of unlawful acts; 42 U.S.C. § 1983 states:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Ordinance 2023-097 is unlawful and unconstitutional which standing alone is insufficient to invoke injunctive relief; see Beal v. Missouri Pacific Railroad Corp., 312 U.S. 45, 49  A federal court may grant a preliminary injunction to enjoin a state criminal proceeding if the movant can satisfy three requirements: first, that the relief sought falls within an exception to the Anti-Injunction Act, 28 U.S.C. § 2283; second, that the movant has met the standards in Younger v. Harris, 401 U.S. 37, 43-46, 91 S.Ct. 746, 750-52 (1971) for authority to enjoin the action; and, third that in the particular circumstances of the case the injunction is proper as set forth in the four-part standard of Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 196 (4th Cir. 1977).  Failure to meet any one of the three requirements is fatal to the request for a preliminary injunction.

The Anti-Injunction act is only one of the three barriers to federal court injunctions, the movant must also satisfy the Younger and Blackwelder standards.  Younger stands for the proposition that the principles of equity and comity prevent federal courts from interfering with pending state court criminal actions except in "unusual circumstance."  401 U.S. at 57, 91 S.Ct. at 755. "A state court criminal proceeding may be enjoined only if the party requesting the relief can show that the party stands to suffer irreparable injury that is 'both great and immediate,' and that the threatened injury relates to his 'federally protected rights…[which] cannot be eliminated

by his defense against a single criminal prosecution.'" 401 U.S. at 47, 91 S.Ct. at 751; Cf.

Cinema Blue of Charlotte, Inc. v. Gilchrist, 887 F.2d 49, 52-54 (4th Cir. 1989) (applying Younger

abstention where the defendants'/movants' constitutional defenses could be adequately addressed

by their defense in the state criminal action and where none of the exceptions to Younger

abstention was present). The Court in Younger stressed that the mere "cost, anxiety, and

inconvenience of having to defend against a single criminal prosecution" is not sufficient to

constitute irreparable injury. 401 U.S. at 47, 91 S.Ct. at 751. Absent the "usual prerequisites of

bad faith and harassment" there are very limited circumstances when a federal court should act to

enjoin a state criminal prosecution.

     The final hurdle to overcome in pursuit of a preliminary injunction is the satisfaction of

the standards outlined in Blackwelder; which made it clear that a court must measure a motion

for preliminary injunction by a balance of hardships test. Id. at 194; Rum Creek Coal Sales, Inc.

v. Caperton, 926 F.2d 353, 359 (4th Cir. 1991). In so doing, a court must consider four factors: 1.

the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; 2. the

Likelihood of harm to the defendant if the requested relief is granted; 3. the likelihood that the

plaintiff will succeed on the merits, and 4. the public interest. Rum Creek, at 359. These factors

do not stand alone; rather, the factors must be seen as flexible and interrelated; Blackwelder, 550

F.2d at 196. However, of the four factors, irreparable harm to plaintiff and the harm to defendant

are the most important. Rum Creek at 359. Where irreparable harm may only be characterized

as "possible," the other factors then become more decisive. Blackwelder, at 195. Stated another

way, the importance of probability of success increases as the probability of irreparable injury

diminishes. Id. The public interest must always be considered. Id. However, that factor is often

treated by the courts in a very cursory manner, and does not often alter the outcome dictated by a sound consideration of the other factors.  Rum Creek at 367.

The purpose of the unlawful and unconstitutional ordinance was a conspiracy amongst a certain group of unknown individuals associated with Tecklenburg and/or certain Board members who set out to have 2023-097 enacted, without any lawful process, for purposes of harassing boaters through CCHS law enforcement to cause for the boaters to flee the area so as to allow for both the CCHS and/or for the marinas to expand by taking federal public use lands; thus, it is a tool used for prying away for corporate acceleration.  Plaintiff has satisfied the Younger standard for injunction by providing that the CCHS's legal team hacked or committed a chop shop job on the SC Legislators intent; altering or superseding legislators intent is unlawful. The intent of SC Legislators did not intend for Merrill to ride around threatening arrest and impoundment for failure to acquire $300,000 in insurance. Plaintiff is presently discombobulated with being an algae-tizer suffering over $20,000 in fines; and Merrill stated that he was instructed by prosecutor Sheer to commence with an additional $3,300/day against this Plaintiff.

The above mentioned acts and facts warrant for this U.S. District Court to step in an as their acts qualify as an exception to the Anti-Injunction Act, and the standards set forth in Younger and Blackwelder have been established to warrant relief for this Plaintiff to enjoin the CCHS Livability Court and/or 2023-097 and Merrill's addendum at (§ 20-70).  In The Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 346 (4th Cir. 2009) The Fourth Circuit applied the stricter test as set forth in Winter v. Natural Resources Defense Council, 555 U.S. 7, 129 S.Ct. 365, 374-76, 176 L.Ed.2d 249 (2008).  The set of facts in this case at hand meet the stricter test in which the Supreme Court relied on in Winter; the CCHS: 1) Altered SC Legislators intent by removing the word "Abandoned". 2) Held a hearing on 2023-097 without notice to the public. 3)

Inserted Merrill's addendums; thus broadening SC Legislators intent. 4) Never actually reading the rhetoric into the record; thus, no reading was ever performed. 5) If Councilmember Shadid's opening statement, above on pg. 6, constitutes a reading then it supports that no one else ever read it. 6) Without following State regulations of having a three reading requirement it was signed into law on May 23, 2023, increasing the corporate boundary of CCHS even though they don't own the riverbeds and despite that SC Code § 5-7-140 (B) stops their jurisdiction at the low tide mark. 7) Thereafter, Merrill commences with fines threatening incarceration and impoundment along with his sidekick Socha who also threatens people forcing them to surrender their titles to their vessels.[30]

**x).**     "Plaintiff may raise his claims about any pending criminal citations, including any equal protection, due process, and excessive fine claims, in the state court."

This statement is true, however, the CCHS Livability Court has no jurisdiction over federal waters wherein they acquired jurisdiction only through this unlawful and unconstitutional ordinance which is patently flagrantly overboard.     Federal intervention is proper where allegations of persecution or harassment under facially unconstitutional statutes should be sufficient for the exercise of federal equity powers.

Page 7. Clarification:

---

[30]     In (Dkt. No. 12 at Exhibit G) Plaintiff mentions where Socha had an alcoholic sign over his vessel to him and had a Last Will And Testament prepared to orchestrate this. Steve Isbin could not even stand to his own feet and on numerous occasions other boaters would have to drop by to get Steve up on his feet. In his drunken state of condition Socha acquired his vessel under those circumstances. Isbin's vessel was said to have a value of $140,000. Socha is said to have informed Isbin's family members that the vessel was going to have be scrapped at a great expense because it was worthless. Socha informed this Plaintiff that the vessel was garbage and filled with Isbin's feces.

xi).    "Plaintiff also complains about a lawsuit filed against him by Socha in state court asking that he be ordered to move.  He provides little detail about the state court action and it is unclear what federal rights he is alleging as to that lawsuit (case number 2023cv1011501026) which _____

**Page eight (8) of R & R.**

_____Charleston County records indicate was filed by private actor Wounded Nature (not Socha) in the small claims court and was dismissed with prejudice in August 2023."

Plaintiff objects to the Magistrate's persistence in wanting to label Socha as a "private actor."  The mere fact that SCCZMC conveyed 12 acres of U.S. Navigable water to Socha and/or his non-profit proves that he is a State Actor; see **Exhibit E.** Socha has "LAW ENFORCEMENT" affixed to the side of his m-b (Dkt. No. 12, Exhibit Q).  The purpose of Socha's acts in filing the lawsuit, granted it was filed under his non-profit's name with his signature, was so that he could condemn the federal public use area for himself for the later transfer to corporate expansion. Once Socha had established his development (Dkt. No. 12, Exhibit Y) any transient boaters that happened to want to anchor in the area would have been ran off.  The details in that case are very simple, litigation was pending in this Court of Equity so Plaintiff merely pointed that out to the Magistrate through Rule 12 (b)(8) South Carolina Rules of Civil Procedure (SCRCP).

Plaintiff objects to the first paragraph on page eight (8) as the PTD allows for Plaintiff the use of the rivers by way of enjoyment; not continual bombardment from harassing tactics of the Defendants whose desire is to condemn the land for corporate expansion.  This Court of Equity could enjoin the CCHS's Livabiltiy court as jurisdiction is only proper in federal court 42 U.S.C.

§ 1983, 28 U.S.C. 1331, 1343, and the Declaratory Judgment Act, 28 U.S.C. 2201, 2202 and that the CCHS jurisdiction stops at the low tide mark as is set forth in SC Code § 5-7-140(B)[31]. Venue is proper in the United States Court for the District of South Carolina under 28 U.S.C. § 1391(b)(2) because the acts to this lawsuit occurred in this judicial district. The District is also an appropriate venue under 28 U.S.C. § 1391(b)(1) because the Defendants reside and do business in this judicial district. Last, admiralty and maritime jurisdiction of the United States of America within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure (FRCP).

Venue is proper in this Court pursuant to Rule F(9) FRCP, Supplemental Rules for Admiralty or Maritime Claims. Last, Venue is proper in the Charleston division under Local rule 3.01 because the Defendants reside in this division and a substantial portion of the events or omissions giving rise to the claims occurred in this division.

    **xii).** "Plaintiff also complains about a lawsuit (case number 2023CP1005590) filed in the Court of Common Pleas for Charleston County (case number 2023CP1005590) which imposes fines of $1,000 per day and incarceration for failure to move."

    First, "County" is incorrect. It's City; CCHS.


    Counsel John Robinson filed on behalf of the CCHS a lawsuit, 2023CP1005590 against Plaintiff in 2023; and over 120 days later it was mailed to Plaintiff which was received, however the 140 days delay warrants a violation of Rule 4, SCRCP. This lawsuit is founded off of Merrill's Laws- Algae/Debris.

---

[31]    S.C. Code § 5-7-140(B) provides for a cities corporate jurisdictional boundary, which states: "The corporate limits of any municipality bordering on the high-water mark of a navigable body of water, other than the Atlantic Ocean, are extended to include all that area lying between the high-water mark and the low-water mark. These areas are subject to all of the ordinances and regulations that may be applicable to the areas lying within the corporate limits of the municipality, and the municipal courts have jurisdiction to publish individuals violating the provisions of the municipal ordinances where the misdemeanor occurred in the area defined in this section."

## **BACKGROUND FACTS**

Throughout 2018-2023 Socha removed 144 vessels from the Charleston rivers (Dkt. No. 36, Attachment 2 /Exhibit B at pg. 14 of transcript or pg. 22 of exhibit ) and Plaintiff opines that such removal was done without due process; (Dkt. No. 12  Exhibit G, paragraph no. 6) wherein Floyd  communicated to the Plaintiff that he was afraid to haul another vessel for Socha as many are in very good condition and that they are very expensive vessels.

Following the removal of those mentioned 145 vessels,  Socha posted on his social media page that it was a violation of DHEC's Reg. 30 to use a m-b unless permission was first received from DHEC.  Soon thereafter, Socha, having provided his notice to the public, commenced with seizing m-b's; see (Dkt. No. 12, Exhibit G) and (Dkt. No. 40, CLAIM THREE); also, (Dkt. No. 47, Attachment 2/ Exhibit B).  Socha and others met in a CCHS bar and were celebrating their victory; and their defeat as they blurted out that they got everyone removed except DAB.[32] Following this Socha and Merrill acquired a copy of CofFB's ordinance which became a statute for abandoned vessels in SC's Legislator 124th Session, Bill 77; **Exhibit J.**

Both Merrill and Socha were televised on May 9, 2023, on local WCSC-TV (channel 5) boasting about how they were going to get rid of Plaintiff's vessels.  Later on that same day they both attended the Board Meeting and were able to get Merrill's Laws accepted by way of a first showing/mentioning, as opposed to an actual reading; (Dkt. No. 36, Attachment 2/ Exhibit B ). No other (lawfully required) readings were held, and on May 23, 2023, Tecklenburg signed the ordinance, thus enacting it; properly referenced in this action as Merrill's Laws.  Prior to enforcing Merrill's Laws and following the Board's acts of motioning on Merrill's Laws without

---

[32]      This Plaintiff uses his initials for identification in his profession; thus, DAB is an acronym. Plaintiff tries to make a living as an artist, however, he is blacklisted from all galleries including the Gibbes Museum of Art for disclosing the truth about the electric-aided technology being used to render most all of the realism work shown here in Charleston; including electronic aided drawings from both Mary Whyte and Jill Hooper.

providing adequate notice to the public, Plaintiff forwarded objections to the Board (Dkt. No. 12, Exhibit T) apprising the Board Members of his petition before the USCG and the Secretary on a SNAA; Plaintiff had apprised Socha, Merrill, and SCDNR agents of these Petitions years prior.

On June 7, 2023, William Ladue (Ladue) and Officer Wait, both with SCDNR, informed Plaintiff that the area along the eastern side of the Ashley River parallel with Lockwood Drive had been approved for a Law Enforcement training center and that they were there to tow Plaintiff's vessels, through the assistance of the USCG First Petty Officer Jason Reiling. The Plaintiff properly denied the tow and immediately went to the public library to confirm that no notice was provided to the public concerning Ladue's communications above mentioned; nor were there any permits pending in either the federal regulations and/or with the DHEC permit listings. On or around July 18, 2023, Plaintiff was served process by Socha for a civil action commanding that Plaintiff move so that Socha could develop the area to allow for Socha to condemn the area. Thereafter, Socha vandalized *TITI IV* (Dkt. No. 37); (Dkt. No. 12, Exhibit G, at paragraph no. 22) and October 2023 addendum with Ed Bulger's email; (Dkt. No. ? ).[33] DHEC conveyed 12 acres of U.S. navigable waters to a private citizen who owns no land in the area; and performed such without notice to the public. Moreover, no land exists in the area to even pull a permit from. Last, without any notice to the public this conveyance was effectuated.

Shortly after the January 9, 2024, storm which carried *TITI IV* and other vessels careening into The Harborage at Ashley Marina. Numerous vessels arrived without rodes attached to anchors; their rodes had been vandalized. No investigation was held regarding viewing the security cameras of the early morning hours of January 9, 2023, from 3-5 a.m. concerning the vessels that breached. Except *TITI IV,* all vessels were in the area directly across

---

[33]     The addendum does not appear on the Court's electronic docket sheet.

from the newly expanded MegaDock end area which is the end that is closer to the James Island connector bridge; see **Exhibit I**. Following the January 9th, 2024, storm, Merrill commenced with his enforcement of his laws. Numerous people departed for fear of impoundment of their vessels, and others fled stating that they were informed that they would be incarcerated. Merrill and Socha used threatening tactics to get boaters to acquire a liability insurance policy of $300,000 despite that neither the federal regulations nor the State of SC requires any insurance at all for sailboats. Merrill even threatened college students that he would pull them from their classes to issue them a citation.[34] These individuals did not have the necessary funds to afford the insurance policy Tecklenburg enacted, however, they were able to borrow the necessary amount to meet the $300,000 requirement. Plaintiff received five (5) citations on April 2, 2024, totalling over $5,000 in fines with possibly 150 days in jail and $1,000/day continuance of being in violation of Merrill's Laws regarding algae crimes; and on June 17, 2024, Plaintiff received over $15,000 in fines.

## DISCUSSION

SC Code § 5-7-140(B) provides CCHS Corporate jurisdiction which states that it ends at the low tide mark. Plaintiff's vessels (Dkt. No. 12, Exhibit A) indicates a topographical view and that it supports that no SC land exists except the SC State Road; Lockwood Drive. The nearest land is that of the USCG Ashley River base station; so this action can only be properly litigated in this Court of Equity as Merrill's Laws are impotent; SC Code § 5-7-270 holds that an ordinance has no legal authority if only one reading was executed in the enactment of the

---

[34]    They claim that Merrill threatened arrest if they didn't sign up for the permit; Merrill's voice recorded message to the college student does state that he will pull them from their classes and issue citations; (Dkt. No. 59 at pg. 35 no. 4 ).

ordinance; see **Exhibit K (Tecklenburg's Counsel's Answer To Plaintiff's Amended Complaint)**.

Notwithstanding the provisions of maritime law, a federal court may grant a preliminary injunction to enjoin a state criminal court proceeding if the Plaintiff can satisfy three requirements; first, that the relief sought falls within an exception to the Anti-Injunction Act, 28 U.S.C. § 2283;[35] second, that the Plaintiff has met the standards in Younger, supra for authority to enjoin the action; and, third that in the particular circumstances of the case the injunction is proper as set forth in the four-part standard of Blackwelder, supra. Failure to meet any one of the three requirements is fatal to the request for a preliminary injunction. The stricter requirements as set forth in Winter, supra are met in the case at hand.

The Anti-Injunction Act is only one of three barriers to federal court injunctions- the Plaintiff must also satisfy the Younger and Blackwelder Standards. Younger stands for the proposition that the principles of equity and comity prevent federal courts from interfering with pending State court criminal actions except in "unusual circumstances." Id. at 57. A state court criminal proceeding may be enjoined only if the party requesting the relief can show that the party stands to suffer irreparable injury that is "both great and immediate," and that the threatened injury relates to his "federally protected rights …. [which] cannot be eliminated by his defense against a single criminal prosecution." Id. at 47; Cf. Cinema Blue of Charlotte, Inc. v. Gilchrist, 887 F.wd 49, 52-54 (4th Cir. 1989) (applying Younger abstention where the Plaintiff's constitutional defenses could be adequately addressed by their defense in the CCHS Livability Court and where the facts in the case at hand the exceptions to Younger abstention are present). Merrill wrote the rhetoric and possibly removed keywords to change the substance of

---

[35]    The Anti-Injunction Act, 28 U.S.C. § 2283, provides: A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction , or to protest or effectuate its judgments.

SC Legislatures intent, then he and Tecklenburg created, without any notice to the public and/or possibly to the Board, the ordinance, 2023-097 — Merrill's Laws.

Following were Merrill's and Socha's threats of impoundment and incarceration. During this period Merrill issued numerous citations violating the rights of many as this Plaintiff has a constitutional right to liberty and through the PTD enjoyment of the use of the rivers; not continual threats and attacks of incarceration over algae and/or refusing to pay a tax to use the rivers; (Dkt. No. 18). The prerequisite of "bad faith and harassment" are thus met and irreparable harm would ensue as Plaintiff is indigent and under a ruling to impound Plaintiff's vessels would surely result in Plaintiff having to move to the streets.[36] Plaintiff resided in his

---

[36]     Plaintiff arrived in CCHS in July of 2005, the day before the opening ceremony of the Arther Ravenel, Jr. Bridge wherein Mt. The Pleasant Police Department seized Plaintiff's paints and Minolta camera as possible C-4 plastic explosives and a bomb mechanism device. Officer Sanchez was the first officer on the scene at Plaintiff's easel, aft of the Motley Rice Law Firm, wherein Sanchez asked from Plaintiff to what he was doing; (an easel stood erected with a canvas positioned and mounted atop, and Plaintiff stood with paint brush in hand rendering a painting of the Arther Ravenel Jr. bridge). Plaintiff replied, "I'm playing basketball, what does it look like?" Sanchez responded, "What's that?" pointing to the camera and tripod, and then stating "It looks like a bomb mechanism device." Plaintiff replied, "It's my camera mounted on a tripod, if it is a bomb mechanism device what could I blow up from here?" Sanchez responded, "The bridge." Plaintiff replied, "I've seen enough war movies and when the smoke clears from an aerial assault with hundreds of bombs dropping the bridge is still standing. I'm a quarter of a mile from the bridge, I could only blow myself and this pluff mud up." Sanches then alerted for backup and this Plaintiff and his oil paints and camera were seized and detained. Plaintiff was carried to a nearby baseball field wherein SLED agents initiated interrogation. The following day Plaintiff's items were returned after SLED confirmed that the oil paints were indeed just that, and that the camera was indeed a Minolta 35mm film camera; however, the film was destroyed. Priorly this Plaintiff had been living at the Supreme Courthouse of SC through an arrangement with former SC Supreme Court Justice Moore, wherein Plaintiff was rendering a painting of the SC Supreme Courthouse and Justice Moore's right hand signing an order. During this project Plaintiff met leading counsel from the Motley Rice Law Firm who invited Plaintiff to travel to Charleston to render the Arthur Ravenel Jr. Bridge from behind their office. After the police invasion, Plaintiff was asked to leave their premises. Plaintiff was also asked to leave the SC Supreme Courthouse by former security guard Strickland as he mentioned that the leading Clerk discovered that Plaintiff had a drug conviction and therefore could no longer stay on the premises of the SC Supreme Courthouse; Moore was on his vacation during this ousting instructions.

    Moore was an associate with Plaintiff's grandmother who was friend's with Moore's aunt; Mrs. Nelson of Indian Mound Rd. in Laurens, SC. Moore would always make a yearly journey up from Greenwood, SC, to sample lemon pie at a homecoming at the Mt. Pleasant Baptist Church. Plaintiff's mother was employed at the First National Tower Brandon and Dorsey Law Firm in Atlanta, Ga. wherein she worked directly with Hugh M. Dorsey, Jr., and between eating lemon pie and discussing Rabun Creek along with minor legal discussions, Moore invited Plaintiff to render the SC Supreme Courthouse. Plaintiff also participated in rendering a scene of the White Point Gardens while SC Supreme Court Justice Toal performed a wedding ceremony for one of her former law clerks.

    Plaintiff had a mansion to live in at 71 Church St. as he was rendering a painting for the owners of that family, however, he was working 18 hour shifts at Church and Queen on the St. Philip's Church project (Dkt. No. 40 6xxix, id ). Not until Officer Reyna of the CCHS police department requested for Plaintiff to move his vehicle, truck, to the East Battery due to the acts of resident Janet Philips, who kept calling the police every two hours trying to get this Plaintiff arrested for painting, did the Plaintiff depart the intersection except that he left his painting and

truck at the intersection of Church and Queen after departing the Motley Rice Law Firm wherein he rendered the St. Philip's Church painting. Homelessness and/or incarceration meets the exception to the <u>Younger</u> abstention doctrine, and due to the bad faith of Merrill's unlawful and unconstitutional act(s) it would be appropriate for this Court in this present case to abstain the CCHS Livability Court's action over algae and Plaintiff's refusal to pay a tax to use the rivers (Dkt. No. 18).

Evidence which would be presented during a hearing is that "irreparable injury" would result to Plaintiff if having to litigate before the CCHS Livability Court as any appeals and motions for stay would not ensure that Socha would not adhere to such legal proceedings and the State courts lack of jurisdiction over the federal waters to enjoin Socha from his acts of vandalism. This Plaintiff would suffer incarceration and loss of all of his property to further suffer homelessness should this Court of Equity not find "irreparable injury," as referred to in <u>Blackwelder</u>. The public interest in this instance concerns not only the Plaintiff's rights provided from the PTD, but the broader public interest with transient boaters being attacked by Merrill's Laws. Merrill's acts are in direct violation to the State of SC and federal regulations and thereby such unlawfulness does tip the scales decidedly in favor of the requested relief.

In the present case, Plaintiff suffers having to defend against groundless criminal charges against algae; thus, the prosecution is brought in bad faith, and as such, should be enjoined by this Court. The facts in this case qualify as an exception to the Anti-Injunction act, regarding

---

easel there on site as Officer Reyna placed it under their watch; the easel and painting remained there from July 18,-September 10, 2005. Pursuant to Reyna's instructions, the Plaintiff drove his truck to the East Battery and commenced with a painting from the early hours from midnight to around 4:30 a.m. and then in the day he rendered the junior regatta race. It was while painting there that Charles Duell called the CCHS police department in an effort to get Plaintiff arrested for painting from the high wall of the East Battery. When neighbor Edith Corry received word of Duell's acts she invited Plaintiff to come render a painting for her; Plaintiff ended up moving in and staying there with her for eight years. Edith took Plaintiff as her date to Duell's annual Christmas party, and she was never invited again.

jurisdiction and the standards set forth in <u>Younger</u> , <u>Blackwelder</u> , and <u>Winter</u> are established to warrant relief.

xiii).    "However, that lawsuit  was filed by the City of Charleston and the State of South Carolina, neither of which are named as Defendants in this action."

Plaintiff has no knowledge of the State of South Carolina being involved in the case. The CCHS has filed action in the Court of Common Pleas, however, Plaintiff to date has not received service of process.   And the CCHS Livability Court has imposed over $20,000 in fines for possessing algae and for refusing to pay a tax to use the river.  If Plaintiff brought the CCHS in at such an early stage in the 1983 action it might be considered premature; thus, at the proper time with motion for leave to amend, then  Plaintiff will attach all Defendants to this action.

xiv).    "Moreover, to the extent Plaintiff may be attempting to ask this Court to stay a state court proceeding or he is otherwise asking for injunctive relief in his state court cases, such a request for injunctive relief is barred by the federal Anti-Injunction Act (Act) which provides that '[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.' 28 U.S.C. § 2283."

Plaintiff is precisely requesting that the Court enjoin the CCHS's Livability Court as the Ordinance was never actually read into the record of the Board's minutes and the actual law that was approved by the SC Senate is not what they approved to be adopted; thus, what went before the Board on May 9, 2023, is not only illegal but it's void as a matter of law.  See above pages for facts and argument, beginning on page 36,  on why 28 U.S.C. § 2283 is appropriate under these circumstances in this case.

**Page eight (8) of R & R.**

"3.    Claim Three"

Plaintiff agrees with what is stated beneath this section, but takes exception with the last two lines on page eight (8).

**xv).**    "Here, Plaintiff fails to allege any violation of his federal statutory or constitutional rights as to Socha putting information out on his social media page claiming that something is  a violation of DHEC violation. And as to the potential safety hazard, Plaintiff merely appears to be complaining about speculative harm." and    "In his request for relief, Petitioner states that he believes that Socha cut the easterly rode of his vessel (*Cirrhosis of the River*) on an unspecified date, it was not discovered until after Hurricane Ian passed, and the alleged incident caused Plaintiff $1,500 in actual damages and loss of employment for the week while he helped disentangle vessels. ECF No. 40 at 33.  Plaintiff's claims are subject to summary dismissal because Plaintiff has only alleged these claims against _____

**Page ten (10) of R & R.**

_____Socha and/or Wounded Nature, and these Defendants are not state actors under § 1983."

Plaintiff takes exception to this statement as Socha and Wounded Nature are indeed from the overwhelming evidence in which Plaintiff has provided from (Dkt. No. 12) to (Dkt. No. 59) and the exhibits associated with such that there is no question that Socha and his non-profit are state actors.

Equal protection is afforded to all, and when one endangers the lives of others with their acts it is not speculative; it's a possible scenario in which no one hopes happens.  To happen could be fatal, thus one could not file any claims at that point to prove to the Court that it happened.  Public parks are protected from idiots who pile rocks up in a vertical column high

above people who walk beneath, because, not "speculative", but because likely someone will get injured. The young college couple mentioned in (Dkt. No. 59) became snared and spent their available monies on Sea Tow in an effort to get their anchor freed, however, they could not free the anchor and Merrill suggested that a scuba diver be retained. Meanwhile, according to them, Merrill was threatening an arrest against them for not signing up for the CCHS's boat permit plan. Destroying federal land, or setting booby traps on federal public land is generally considered unlawful. Here in Charleston Socha was being applauded by law enforcement for disengaging m-b rodes and thus possibly creating snares. The PTD provides for people, including this Plaintiff, to enjoy the rivers free and outright; not to suffer on whether one will be caught up in one of Socha's booby traps. If one escapes the harms of Socha, one still has to escape Merrill's onslaught of daily fines for not possessing the liability insurance in which he imposes.

See Villiage, supra, for a "class of one" argument. Merrill's Laws single out those who he wants to target; not everyone gets approached. Moreover, as evident in the Ordinance 2023-097, **Exhibit L**, it states that it does not apply to those at a marina. Therefore, Indigence should be a protected class with the provision of the Equality Act, yet if the Court does not find that argument valid then "class of one" remains. So the quadrum is not just that Socha's acts may snare one, but Plaintiff argues that boaters should not have to worry due to his unlawful acts. Due Process In a substantive due process argument Plaintiff would argue that when Socha was out in the federal anchorage, as a state actor, with law enforcement in close proximity watching over to protect him, Socha could have hired a diver to go down and either bring up the anchor and m-b rode system; thus alleviating any snares, or cutting the rode at the anchor accomplishing the same. This would have protected the property for those who lost their

property, however this was not performed. Instead the worst possible scenario was administered; Socha dislodged the rodes systems to the river bed below. Under this set of circumstances, now anyone who pivots their vessel in this sabotaged area stands the chance of becoming snared. Because proper removal was not executed one's life could become jeopardized if snared prior to a Category Four or greater storm should hit; thus, procedural due process due to the acts of the state actor Socha violated procedural protections. This subjects this Plaintiff to possible loss of his property and even life, because if one gets caught in his booby traps before a hurricane then one is not going anywhere and his doom would be to this Court's finding "speculative" as controlling; see Connell v. Higginbotham, 403 U.S. 207, 208, 91 S.C.t 1772, 1773, 29 L.Ed.2d 418.

 **xvii).** " Additionally, to the extent that Plaintiff is alleging a claim for negligence, he fails to state a due process claim. The Due process Clause is not implicated by a negligent act of a governmental official causing unintended loss of or injury to life, liberty, or property." ; "Even if Plaintiff has adequately alleged that a state actor deprived him of a liberty or property interest, he fails to allege any facts that he availed himself of a post-deprivation remedy provided by the state or local government."; "To the extent Plaintiff alleges claims against state actors, he has remedies under South Carolina law to obtain relief for any alleged taking of this personal property by bringing a tort action in state court or proceeding pursuant to the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10."

 Plaintiff takes exception in the Magistrate's position that Socha's acts of cutting one's rode is only regarding the value to the anchor and rode. Vessels rely on the anchor for holding; without holding the vessel drifts aimless until it alliedes with something. If one's vessel has multiple anchors and some individual such as Socha vandalizes a portion of that anchoring

system, then during a storm it becomes life threatening. Socha did not have the common decency to explain that he cut this Plaintiff's rode and left *Cirrhosis of the River* in a perilous state. The acts are a violation to one's life under storm conditions; which Hurricane Ian was. Socha's acts violated this Plaintiff's due process rights as when he bunkered down for Ian he had not been informed the truth from Socha that he had cut the easterly anchor. Yes, much damage occurred, but this Court has jurisdiction for Socha's acts and the damage in which was placed upon Plaintiff +from such negligence._ In Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 I.E.R. Cas. (BNA) 23 (U.S. June 29, 1972), states at 2706 "'Liberty' and 'property' are broad and majestic terms. They are broad and majestic terms. They are among the '[g]reat [constitutional] concepts… purposely left to gather meaning from experience… [T]hey relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged.' For that reason, the Court has fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights. The Court has also made clear that the property interest protected by procedural due process extends well beyond actual ownership or real estate, chattels, or money." (Citations omitted). Socha's acts were life threatening by removing portions of Plaintiff's property.

"4.     Claim Four"

**Page eleven (11) of R & R**

Plaintiff agrees with the upper portion that explains what Plaintiff is alleging.

**xviii).** "There are simply no facts alleged by Plaintiff to indicate that a federal constitutional or statutory law was violated by Merrill by proposing that the City of Charleston create a new law. No facts indicate that Merrill enacted the law."

Rule 8, FRCP, does not require that the evidence be provided with the complaint; it merely states that the averments are to be numbered. Nevertheless, the Plaintiff has acquired the evidence for the Magistrate. Merrill did write the law; see **Exhibit A, (Email correspondence from Ms. Mallery L. Scheer and an excerpt from the flashdrive transcript).** At the transcript at 16:43 Merrill answers in the affirmative. On June 17, 2024, when he issued over $15,000 in fines for violating the algae/tax code Plaintiff asked him, after confirming that his video recording was operating, on whether or not he scratched out the word "Abandoned". Merrill stated that the CCHS legal team committed those unlawful acts. SC Legislators created a law to be followed; not bastardized.

**xix).** "Plaintiff may be alleging that Defendant Tecklenburg violated his due process rights because there was not proper notice and readings of the proposed law before the City of Charleston Board voted to approve the law and Tecklenburg signed it into law. However, Defendant Tecklenburg is entitled to legislative immunity as discussed below."

This is addressed above. Tecklenburg's acts remove him from any immunity as the rhetoric was never read into the minutes. No reading ever took place. They, the Board, merely met and introduced Merrill who explained that it was a law in which the CoFB enacted and was approved by the Senate. That alone does not constitute a reading; moreover, no one could come present themselves to voice an objection because no adequate notice was provided to the public; thus, a due process violation against this Plaintiff's rights to object and explain that algae is not a crime and that a $300,000 dollar insurance policy is unlawful and absurd.

**xx).**    "Plaintiff also contends that the Ordinance places restrictions over federal waters by the City of Charleston for which the City has no jurisdiction. However, plaintiff has not named the City as a party to this action. Additionally, South Carolina law concerning watercraft laws and ordinances allows a local government to adopt certain ordinances requiring a permit for watercraft to remain moored or anchored in any one five-mile radius on public waters within its local jurisdiction for more than for consecutive days. See S.C. Code Ann. 50-21-3 (B)."

**xxi).**    "Plaintiff alleges that the Ordinance 'discriminates' because it treats persons who do not rent from marinas differently than those who anchor. Plaintiff may also be attempting to allege that the Ordinance violates his equal protection rights because he is indigent. However, indigence or low socioeconomic status is not a protected class under the Equal protection Clause."

**xxii).**    "There is no indication that the law does not apply to those who are not indigent and the law applies to anyone who anchors for more than the allowed time in the City's territorial waters. Plaintiff's equal protection claim should be summarily dismissed because Plaintiff has alleged no facts to indicate that similarly-situated persons are treated differently and has not alleged any facts to indicate that the alleged treatment was the result of intentional or purposeful discrimination."

Plaintiff attacks this ordinance, 2023-097- Merrill's Law, before this Court of Equity. To get a permit one must acquire $300,000 of liability insurance. That requirement prevents the lower financial status group from ever being able to "enjoy" the rivers use; despite that the PTD specifically states that the rivers are "free and outright forever for all without tax or impost." This brings indigence to the table to become inclusive in the Equality Act as it discriminates;

especially since the waters are U.S. navigable waters and that neither the State of SC nor the federal regulations require any insurance. Until discovery is held, Plaintiff cannot determine who all the Defendants will be. The City of Charleston will most likely become amended into this action. The Magistrate provides a correct quote for S.C. Code Ann. 50-21-30(C)(2), however, that was made at the State Senate with the word "ABANDONED VESSELS"; which does not include liveaboards. Plaintiff has been living on his vessel since 2013 and thereby is grandfathered in. Any alteration of the laws would mandate that notice is provided to the public, namely Plaintiff, to be allowed to voice proper objections against such absurd laws as "Algae", especially since the City regulations require that notice is mandatory.[37] By scratching out the word "abandoned" the legal team of CCHS altered SC regulatory powers and SC Legislators intent with S.C. Code Ann. 50-21-30(C)(2). These acts violate this Plaintiff's due process rights as are provided for in the Fourteenth Amendment. Proper notice should have been provided to the public concerning the May 9, 2023, hearing which actually never received a proper reading. Plaintiff's theory remains that a cleansing of the river was effectuated to eradicate those in a lower "socioeconomic status" for the conquest of transferring federal public use lands over to private corporate gain. Of course, this can only be proven through discovery.

**Page twelve (12) of R & R**

"5.    Claim Five"

**xxiii).** "In his fifth claim, Plaintiff contends that the Ordinance and Reed's providing of a DHEC permit to Socha and Wounded Nature were retaliatory for Plaintiff petitioning the USCG

---

[37]    Placing the word "Safety" as the only word for a CCHS Board meeting does not meet the standard of "adequate notice" as one's due process rights require; see (Dkt. No. 36, Attachment 5/ Exhibit E).

and the Secretary of the Interior to establish a special needs anchoring area. ECF No. 40 at 22-24."

Plaintiff's objects in that much more are stated between (Dkt. No. 40), CLAIM FIVE paragraphs 22-24) however, the gist is that the Defendants were informed of Plaintiff's filing petitions to both the Secretary and the USCG for a SNAA. The various methods in which the Defendants used in an effort to get Plaintiff to move from a safe area to an unsafe area varied, but Plaintiff sensed that their agenda of the Defendants was for the expansion of corporate development. OCRM 04513[38] provided Socha's non-profit approximately 12 acres of U.S. navigable waters which upon the completion of his development that he would have condemned the area from transient boaters and then the CCHS could show to both SCCZMC and USACE that the area isn't being used and that it would be suitable to further expand SHM. Permits may already be pending on this. Maritime Laws on anchoring provide that Plaintiff's vessel has right of way over all encroachments.

**xxiv).** "However, Plaintiff again fails to show how these Defendants, who at most proposed and/or lobbied for the Ordinance, violated his federal rights."

The PTD provides use of the rivers to all, "forever", "free", "without tax or impost". While the Defendants lobbied, especially Merrill, SC Legislation makes enforceable laws; not Merrill. Plaintiff is now facing a year of incarceration as the citations from Merrill are continuous; imprisonment of Algae.[39] Plaintiff has a right to enjoy the river's use; whether that be sitting in his dingy or anchored in his vessel. To be required to pay to use the river is unconstitutional, however, not being able to afford an outrageous insurance policy that Merrill

---

[38]    The m-b was situated on or around August 8, 2023, however it never really received any use until the storm of January 9, 2024, and when Socha threatened incarceration against Ms. Summers if she did not surrender her title to him (Dkt. No. 59, Attachment 1/ Exhibit A). The vessels brought over after the storm suffered from vandalism to the vessels rodes.

[39]    Celeste has rights under the SC Harbor Wildlife Sanctuary provisions and to remove her food source would be in violation of that statute; SC Code § 50-11-980.

created, **Exhibit A**, and being subjected to incarceration is a violation of this Plaintiff's due process rights especially since he was never afforded adequate notice and thereby denied the opportunity to object at the May 9, 2023, hearing. Incidentally, as above mentioned, that hearing never even read the ordinance into the record which further violates Plaintiff's equal protections rights of a "one member" class and/or of a low socioeconomic status to be allowed to use the rivers has been curtailed/prevented by § 21-70 (g)(1)(n).

Acquiring a copy of CoFB's ordinance and then molesting it by scratching out choice words is not really lobbying, those were acts within the meeting of the minds of a certain group of individuals to bring harm to others; including this Plaintiff. Scratching out intentful words which the SC Legislator approved so as to fine and incarcerate people is criminal, and it violates this Plaintiff's constitutional rights which are afforded to him. Lower courts would not be proper to resolve the matter as it is the law enforcement that participated; thus, 42 U.S.C. § 1983 before this Court of Equity in Admiralty is proper. SC Legislature addressed "abandoned", CoFB ordinance possessed the word "abandoned", the minutes of the Board of May 9, 2023, on pg. 8 last paragraph Councilmember Shahid states, "This is an ordinance that we are hoping will make it a whole lot easier to identify abandoned boats…" (Dkt. No. 36, Attachment 2 / Exhibit B at pg. 8 in the minutes transcript or pg. 16 in the exhibit). Above that Shahid states, **"If you looked at your agenda, you would notice the strikeouts and highlights associated with that."** Not only did the Council members not read it, it was never read into the record; at all.

On June 17, 2024, Merrill (see footnote 14) answered Plaintiff in that CCHS legal team did the scratching out of words. And, again, under the theory that the Defendants have conspired to form ways to cleanse the rivers of such people so as to remove the land from the public and convert it into private corporate gain.

**Page thirteen (13) of R & R**

xxv). "As discussed above, it is unclear what permit was issued by DHEC and there is no indication that land in question has been given to a private corporation."

Plaintiff apologizes to the Court for not being clearer in his writing of his SAC; it was prepared in a hurried fashion as it was written under a time constraint. The "permit" is OCRM04513 (Dkt. No. 12, Exhibits Q, and Y). If this Court is bound to the four corner of the SAC, then Plaintiff merely relies on Rule 8, FRCP, in not being completely specific. The plan allows for Socha to possess that area; it had to have been coordinated through law enforcement and the CCHS. Reed conveyed 12 acres of U.S. navigable water area, without adhering to SCCZMC's regulations, to Socha's non-profit. Thereafter, Socha moved to condemn the area.

**RETALIATION:** 1) "his speech was protected." Plaintiff has a right to petition the Secretary and the USCG for a SNAA. 2) "the alleged retaliatory action adversely affected his protected speech." The Defendants conspired and plotted on ways to get rid of this Plaintiff; this was communicated to Plaintiff from Socha. (Dkt. No. 40, CLAIM ONE) provides an example of conspiring to get Plaintiff's vessels moved. (Dkt. No. 40, CLAIM FOUR) Merrill's Law at **Exhibit L** at 21-70(7)(A)(2); this alone makes a third of a mile not accessible to the public. All of that federal use space was just removed by Merrill's acts of which he has already admitted to. Then, Reed steps in and conveys 12 acres to Socha's non-profit which is the area in which this Plaintiff is, and others were, situated. This meets the retaliatory action. 3. "[there exists] a causal relationship between the protected speech and the retaliation." Because the Plaintiff is anchored in U.S. navigable waters, in an area that is not traveled as it tucks in and is shallow, and the Defendants want to develop this area for private use they have conspired and formulated ways to achieve Plaintiff's removal. See Shaw v. Forman, 59 F.4d 121 (4th Cir. 2023) wherein the

standard to demonstrate a causal relationship between a protected activity and the defendant's conduct, this Court applies the burden-shifting framework of the same-decision test. Plaintiff's actions of trying to get the area designated caused the Defendant's actions to oust the Plaintiff and condemn the area.

**xxvi.** "Plaintiff has alleged no facts to indicate that the alleged retaliatory action adversely affected any protected speech. Nor has he alleged any facts to indicate that there was a causal connection between his filing a petition for the creation of a special anchorage and the alleged actions"

Plaintiff objects and uses the same information in his objections above at xxv. Also, Socha filed civil action against this Plaintiff in an effort to get a court order to command Plaintiff's removal. Socha has been aired live several times on local Grey t.v., CBS affiliate, wherein he explains that he is getting ready to move these vessels. On June 19, 2024, both Socha and Isom were aired live with the camera pointing directly at Plaintiff's vessel wherein they communicated that "These people come ashore at night and vandalize the boats at the marina and they break into are showers." This was aired during the evening news. The communications presented to Plaintiff on June 7, 2023, from SCDNR Agent William Ladue, accompanied by Agent Wait, was that the USACE was getting ready to dredge the area. All of their communications and acts support a marina expansion; thereby removing public use lands for private corporation gains.

"but for'

**xxvii.** Footnote number ten (10). "Plaintiff opines that the current special anchorage area is too small and that it is dangerous because of this and because it requires a longer passage through the Ashley River if a person wants to go to Lockwood Drive."

First, the "Special Anchorage" was constructed after the Department of Transportation (DOT) provided the Beach Co. a permit back in 2012 which allowed them half of the river with a westerly expansion. Due to the reduction of the Ashley River Anchorage No. 1, the Special Anchorage was situated SW of the ICW nearer to James Island. Yes, it is impossible to get to unless one has a seaworthy dinghy and a suitable outboard motor; Plaintiff does not have such. There are numerous people who also cannot reach that anchorage; thereby there is a need for a SNAA. Due to the reduction of the Anchorage No. 1, and Socha having sabotaged it for those reasons it is unsafe; however, Plaintiff also cannot reach this area with his present motor and dinghy. People who row ashore cannot even safely make it to Anchorage No. 1. It's probably one mile from the SHM to the Special Anchorage.

It is true that USCG Captain J. D. Cole denied Plaintiff's request which is why it was appealed.


**Page fourteen (14) of R & R**

The cases used throughout the Magistrate's R & R (Dkt. No. 51) are mainly irrelevant to this cause of action; however, in Huang v. Board of Gov. of Univ. of N.C., 902 F.2d 1134 (4th Cir. 1990) is about a whistle-blower claim. This case is where Defendants are moving to convert federal public use lands and are converting it into private corporate gain through various tactics which are violating the constitutional rights of many; including this Plaintiff. 1. Plaintiff trying to acquire a SNAA is of public concern. 2. Plaintiff has been denied the Constitutional provision of being able to "enjoy" the river. 3. Plaintiff attempts to acquire a SNAA and the Defendant's retaliate by attacking as described above. 4. But for the Plaintiff petitioning the government and

having anchored in the safety of the eastern side of the Ashley River the Defendants would not have assaulted him constantly.

"6.     Claim Six"

**xxviii.** "Plaintiff alleges that the State of South Carolina breached its fiduciary duty with regards to the United States Public Trust Doctrine because it allowed the City of Folly Beach, South Carolina to enact regulations that were not recognized by the State of South Carolina. ECF No. 40 at 25." and "Plaintiff has alleged no facts to indicate he has standing.."

Plaintiff objects to "40 at 25" as that is CLAIM THREE and it has nothing to do with Breach of Fiduciary Duty; CLAIM THREE is mentioning the vigilante acts of - Socha. Matters concerning breached its fiduciary duty should properly be found at ECF No. 57.

However, Plaintiff does not have standing to attack the CoFB, nor their ordinance, etc. However, the State of SC allowed for the CoFB to enact its own laws before the State of SC had adopted such (Dkt. No. 36, Attachment 2/Exhibit B at page 12 of the minutes transcript/ page 20 of the exhibit)[40] and the CoFB was able to get the State of SC to adopt their laws; Act No. 77 SC General Assembly 124th Session. This Bill is in violation of the SC PTD as it allows for a tax to be collected for using the rivers. Moreover, it is SC Statute 50-21-30 (C)(1) which was formed off of this Bill No. 77; which has its discriminatory provisions at (a)(b)(c) and (2). It treats those who can afford to pay slip fees at a marina differently; this invokes the Fourteenth Amendment.

The Attorney General is properly listed as a Defendant and when attacking an ordinance and/or a State Statute for its unlawfulness or unconstitutionality the Attorney General is a proper party as it is his duty to defend. Moreover, the Breach of Trust is that not only did the General

---

[40]     Plaintiff opines that Merrill formed the opinion that since CoFB enacted their own laws that it's be acceptable for him to make his set of laws.

Assembly encroach on the PTD but Reed did as well when she provided 12 acres of U.S. Navigable water/land to Socha's non-profit. Plaintiff is not making a claim that is governed by the Eleventh Amendment Immunity, because his cause of action is not suing the State of SC or Reed or Wilson in their official capacity. Plaintiff is challenging the constitutionality of the Ordinance 2023-097/Merrill's Laws; and Wilson and Reed in their individual capacity in as much as they have conspired with the other Defendants to obtain federal public use lands for corporate expansion. The Attorney General's duty is to defend the statute and/or ordinance and he automatically becomes a party due to SC statute, however, if discovery suggests otherwise and that the conspiracy to convert public land to private land includes him being involved then his involvement would be more than just his present status.

    **xxix.** "This, and many of Plaintiff's other claims, appear to be an argument that the Federal Public Trust Doctrine was violated. However, any such claim has not been sufficiently plead and should be dismissed. It is unclear from the alleged facts how any of Defendants' actions are a violation of the Federal Public Trust Doctrine."

    Imposing a tax to use the rivers violates the PTD; mandating a liability insurance policy of $300,000 (§ 21-70) (g)(1)(n) is a direct attack on the low socioeconomic status people. This should open the door for a first impression on whether or not the Equality Act should include such people as a protected class. Seems unconstitutional to allow the wealthy to use the rivers but not Tom Sawyer as mentioned above in footnote number nine (9).

    **xxx.** "Additionally, it appears that any such claim belongs in the state, not federal court."

    Plaintiff takes exception to this conclusion as follows:

The construction of the U.S. Constitution was imbued with trust embedded with all that surrounded its intentful purpose at a time which the PTD preceded. Congress has the power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the U.S.; U.S. Const. Article IV § 3, cl. 2. The Constitution's preamble and the Equal Protection Clause also support a federal PTD. The PTD is a structural constitutional principle confirmed by the Property Clause; thus, providing judicially cognizable limits on congressional and Executive Branch authority over public resources recognizing public rights in trust resources allows for the creation of administrative entities to adjudicate public trust issues. Congress has removed the DOT from its control over the rivers, maybe for the MegaDock expansion into the federal channel. Nevertheless, the Secretary and Homeland Security are over the USCG regarding rivers. The magistrate's reliance on PPL Montana, LLC v. Montana, 565 U.S. 576, 1234-1235 (2012) is actually case in point of the federal courts neutrality on the subject; thereby acknowledging an implied structural understanding of separation of powers. However, Montana is dicta and not controlling; moreover, this situation commands the U.S. District Court's responsible intervening to recognize the U.S. PTD because all of the land in which this Plaintiff is situated, anchored, is in federal navigable waters with only federal land attaching. Reed pulled a permit for Socha from the federal channel as no land was available; the fraudulent address that Socha placed on the permit application is an address a half mile away from his development.

In Montana the court explicitly refused to recognize a federal public trust, stating that, like the equal-footing doctrine which is the "[u]nconstitutional foundation for the navigability rule of riverbed title, the public trust doctrine remains a matter of state law." See Light v. United States, 220 U.S. 523, 537 (1911) and United States v. Trinidad Coal & Coking Co., 137 U.S. 160,

170 (1890). Without federal intervention the PTD will dissolve and become useless; dissolved of any reason. For example, in (Dkt. No. 12 at pgs. 20-21 ) Plaintiff used an example of an anchored vessel across the river from homes with vessels in front of the aft portion of their houses. These situated people similarly boaters, i.e. are treated differently than the individual across the river with no rational basis. Nevertheless during the period of time from docket entry (Dkt. No. 12) to this present entry (Dkt. No. ?) the river in that area has since been developed. A developer placed his resort on stilts above the wetland, with CCHS Board approval, allowing his resort to hover over the marsh; adjacent is the resort's mooring field wherein they have acquired the rights to the river by way of permits from Reed at SCCZMC. They collect the m-b rental fees, CCHS collects their rivers' use taxes, and Merrill choses which vessels he wants to stick an algae fine to.

The property subject to trust must be used for public purposes for the general public; bearing in mind that if traditional use values are not kept then future generations are bound to a slip/corporate m-bs. In this case at hand Reed transferred approximately 12 acres of U.S. navigable waters/land to a private citizen who is a state actor as mentioned in (Dkt. No. 40 CLAIMS ONE-FIVE) however, even though Reed conveyed the land and Socha moved to condemn the area, the area is still within the confinement of the PTD; see Nat'l Audubon Soc'y v. Sup. Ct. of Alpine City, 658 P.2d 709 (Cal. 1983) and (Dkt. 12, Exhibit A).


**PROPERTY CLAUSE**

"The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States ." See Kleppe v. New Mexico, 426 U.S. 529, 539 (1976).

## **ARTICLES OF CONFEDERATION**

See Wikipedia's explanation. However, Maryland refused to join until the landed states ceded their western territory. After New York ceded its western territory in 1780 congress commenced with forming the western portion of the U.S. for the common benefit to the U.S. In 1784 the Continental Congress ratified the Treaty of Paris on January 19, 1784, officially establishing the U.S. as an independent and sovereign nation. It was during this period that Congress became the Trustee over the lands; and clearly the framing of the Constitution is proof in fact that the federal government regulates public lands for the common benefit of the people. In Dred Scott v. Sanford, 40 U.S. 393, 448 (1852) held with all Justices concurring that the federal government's Property Clause powers in the territories were that of a "trustee of the territories."

In Light, supra, the court held, "All public lands of the nation are held in trust for the people of the whole country... And it is not for the courts to say how that trust shall be administered. That is for Congress to determine. The courts cannot compel it to set aside the lands for settlement, or to suffer them to be used for agricultural, grazing purposes, or corporate marina take over of U.S. navigable waters, nor interfere where, in the exercise of its discretion, Congress establishes a forest reserve for what it decides to be national and public purposes. In the same way and in the exercise of the same trust it may disestablish a reserve, and devote the property to some other national and public purpose." (emphasis added). The U.S. PTD and Property Clause are closely related; the Property Clause confirming the PTD as a structural Constitutional principle. This principle, drawn from the inherent nature of a sovereign's stewardship over land and resources provides for the federal government to establish an administrative state to effectuate its public trust duties; conveying 12 acres of U.S. navigable

water/land to a private citizen, state actor in this case, without any notice to the public and violating SCCZMC regulations is a breach of fiduciary duty and this Court should suspend SCCZMC's control.  See <u>Friends of Gadsden Creek v. DHEC and WestEdge Foundation, Inc.,</u> 21-ALJ-07-6433-CC (Dec. 5, 2022) ; presently appealed to the Supreme Court of SC. Thus, a creek in Charleston becomes a parking lot for further removal of green space to complete the CCHS mission that every available space is to become developed.

Regarding footnote eleven (11) The cases that the Magistrate cites were probably legitimate ordinances that established those regulations.  What happened/did not happen here in the CCHS is unheard of.  A law enforcement making Algae a crime and then issuing over $20,000 in fines and threatening people to arrest them if they do not sign up for his boating permit plan. Plaintiff cannot find a case this bizarre.


**Page fifteen (15) of R & R**

"7.   Claim Seven"

   **xxxi.**   "Plaintiff...ECF. 40 at **26.**" in footnote twelve (12).

   Plaintiff corrects typing error as CLAIM SEVEN starts around paragraph number 59.

   **xxxii.**   "Plaintiff claims the Ordinance violates his First Amendment rights to display his vessel which he claims is art and an expression of his viewpoints on art."

   Plaintiff wholly objects to this statement.  Plaintiff does not state that "art" is garbage; he states that grown adults who stand on pedestals referencing themselves as artists when all that they have done is apply paint over a provided boundary that such is the equivalent to electronic singing- lip syncing.  The provided examples before the Federal Trade Commission, at (Dkt. No. 40, 6vi, Exhibit B pages l-x)  are that of Mary Whyte, West Fraser, Jill Hooper, Jim Booth,

Thomas Kinkade, who have tricked the public for the past four decades with their electronic-aided drawings and paintings. Provide any of these individuals with a blank canvas and a brush and commission a portrait thereafter one would see that the finality, provided they could not leave with the canvas, would be nothing like what they have hanging at the Gibbes and/or their studios. Recently Angela Mack announced stepping down as director of the Gibbes, see **Exhibit (May 28, 2024, article on Angela Mack departing the Gibbes)** so perhaps real paintings by way of natural talent may return; as opposed to the electronic-aided paintings in which she has been passing off as paintings. It's the electronic-aided paintings that came on the scene in the mid to late 1980's is what DAB, this Plaintiff, refers to as garbage; thus, the so-called art collectors enjoy viewing garbage so DAB gives them garbage to view; free of charge (Dkt. 40, at 6v).

"Id. at 26-7" is incorrect; typo error as CLAIM SEVEN starts at 59.


**xxxiii.** "However, Plaintiff has alleged no facts to indicate how any of Defendants' actions have violated any of his First Amendment rights." and "He has not alleged any facts to indicate that Defendant's actions or the Ordinance (regulations which concern such things as mooring permits, the duties of owners of vessels, the abandonment of vessels, and the seizures of certain vessels) has any direct prohibition of his speech or expression. Even if the art exhibit on *Cirrhosis of the River* is a protected expression, Plaintiff has not alleged any facts to indicate that Defendants' actions are actionable as chilling protected speech."


**Page sixteen (16) of R & R**

Plaintiff objects as the Magistrate fails to list Merrill's Law of § 21-70 (7)(A)(5) DEBRIS is a crime. What is debris, what is an algae violation. Is it too green? These are violations of the vagueness doctrine and such were placed in Merrill's Laws to allow for him to pick and choose who he wants to target. Merrill presently has Plaintiff cited with over $20,000 in citations; that's "chilling." Making "debris" a crime is an attack on "Garbage"

"8. Failure to State a Claim/Defendant Wilson"

Plaintiff's legal work was stolen. If Plaintiff can find the time to read back through the SC Statute book he will supply the Statute; however, due to time constraints Plaintiff ask that the Court accept under penalty of perjury that a statute exists that when one attacks a statute or ordinance of the State of SC that the Attorney General has to be made a party. As above mentioned, Wilson has a duty to defend the statutes and ordinances; so he is properly attached as a party defendant.

**Page seventeen (17) of R & R**

"B.    Admiralty Claims"

**xxxiv.** "Plaintiff fails to assert facts as to how the Court possesses jurisdiction over this case in admiralty."

Plaintiff objects to this statement as the Plaintiff has certainly provided facts sufficient to establish jurisdiction in this Court of Equity. All of the activity is over the U.S. navigable waters, with acts of the Defendants moving to abscond federal public use lands.

**Page eighteen (18) of R & R**

"C.     Defendant Tecklenburg is Entitled to Legislative Immunity

**xxxv.**  "Plaintiff fails to state a claim. Moreover, Defendant Tecklenburg is entitled to legislative immunity based on the facts alleged."

See argument above on pages   6-9  on why Tecklenburg is not entitled to immunity. Tecklenburg is not being sued in his official capacity.

"D.     Defendants Socha, Wounded Nature, and Isom are not State Actors under § 1983"

**xxxvi.** "Defendants Socha, Wounded Nature, and Isom are additionally entitled to summary dismissal because Plaintiff has not alleged facts to indicate that these Defendants are state actors under § 1983."

(Dkt. 40, CLAIM ONE) supports  both Socha and Isom engaged in a conspiracy with SCDNR, DHEC, the CCHS and by and through their conspiring acts to willfully bring harm to this Plaintiff with an agenda to remove federal public use lands to convert to private corporate control that makes them both "state actors under § 1983." See, Kress at 1605.

**xxxvii.** "Defendant Socha is a private individual, Wounded Nature is a private entity, and Isom is an employee of a private entity (SMH).  With few exceptions, purely private conduct, no matter how wrongful, is not actionable under 42 U.S.C. § 1983 or the United State Constitution. The 'under-color-of-state-law element of_____

**Page nineteen (19) of R & R**

_____ § 1983' like the Fourteenth Amendment's 'state action' requirement, 'excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'.....Here, Plaintiff has not alleged facts to indicate that Socha, Wounded Nature, and Isom are private actors." (citations omitted).

Plaintiff objects and the facts are supportive that the Defendants engaged in a conspiracy with state officials in an effort to bring harm to Plaintiff to cause his removal so as to engage in blocking federal public land space from being utilized and at a later date to become developed.

**Page twenty (20) of R & R**

"E.    Eleventh Amendment Immunity"

**xxxviii.**    "Additionally, Defendants Wilson and Reed, in their official capacities, are entitled to Eleventh Amendment immunity as to Plaintiff's monetary claims."

Plaintiff objects to this entire section "E" as Plaintiff's claims relate to the challenge of the constitutionality of the ordinance, 2023-097, and that it was implemented for the sole purpose to eradicate those who cannot afford to pay slip fees and that it has a furthered agenda which by way of eradication that it enables the opportunity of a conversion of federal public use lands into private corporate expansion. Neither are being sued in their official capacity.

"F.    State Law Claims"

**xxxix.**    "Plaintiff may be attempting to assert state law claims, including claims under the South Carolina Constitution, as to the South Carolina Public Trust Doctrine. However, as Plaintiff fails to state any federal claim, only the state law claims would remain, and federal courts are allowed to hear and decide state-law claims only in conjunction with federal-law claims, through the exercise of 'supplemental jurisdiction.'"

Plaintiff's objects to this as he has stated federal claims and therefore the State law claims should remain.

**Finally, page twenty-one (21) of R & R**

**xxxx.** "Thus, there is no complete diversity and Plaintiff may not bring his claims pursuant to § 1332."

Plaintiff objects to this statement as there is no requirement of "complete diversity" to acquire diversity of citizenship. The federal anchorage has transient boaters that are not residents of this State and many boaters come in from over the Atlantic Ocean from other countries; thus, such support for diversity of citizenship. In (Dkt.No. 59, pgs. 33-34 no. 1) provides where Merrill telephones the wife of a boater threatening to arrest her husband while her husband was traveling with teenage son. That fear caused the wife/mother to pay into Merrill's boating permit plan; moreover, it caused the wife/mother to increase their insurance premium. That act constitutes a diversity of citizenship and supports why this case should be a Class Action with proper counsel appointed to take over.

**xxxxi.** "As Plaintiff has asserted no valid federal claim and there is no diversity jurisdiction, this Court should not exercise supplemental jurisdiction over any state law claims."

Plaintiff objects and relies on his above arguments in support. The theory is that the Defendants are cleansing the rivers of people who cannot afford the marina slip fees and that they have devised a scheme to even further cause harm by way of Merril enacting his liability insurance requirement and thereby alleviates an area of boaters/"squatters" (quoting Merrrill from (Dkt. No. 36, Attachment 2 / Exhibit B, pg. 11 of transcript/ pg. 19 of exhibit) so as to convince the USACE and/or SCCZMC to convert the land area into private/corporate mooring fields and marina expansion.

Plaintiff objects to most all of the cases that the Magistrate relied on as being wholly irrelevant. Plaintiff objects that this action be summarily dismissed and further requests that an Order issue for Service of Process.

WHEREFORE, Plaintiff opines that he has stated a valid claim and that this Court of Equity has jurisdiction to hear this case, and that process should issue against the present Defendants and allow for Discovery through Interrogatories to commence immediately.

Respectfully submitted, _28th_ this day of June, 2024.

David Anthony Babb
P.O. Box 522
Charleston, SC  29402