**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| **DAVID ANTHONY BABB,** | ) | |
| **Plaintiff,** | ) | **C/A No. 2:23-03218-RMG-MHC** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DAVID ISOM, et al.,** | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | **EXPEDITED MOTION BEFORE** |
| _____ | ) | **FILING RECONSIDERATION** |

**EMERGENCY MOTION**

**MOTION TO AMEND TO ADD OR JOIN AN INDISPENSABLE PARTY FOR INJUNCTIVE RELIEF TO ENJOIN A QUASI CRIMINAL PROCEEDING IN THE CITY OF CHARLESTON'S MUNICIPAL COURT, AND/OR CHARLESTON'S LIVABILITY COURT AS IT IS SO DESCRIBED; FOR DECLARATORY JUDGMENT, AND APPOINTMENT OF COUNSEL AND MEMORANDUM OF LAW[1]**

       COMES NOW the Plaintiff, David Anthony Babb, hereinafter Plaintiff and respectfully moves this Honorable Court, pursuant to Federal Rules of Civil Procedure 15 (a), 19 (a), 57, 65 (a), 28 U.S.C. § 2201, and the exceptions to abstention established in <u>Younger v. Harris</u>, 401 US 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its progeny, to: (1) amend the pleadings to add A. Peter Shahid and Mike Seekings, City of Charleston Council Board Members (Board) as so were recognized on May 9, 2023, and to add the City of Charleston (CoCHS) as the real party in interest in the outcome at this proceeding and as an indispensable party to obtain complete relief; (2) enjoin the City, its officers that were involved, and any named defendant acting in its steed from enforcing CoCHS Ordinance No. 2023-097 (The Ordinance is codified at Sections §§

---

[1]       On July 29, 2024, Plaintiff learned that this Court adopted the Magistrate's R&R (Dkt. No. 51); however, Plaintiff intends to file a Motion For Reconsideration and an appeal if necessary. This is neither a reconsideration nor the appeal of said Order .

21-67 through 21-70 of the CoCHS Code of Ordinances) and to enjoin any criminal, civil, or quasi criminal proceeding resulting from the enforcement of said ordinance as to any person, unless and until its constitutionality and legality under state law is determined by this Court after discovery and a full adversarial hearing; (3) issue a declaratory judgment that said ordinance was obtained in violation of due process and adequate notice to the Board and the public as is required by SC Law and regulations to include the CoCHS's own regulations and violating requirements of both US and SC Constitution, whereby the Ordinance § 21-70 from 2023-097 is unconstitutional on its face as being vague, overly broad to exceed the purpose authorized by the SC State Legislators to address the problem of abandoned vessels, and is being applied in an unconstitutional manner and for an improper ulterior motive as alleged and explained in the pleadings; and (4) appoint counsel to assist the Court in marshaling the facts and to protect the rights of all boaters who the waters claimed by the CoCHS or have been or will be affected by the defendants and the Ordinance improperly passed and enforced by the CoCHS and its officers and agents, and in support thereof states the following:

## REASONS FOR GRANTING THE MOTIONS

1.      Addressing the last motion for appointment of counsel first in the reasons for granting the motions, the Plaintiff submits to the Court that he is an artist;[2] and as such, his brain has been overly developed in the area of visual skills and under-developed in the area of his writing, language and organizational skills. For that reason, he has been unable to adequately

---

[2]      Plaintiff has the ability to draw; his images are not paint applied over a provided for scene which is viewable by way of controlling the amount of ink or provided for electronic-aided boundary. 98 percent of the images in the Charleston Galleries and at the Gibbes under Angela Mack's Directorship are electronic-aided images; not images by way of natural talent. Each illustrator learned to pull a brush within or over the provided boundary.

articulate his claims sufficiently for the court to be persuaded that he has stated a federal claim upon which relief can be granted. His objections to the recommendation of the Magistrate Judge for dismissal without prejudice but without leave to amend are now before this District Court and the denial of his first motion for injunctive relief is now before the Fourth Circuit Court of Appeals in an effort to determine how Rule 65, FRCP, has any authority to those in limbo under the constraints of 28 U.S.C. § 1915. However, those pleadings were resolved primarily on abstention grounds without considering the recognized exceptions to abstention; and on technical pleading deficiencies of adequately describing the capacity of the defendants, by dissecting separate parts of the pleadings out of their overall context. This motion attempts to overcome those deficiencies and is not a relitigation or reconsideration of what is now before the Court.

2.       Notwithstanding the fact that the Magistrate has held that Plaintiff has not stated a federal claim or satisfied the technical pleading requirements for injunctive relief the pleadings indisputably raise an important issue of national and public importance concerning when, and under what circumstance, a local municipality may regulate boating in federal waters that should be decided in an adversarial proceeding with the aid of competent counsel.

3.       The totality of Plaintiff's claims are summarized in the preamble to his Second Amended Complaint (SAC) (Dkt. No. 40), which is an overarching conspiracy to violate not only the rights of the Plaintiff, but also the rights of the public and all persons using the Ashley River for an improper private purpose, rather than a legitimate government interest. Therefore, whether or not one single defendant is or is not a state actor or has sovereign or legislative immunity is irrelevant. Plaintiff has also shown and provided proof in his motions for injunctive

3

relief that said conspiracy by acting in concert with a private party vigilante to do its dirty work has actually caused more cost to the taxpayers property damage, and serious threats to human life and safety than if there was no regulation or conspiracy. Additionally, he has shown that in any other context by any other person a federal claim would be found and the action would have gone forward to service of process and discovery. For instance, if the words restaurant or lunch counter had been substituted for public parking lot; or if the word automobiles had been substituted for boats, there is no doubt that clearly established law would have required the action to go forward. Competent, experienced counsel could satisfy those pleading requirements and convince the court to step in to protect the public from this conspiracy that is not authorized by the SC Legislators and has already cost the taxpayers and boaters hundreds of thousands of dollars by allowing a private party vigilante to implement public policy.

4.     The primary means to accomplish the illegal purpose of the alleged conspiracy is a policy or ordinance adopted contrary to state law and without adequate notice by the CoCHS, nor following SC State Statutory requirements with the adoption of such ordinance provisions as set forth in SC Code § 50-21-30 to enact 2023-097 or § 20-70. In his lack of understanding of the law and pleading requirements, the Plaintiff named as defendants the persons responsible for enacting that ordinance in violation of due process, which the Court found were either private actors or clothed with legislative immunity, rather than the CoCHS. The situation is that Plaintiff opines that if all of the CoCHS Board Members were to be asked if they knew that Officer Mike Merrill (Merrill) wrote his own set of insurance laws into the ordinance that many would probably not even have a clue that he executed such; that is because the minutes support that no actual reading ever took place. The matter was mentioned by way of deceiving the group of

other Board Members, that the document in which Merrill possessed was similar/identical to the City of Folly Beach's (CoFB) ordinance;[3] and then voted on at the instructions of Council Member Shahid with  no actual  reading having ever taken place.  That type of monkey business is not what SC Legislators intended regarding local municipalities making up their own set of rules for adopting ordinances; the SC Attorney General's correspondence is that:  a three days notice to the public, along with a three reading requirement, with an opportunity for the public to object is a proper course over water areas in which municipalities must accomplish before even considering extending their corporate jurisdiction "to the center of the river" as S.C. Code § 50-21-30 provides.[4]  However,  the federal channel, and USCG approved federal anchorages nor US navigable waterways are not within the purview of that statute's intent.  The Fourth Circuit has clearly and unequivocally held that local governments and municipalities are subject to liability under 42 U.S.C. § 1983 pursuant to <u>Monell v. New York City Dep't of Social Services</u>, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) in any and every context for any policy, ordinance, or decision, adopted, by that body's officers that violates constitutional rights, regardless of whether its members might be immune under legislative immunity and despite any policy arguments against the categorical statements in <u>Monell</u>.  Therefore, the Plaintiff should be able to amend the pleadings to name the CoCHS as the real party in interest irregardless of the

---

[3]      The Board minutes of the May 9, 2023, hearing at pg. 8 ; also entered in (Dkt. No.  36  at Exhibit  B ).
[4]      Not all rivers in SC are penetrable to the "center of the river"  as  the allowed for ordinance provides, which is most likely why the SC Legislators did not make the amendment to 50-21-30 adhered to statewide; moreover, a Lease agreement with the federal government entered in 1991 prevents certain areas. Plaintiff argues that his vessels are in such an area; see **Exhibit F** and  (Dkt. No. 12, Ex. A).  The only land in the vicinity to Plaintiff's vessels is that of federal land/ federally protected Wildlife Sanctuary, or federal channel, or federal ICW. Consider it the four-corners of federal law; Wildlife, Security, Highway, Anchorage which are all for the public.

fact that Plaintiff's objections to summary dismissal are before the Court.[5] A proper Motion For Reconsideration will be filed before the deadline.

5.    Many of Plaintiff's claims were recommended to be dismissed on abstention grounds or barred by the Anti-Injunction Act codified at 28 U.S.C § 2283. Plaintiff submitted throughout the pleadings that the facts satisfied the recognized exceptions to abstention. However, the Court did not rule on those proffered exceptions or otherwise consider any of them. Therefore, they can be considered here without being precluded by any previous litigation bar.

6.    No court has decided the constitutionality of the SC State statute, § 50-21-30, authorizing the local ordinance at issue here, which the Plaintiff submits is broader than authorized by the SC Legislator, and no court has decided the constitutionality of that ordinance. It is far from settled in this Circuit whether the CoCHS has the authority to impose the restrictions it has enacted by its new ordinance, nor has it been recognized in the Code of Federal Regulations that it does. For example, there are 103 areas listed as Special Anchorages areas in 33 CFR Part A § 110.15-110.129c.[6] Only 15 of these areas have a note saying that anchoring and mooring is governed by local regulations as the local Harbormaster. These are two Special Anchorage areas in South Carolina, that includes the Ashley River, but neither say that anchoring or mooring is governed or controlled by any local ordinance as the other 15.

---

[5]    Until discovery is held, Plaintiff moves to have the CoCHS amended into the SAC/Third Complaint if necessary as a Defendant; however, this filing is a continuum and not the Motion For Reconsideration and/or the appeal. Plaintiff has recently learned that a group of wealthy residents on the CoCHS peninsula enacted a petition that was handed over to certain Board Members wherein it is possible that this, their petition, has caused public corruption amongst certain Board Members. Plaintiff is motioning for discovery request of this petition.

[6]    No Special Needs Anchorage area exists anywhere in the United States of America. Plaintiff has petitioned for the Department of Interior (Secretary) and the USCG to enact such; specifically in the area wherein Defendant Reed conveyed to Socha approximately 12 acres of U.S. Navigable waters for purposes of blocking others use of federal public use lands.

There are 70 anchorages grounds in Part B 33 CFR 110.130-110.255, including the Port of Charleston at § 110.173, which has its own regulations concerning anchoring and mooring not applicable here. Only 15 of those areas say that anchoring and mooring is governed by any non-federal authority as an entity. For that reason the Court can and should determine whether the local ordinance, 2023-097 and/or § 20-70, is constitutional and legal, with full briefing by competent counsel, and enter a declaratory judgment that is reflected as a notice in the C.F.R. that anchoring and mooring is governed on the Ashley River by local ordinance within the jurisdiction of the CoCHS. At the present time, any boater from another state or country has no notice that anchoring and mooring is governed by any legitimate and constitutional ordinance.

## MEMORANDUM OF LAW

The issue in this action is a local ordinance regulating only boaters within the jurisdictional limits of the CoCHS who cannot afford to pay to have their boats docked or moored at a commercial marina. The Plaintiff contends that the ordinance exceeds its legislative authorization, is unconstitutional on its face for its terms being arbitrary, vague and overbroad, and illegal because it was enacted without proper notice, nor any actual readings, and for those reasons, should be enjoined from enforcement in any current or future criminal or civil proceeding unless and until it is declared legal and constitutional by a court of competent jurisdiction.

In Berkley v. Common Council of Charleston, 63 F.3d 295 (4th Cir. 1995) (en banc) the court heard that "case en banc to decide whether a municipality, [there] the City of Charleston [West Virginia] , is entitled to absolute immunity from liability under 42 U.S.C. § 1983 for

unconstitutional enactments and actions of its local legislature." Id. at 296. It held that in every

context that " a municipality is not immune from liability under section 1983 for the enactments

and actions of the local legislative body." Id. It did so, despite the fact that immunity for local

legislatures, sued in their individual capacity, are entitled to absolute immunity from suits under

42 U.S.C. § 1983 relating to their legitimate legislative activities. Id. at 300 n. 5. The court also

rejected the arguments of the dissent on the grounds that the unacceptable policy implications of

their decision were contrary to the Supreme Court's interpretation of the statute and its

categorical statements in Monell and its progeny. Id. at 296 n.


If the CoCHS is added as a party, as is required by the en banc court's conclusions in

Berkley, then this Court can consider what it failed to consider in rejecting the Plaintiff's prior

attempts to obtain injunctive Relief and in dismissal of the SAC under the standards established

by the Fourth Circuit:

> Absent a few extraordinary exceptions, Younger mandates that a federal
> court abstain from exercising jurisdiction and interfering in a state criminal
> proceeding if (1) there is an ongoing state judicial proceeding brought prior to
> substantial progress in the federal proceeding, that (2) implicates important,
> substantial, or vital state interest; and (3) provides adequate opportunity to raise
> constitutional challenges.

Nivens v. Gilchrist, 444 F.3d 237, 241 (4th Cir. 2006). Although not relevant in that case,

the court noted that Younger "has been extended beyond the criminal context." Id. at n. 3.


The effect of Younger and its companion cases and the law to be derived therefrom might

best be summarized by Mr. Justice Stewart, who, in his concurring opinion declared the Supreme

Court's holding to be that a federal court must not, save in exceptional and extremely limited

circumstance, intervene by way of either injunction or declaration in a existing state criminal prosecution, and that such circumstances exist only when there is a threat of irreparable injury both great and immediate. The Justice pointed out that a threat of this nature might be shown if the state criminal statute in question were potently and flagrantly unconstitutional on its face, or if there had been bad faith and harassment-official lawlessness- in a statute's enforcement. <u>Younger</u>, 401 U.S. at 56 (Stewart, J., with whom Justice Hallan joined, concurring).

Based on the conclusions of five concurring justices in <u>Younger</u>, and a later case where the Court provided an inexhaustible list of exceptions it found "impossible to anticipate and define," the Fourth Circuit summarized those exceptions that the Court here failed to consider:

> The Supreme Court has recognized that a federal court may disregard Younger's mandate only where (1) "There is a showing of bad faith or harassment by state officials responsible for the prosecution"; (2) "the state law to be applied in the criminal proceeding is flagrantly and potently violative of express constitutional prohibitions"; or (3) "other extraordinary circumstances" exists that present a threat of immediate and irreparable injury.

<u>Nivens</u>, 444 F.3d at 241 (citing and quoting <u>Kugler v. Helfant</u>, 421 U.S. 117, 124, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975)). [7]

## I.    <u>The Ongoing State Judicial Proceedings</u>

One of the ongoing state judicial proceedings that are based on the challenged ordinance sought to be enjoined is a complaint filed in the Court of Common Pleas of  County on November 14, 2023 by the CoCHS, but not properly served in accordance with the South

---

[7]    In <u>Younger</u>, the Court also held that in addition to the three statutory exceptions to the Anti-Injunction Act codified at 28 U.S.C. § 2283, "a judicial exception to the longstanding policy evidenced by the statute has been made where a person about to be prosecuted in a state court can show that he will , if the proceeding in the state court is not enjoined, suffer irreparable damage." <u>Id.</u> at 43 (citing <u>Ex Parte Young</u>, 209 U.S. 123 (1908)). That threat became the third exception to the <u>Younger</u> abstention doctrine.

Carolina Rules of Civil Procedure; Case No. 2023-CP-1005590. The other ongoing state judicial proceeding involves over $20,000 in citations issued by Merrill on April 2, and June 17, 2024, [8] A trial is tentatively set for September 23, 2024, at 8:30 a.m. Case Number U91382 pending the outcome of litigation before this Court; attached as **Exhibit A (Letters both dated July 15, 2024, with different case numbers: 1) U91382 and U91387, and 2) U91384 and U91386 provided by Clerk Ms. Brenda Armstrong; except she does not place her name on the letters).** However, see attached **Exhibit B (Court Docketing Schedule of August 5, 2024); and Exhibit C (Affidavit of Plaintiff ¶ g p. 24-25),** which provides further discrepancies on the actual trial date.


## II.

**The Criminal Proceedings implicates NO important, substantial or vital state interests.**

The South Carolina Legislation enacted a statute, SC Code § 5-7-270, that authorized the municipalities within the State that enact ordinances, must have two readings before it has any legal force; elsewise, it is null and void with no legal force. In the enactment of SC Code § 50-21-30, that authorized the municipalities within the State to enact ordinances to address an important, substantial or vital state interest, which explicitly stated was to address the problem of abandoned boats. Instead, the CoCHS struck that mandate in the purpose of its ordinance and broadened its authorization to include all boaters who cannot afford to moor at a commercial marina and to criminalize debris and algae, without defining those terms, and to require $300,000 of liability insurance,[9] when there is no evidence that any small boat has ever caused that amount of damage, even if it were to be abandoned. There is no important, substantial or

---

[8]    The actual citation numbers were made a part of the record in (Dkt. No. 65 at Exhibit C).
[9]    Merrill wrote his own set of insurance laws requiring $300,000 of liability insurance despite U.S. Congress's enactment of 46 U.S.C. § 3506; see (Dkt. No. 65, Ex. A).

vital interest in debris, or algae or a substantial insurance policy because all boats have debris and algae to some extent and there is no requirement that any boat have any liability insurance.

## III.

### There is No Adequate Opportunity to Raise Constitutional Challenges to the Ordinance

Plaintiff concedes that this third prong required for abstention could be satisfied with respect to the civil complaint filed in the Court of Common Pleas of Charleston County because that court is governed by SC State Statutes and the South Carolina Rules of Civil Procedure. However, he disputes that it can be satisfied with respect to the citations issued for violating the ordinance because they are addressed to the Livability Court of the CoCHS and the penalties threatened by those citations exceed the jurisdiction of that court and there are no published rules for challenging the constitutionality of an ordinance, how it was enacted, and whether it is being enforced in a constitutional manner or how any adverse decision can be appealed. Plaintiff has appeared in that court twice. There, the presiding judge refused to say how an adverse order is appealed. When asked what rules it goes by, he said "we go by the rules of the South Carolina Supreme Court." In the SC Code § 14-25-65 the Municipal Court's jurisdiction is exceeded if the amount in controversy exceeds $500;[10] however, when Plaintiff pointed this out to the CoCHS Livability Court's senior Clerk he said "we don't go by those rules." See, **Exhibit C (Affidavit of Plaintiff at ¶ a pg. 23)**. For these reasons alone, abstention under <u>Younger</u> should not apply. Even more bizarre is trying to acquire a transcript of the hearing; see **Exhibit D (Email correspondence with VERITEXT)** and See, **Exhibit C (Affidavit of Plaintiff at ¶ f)**.

---

[10]     Plaintiff's case is far in excess of 20k; SC Code § 14-25-65 caps criminal cases at $500.

IV.

**The Plaintiff has Alleged in the Pleadings Bad Faith, Harassment and Official Lawlessness by CoCHS Officials Responsible for Enforcing the Ordinance**

As to this exception, the Supreme Court has held that a public official's acts in bad faith when a prosecution is undertaken with a different, invalid motive other than to obtain a valid conviction to advance some legitimate state interest. Kugler, 421 U.S. at 124; Younger, 401 U.S. at 48. It also held that abstention can be overcome upon an allegation and proof of "official lawlessness-in a statute's enforcement." Younger, 401 U.S. at 47-49.

The Plaintiff alleged in the pleadings that the ordinance was not obtained or enforced to address the problem of abandoned boats as was authorized by the SC State Legislature. The facts alleged are that the ordinance was obtained and enforced for the purpose of riding that part of the river of all boats except those that are moored of a commercial marina and to serve the expansion needs of that marina for private financial reasons.

It was also alleged throughout the pleadings that the ordinance was obtained and passed in a lawless manner. SAC (Dkt. No. 40 at CLAIM FOUR ¶¶ 32-47). In addition to that fact, the pleadings also alleged, particularly in the prior motions for injunctive relief, that the overall conspiracy is being carried out and the ordinance is being enforced by the lawless acts of Defendant Rudy Socha (Socha) in cutting the mooring balls of dozens of boats and causing hundreds of thousands of dollars in damages and threats to safety and human life; SAC (Dkt. No. 40 at CLAIM THREE ¶¶ 25-31). It was alleged that Defendants Isom and Socha are participants in the conspiracy, acting lawlessly in concert with the CoCHS and its officers. However, the

Court denied injunctive relief and the Magistrate judge recommended dismissal of the SAC based on a conclusion that they were private citizens and not acting under color of law, which is contrary to the evidence and the law because of the allegations that Isom acted in concert with CoCHS officials and Socha's lawless acts were sanctioned by certain CoCHS officials.[11] See United States v. Price, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), in which several police officers and private citizens murdered three civil rights workers. There, the court found not only that the officers acted under color of state law, but also that the private citizens "were participants in official lawlessness, acting in willful concert with state officers and hence under color of law." Id. at 795.

V.

### The Ordinance 2023-097 § 20-70 is Flagrantly and Patently violative of the Constitution on its Face and in How it was obtained

The pleadings demonstrate that the SC State Legislature authorized municipalities to enact ordinances to address the problem of abandoned boats. Instead, the Defendants struck that purpose to enact an ordinance that made all boats violate its provisions unless they are moored at a commercial marina that wants to expand. For example, it made having algae or debris on a boat a crime without defining those terms or quantifying the amount of algae or debris that can violate the ordinance. It required a liability insurance policy of $300,000 without any evidence for any need of such a policy in that onerous amount or any requirement in State or federal law

---

[11]    Plaintiff provided evidence in his Emergency Motion For Temporary Relief (ETRO) at (Dkt. No. 12 at Exhibits A, B, G at ¶ 30, and Q) where Socha identified his mooring ball and area as OCRM permit 04513 issued by Defendant Sarah Reed (Reed) for a law enforcement purpose. Also, Plaintiff provided text communications from Socha and Bronske at (Dkt. 65, Ex. E) and Socha's letters to the Court (Dkt. No. 37 and 48) and Plaintiff's Motion to Take Judicial Notice of Socha's Letters (Dkt. No. 61); each supports that Socha is indeed a State Actor.

for insurance.  Finally, the pleadings showed that the ordinance was enacted without adequate notice to the public or the necessary readings required by SC State and CoCHS law.

## VI.

### The Pleadings have Pled that Extraordinary Circumstances Exist that

### Present a Threat of Immediate and Irreparable Injury

Failure of this Court to enjoin the CoCHS's Livability Court over the case STATE OF SOUTH CAROLINA CITY OF CHARLESTON SUMMARY COURT SUMMONS Case No. U91384, **Exhibit A**, scheduled for September 23, 2024[12] will cause this Plaintiff an irreparable injury to the extent: 1) Any fines sanctioned against this Plaintiff, due to his indigence, would cause for incarceration and thereby his vessels would be impounded. Upon release from incarceration the Plaintiff could not afford the impound yards fees for release and would thereby be homeless; moreover, all of his personal property items would be lost; 2) If the fines were waived by the CoCHS's Livability Court, and an order issued commanding that the vessels move to another section of the Ashley River to allow for Socha and others to develop that portion of the federal waters for private gain, then Plaintiff would also lose his vessels as he could not afford to move. To retrieve the anchors would take a barge with machinery necessary to pull anchors out of the pluff-mud riverbed which exceeds this Plaintiff's financial abilities. The same scenario as mentioned above in ¶ 1) as the vessels would go to impound as Plaintiff could not afford to purchase new anchors and rode tackle; 3) Plaintiff's entire reasoning for Petitioning the USCG and Secretary for a Special Needs Anchoring Area is that Plaintiff does not own a

---

[12]     The discrepancies of the actual trial date are provided for in **Exhibit C** (**Affidavit of Plaintiff at ¶¶ g and h**) ; and **Exhibits A** and **B**.  Also, despite that my receiving address is on file with the court the documents were first sent to my last mailing address as opposed to what is on file at the Livability Court.

seaworthy dinghy and thus could not make the journey in coming ashore from outside the boundary of the eastern side of the Ashley River; see (Dkt. No. 12, Exhibits K and J).

## **CONCLUSION**

For all of the above reasons and to include all matters discussed in Plaintiff's prior Temporary Injunction Motion(s), this Court should find that the extraordinary circumstances exist in this case wherein federal constitutional violations are prevalent and that jurisdiction is only proper in this Honorable U.S. District Court and that the CoCHS Livability Court, of which CoCHS Board Member A. Peter Shahid is a municipal judge, should be grounds for this Court to enjoin Case No. U91384 and/or the CoCHS Livability Court's enforcements over § 20-70.

Plaintiff submitted to this Court the factual evidence of the transcribed conversation between Merrill and the Plaintiff of April 2, 2024, in his objections (Dkt. No. 65 at Exhibit A, Email correspondence from Ms. Mallery L. Scheer and an excerpt from the flashdrive transcript ) to the Magistrate's R&R (Dkt. No. 51), wherein Merrill acknowledges that he wrote the insurance policy into § 20-70; he again confirmed that he did such, **(Exhibit C, (Affidavit of Plaintiff at ¶ 13, pg. 23 ),** on June 17, 2024, under the recording of his body recording device. Presently this recording has been requested for by way of discovery motions to Ms. Katie Dahlheim, legal counsel and/or assistant legal counsel to the CoCHS's Legal Team and stated that not only did he write it but that when he wrote it that he was fully aware that neither the State of SC nor the Federal Regulations require such. Moreover, 46 U.S.C. § 3506 is the controlling authority of liability matters concerning matters over federal waters which was enacted by the U.S. Congress. It is absurd that a law enforcement officer can write the law, provide no notice to the public, enact his ordinance by unlawful means by not following the State

and City regulatory requirements, and then selectively enforce it; these are issues that invoke the Fourteenth Amendment's due process violations as this indigent Plaintiff cannot afford Merrill's unlawful requirements which subjects Plaintiff to the loss of his liberty.

Plaintiff provided to this Court in (Dkt. No. 12, Exhibits P, Q, and Y) Socha's acquired 12 acres of U.S. navigable water/land development wherein he was authorized to block others from using said federal public use lands so as to await the necessary permits for private marina expansion; see **Exhibit E (Photographs taken of engineers at SHM on July 11, 2024).**[13] The eastern side of the Ashley River at the location where Plaintiff's vessels are anchored has only federal land in the vicinity as provided in (Dkt. No. 12 at Exhibits A and K ); moreover, SC State Bill § 777 adopted the provisions within the federal government that mandates that the area is a SC Harbor (which is federal) Wildlife Bird and Fowl Sanctuary which is under the provisions of the Secretary and the U.S. Fish and Wildlife Services; this area falls in the U.S. Congress Migratory Bird Conservation Act of 1932; see also, 16 U.S.C. §§ 668dd(a)(2) and (b)(5).  The permit issued to Socha is unlawful as DHEC has not acquired federal authorization to even pull a permit from a protected wildlife refuge sanctuary.  There is no SC land or CoCHS land in the vicinity; only federal land.[14]  A legal permit for a mooring ball to block all others from using the federal public land could only have been issued through the Secretary.  Thus, Socha's issued permit (making him a state actor) bypassed practically all of the regulatory requirements that SCCZMC has within its provision that one must adhere to in order to even acquire an application for the issuance of a  permit. The Property Clause of the United States Constitution grants

---

[13]     Plaintiff spoke to one of the engineers who stated that they were extending the marina.
[14]     Likewise, only federal water is found in this area; federal channel, federal ICW, underwater federally protected sewage pipe for the State facility on James Island.  All navigable water by the USCG Ashley River base station is federal. The land tracts that make up the SC Harbor (federal)  Wildlife Bird and Fowl Sanctuary specifically state that it is "UNDEVELOPABLE"; which disallows Socha to even pull a permit from that location.

Congress the "[p]ower to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. Art. IV, § 3, cl. 2.

Wounded Nature Working Veterans 501(c)(3) non-profit is an entity established and controlled by Socha which acquires vessels through donations and thereafter Socha profits off of the salvage of the impounded vessels. Socha is not acquiring the property of others in violation of their due process rights, and then walking away empty handed; he has been conducting vigilante tactics, approved by certain officials within the CoCHS, and profiting financially. OCRM04513 is a staging area for his profitable commercial enterprise.[15] Under the regulations pertaining to The National Wildlife Refuge System Improvement Act of 1997 16 U.S.C. § 1531-44, and the Migratory Bird Treaty Act 16 U.S.C. §§ 703-12, "conducting a commercial enterprise on any national wildlife refuge is prohibited except as may be authorized by special permit." 50 C.F.R. § 27.97. Socha, on behalf of his non-profit, and through the unlawful acts of Defendant Reed, acquired a permit which is void as a matter of law. Jurisdiction in addressing this matter is only in this federal Court; not in the Summary Court named as CoCHS's Livability Court which unlawfully expanded their corporate jurisdiction into federal jurisdiction. A case previously before this Honorable Court regarding the necessity of acquiring a permit from the Secretary was and/or is Livingson v. U.S., No. 2:15-cv-00564-DCN which held that Livingson[16] had to acquire a "Special Use Permit " to operate her business. While that case dealt with a Lease Contract, Recorded at 201 pg. 729 in the County of Charleston with the federal government and the SC Budget and Control Board, the similarities is that that lease gave the Secretary the power of the waterways. Here in the Ashley River no lease to the federal government is necessary as

---

[15]     Until discovery is allowed the scrap yard associates who deal with Socha and others remain out of reach to acquire and prove Socha's role in any sales of the parts of these so-called junk vessels.
[16]     The Citation spells the name as Livinson without a letter "t", however, on the second page of the Order her name includes the "t".

the waters are indeed U.S. Navigable; see **Exhibit F (Dkt. No. 12, Ex. A with descriptive notes)**. Thus, for Socha to drop a 4,000 lb. cement block, to the riverbed, he would need a Special Permit from the Secretary. However, his acts of fraud would not get past the Department of Land Managements permit provisions as Reed so allowed.

Plaintiff has a probable right to the relief sought to allow for him ot to become incarcerated which is imminent as of August 23, 2024, according to an unknown clerk at the Livability Court of Charleston SC. The balance of irreparable harm favors the issuance of an injunction from the Honorable Court as neither the Court of Common Pleas nor Livability has any jurisdiction over this matter. State remedy motions have been filed for dismissal in both lower courts which to date remain unanswered. The tactics of the Livability Court of possibly advancing a fraud in the misalignment or acknowledgment of a trial date warrants for this Court as opposed to the Supreme Court of SC to intervene because those are federal waters; thus, no injury results to the Livability Court as an injunction would spare the taxpayer the expense of trial and the cost associated with Plaintiff's incarceration.

WHEREFORE, Plaintiff prays for relief in that an Order issue enjoining the City of Charleston's Livability Court over or from enforcing § 20-70, and for any other available relief within this Court's purview to dispense with.

Respectfully, submitted this 2nd day of August, 2024

David A. Babb
P.O. Box 522
Charleston, SC  29402

18

# EXHIBIT A

**(Letters both dated July 15, 2024, with different case numbers: 1) U91382 and U91387, and 2) U91384 and U91386 provided by Clerk Ms. Brenda Armstrong; except she does not place her name on the letters).**

180-B Lockwood Dr
Chas SC 29403



CITY OF CHARLESTON
MUNICIPAL COURT
180 B LOCKWOOD BLVD.
CHARLESTON, SOUTH CAROLINA 29403

David Babb
P O Box 592
Chas SC 29402

FIRST-CLASS



ZIP 29403
02 7H
0006043667

US POSTAGE™PITNEY BOWES

$ 004.31⁰

JUL 16 2024

# STATE OF SOUTH CAROLINA
# CITY OF CHARLESTON

**David Babb**
**P O Box 522**
**Charleston, SC  29402**

## SUMMARY COURT SUMMONS

You are hereby summoned to be and appear in the

**Charleston Municipal Court**
**180 B Lockwood Boulevard**
**Charleston, SC**

on **September 23, 2024** at **8:30 AM**, to serve as a defendant/defense counsel/witness in the Jury Trial of State vs. **David Anthony Babb**, Case Number: **U91384**, Charge: **Ordinance / Mooring permit required to moor or anchor within territorial limits of the city**.

Failure to appear by the defendant, without leave of the Court, may subject the defendant to trial in absentia.

**Charleston Municipal Court**
**180 B Lockwood Boulevard**
**Charleston, SC  29403**
**Phone: (843) 724-7460**
**Fax:  (843) 724-7171**

July 15, 2024

MJ7

# STATE OF SOUTH CAROLINA
# CITY OF CHARLESTON

**David Babb**
**PO Box 522**
**Charleston, SC  29402**

# SUMMARY COURT SUMMONS

You are hereby summoned to be and appear in the

**Charleston Municipal Court**
**180 B Lockwood Boulevard**
**Charleston, SC**

on **September 23, 2024** at **8:30 AM**, to serve as a defendant/defense counsel/witness in the Jury
Trial of State vs. **David Anthony Babb**, Case Number: **U91386**, Charge: **Ordinance / Duty to
keep watercraft and floating structures clean**.

Failure to appear by the defendant, without leave of the Court, may subject the defendant to trial
in absentia.

**Charleston Municipal Court**
**180 B Lockwood Boulevard**
**Charleston, SC  29403**
**Phone: (843) 724-7460**
**Fax:  (843) 724-7171**

July 15, 2024

MJ7

# **EXHIBIT B**

## **(Court Docketing Schedule of August 5, 2024)**

## Menser, Cameron

### Tuesday, August 6, 2024

| Time | Court | Defendant | Charge | Case Number |
|---|---|---|---|---|
| 2:00 pm | Criminal Court | Adams, Ryan Quentin | Traffic / Following vehicle too closely | 202404163011390 |

### Monday, August 12, 2024

| Time | Court | Defendant | Charge | Case Number |
|---|---|---|---|---|
| 9:00 am | Criminal/Traffic Jury Trials | Simmons, Dexter Maurice | Disorderly / Public disorderly conduct | 2023041620707329 |

### Thursday, August 29, 2024

| Time | Court | Defendant | Charge | Case Number |
|---|---|---|---|---|
| 3:15 pm | Admin Docket / Pending GS Cha | Seabrook, Wesley Bernard | Alcohol / Open container of beer or wine in motor vehicle | 2024041629030344 |
| 3:15 pm | Admin Docket / Pending GS Cha | Seabrook, Wesley Bernard | Alcohol / Transport alcohol in motor vehicle with seal broken | 2024041629030345 |
| 3:15 pm | Admin Docket / Pending GS Cha | Seabrook, Wesley Bernard | Drugs / Poss. of 28g (1 oz) or less of marijuana or 10g or less of hash - 1st offense | 2024041629030346 |
| 3:15 pm | Admin Docket / Pending GS Cha | Seabrook, Wesley Bernard | DUS / Driving under suspension, license not suspended for DUI - 3rd or sub. offense | 2024041629030347 |

## Merrill, Michael

### Monday, August 5, 2024

| Time | Court | Defendant | Charge | Case Number |
|---|---|---|---|---|
| 9:00 am | Livability Court | Decker, Michael David | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23829 |
| 9:00 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23834 |
| 9:00 am | Livability Court | Babb, David Anothony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23835 |
| 9:00 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23836 |
| 9:00 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23837 |
| 9:00 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23838 |
| 9:00 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23839 |

| Time | Court | Defendant | Charge | Case Number |
|---|---|---|---|---|
| 9:00 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23840 |
| 8:30 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23841 |
| 9:00 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23842 |
| 9:00 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23843 |
| 9:00 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23844 |
| 9:00 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23845 |
| 9:00 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23846 |
| 9:00 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23847 |
| 9:00 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U2386 |
| 9:00 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23848 |
| 9:00 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U23849 |
| 9:00 am | Livability Court | Babb, David Anthony | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U91368 |
| 9:00 am | Livability Court | Decker, Michael David | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U91373 |
| 9:00 am | Livability Court | Boshard, Albert R | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U91385 |
| 9:00 am | Livability Court | Decker, Michael David | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U91388 |
| 9:00 am | Livability Court | Lezama, Noel Jesus | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U91389 |
| 9:00 am | Livability Court | Decker, Michael David | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city | U91395 |
| 9:00 am | Livability Court | Fleschimner, Tee Hewitt Emerson | Ordinance / Mooring permit required to moor or anchor within territorial limits of the city |  |

## **EXHIBIT C**

## **(Affidavit of Plaintiff)**

I am David Anthony Babb, the Plaintiff in case No. 2:23-cv-03218-RMG-MHC, hereinafter the Affiant, and the Affiant is a Defendant in: 1) a Civil Action in the Charleston Court of Common Pleas; and 2) a quasi-criminal action in the Livability Court of Charleston and the Affiant is competent to attest as follows:

First, the initial paragraphs are a redundancy of what has already been filed in this case. The importance is whether a court with no published rules can subject incarceration; their rules allow them such discretion and whether this Court finds that to do such outside of their corporate jurisdiction is lawful. The question hinges on whether or not SC Code § 50-21-30, which is on abandoned vessels, allows a Board to remove the words "Abandoned" and attack all boaters including those in federal waters. The irreparable harm is below at pgs. 25-26.

1.      Affiant learned that SC Legislators allowed for SC Code Title 50 to become Amended regarding "Abandoned vessels." This occurred on their 124th Session thru Bill 77; attached in (Dkt. No. 65, Ex. J).

2.      Affiant further learned that the Amendment in § 50-21-30 allows for State entities to adopt the provided ordinance provided that each entity's ordinance remains "Identical" to that in which SC General Assembly allotted for regarding "Abandoned" vessels. Affiant's vessels are not abandoned; he lives on one, uses another for a garage-workshop for remodeling his third vessel, and is remodeling the third.

3.      On May 9, 2023, during the early evening televised news Affiant witnessed Merrill and Socha discussing their new laws.  Shortly after viewing such, Affiant, while peddling his bicycle home, viewed Board Member Mike Seekings (Seekings) crossing the road to eat at Stellas.  In brief conversation Seekings apprised Affiant that the ordinance, 2023-097, would not affect liveaboards, and that it would one effect abandoned vessels.

4.      Affiant disclosed to Seeking's that Socha and/or Socha acting on behalf of Wounded Nature Working Veterans was cutting the rodes to peoples vessels and absconding their mooring balls.  Seeking's stated that he was aware of such and that law enforcement were in close proximity  overseeing his [criminal] acts.

5.      On May 6, 2022, approximately one year prior, Socha met with Defendant Isom and two SC State Law Enforcement officers to enact a plan to force Affiant to move away.  Their arrangement led to the idea that if Isom could force Affiant from being able to use the public parking facilities that the hardship would cause Affiant to resituate his vessels at another marina further up river.

6.      Affiant has sustained an anchorage hold which would require a barge with machinery in order to lift his anchors in order to move.

7.      Affiant has three vessels which each have four anchors attached to each with rode length allowed for hurricane strength holding.  Thus, the cost of anchors per vessel is approximately $2,500 in anchors, and with chain at $ 6/foot each rode of 150' cost an additional $ 1,000 plus rope and tackle; thereby putting Affiant's cost of anchoring, his insurance, in excess of $20,000.

8.      Affiant is indigent and is unable to afford new anchors.  As mentioned above in paragraph No. 6 that only a barge can hoist the 45 lb anchors up out of 12' of pluff mud river

bank. As mentioned above, in ¶ No. 4 as Socha cut others rodes as opposed to pulling up their anchors; lifting the anchors is impossible. Affiant has first hand experience in attempting to lift his anchors; it is virtually impossible by human strength alone.

9.      On or around May 15, 2023, Affiant obtained a copy of the CoCHS's regulations on establishing an Ordinance and their regulations require three readings on three separate days approximately six days apart; with notice to the public for an opportunity to object.

10.     On or around May 16, 2023, Affiant saw that the next scheduled Board Meeting was on May 23, 2023, however the Board's agenda did not include anything on anchoring /boat permitting; therefore the Affiant did not attend.

11.     On June 1, and 7 Affiant submitted his objections (Dkt. No. 12, Ex. T). Again, Affiant was still unaware that the former Mayor Tecklenburg had enacted the ordinance 2023-097 from a single reading before the Board on May 23, 2023.

12.     The Board's minutes to the May 9, 2023, hearing were not made available to the public until over one and a half months after the hearing. It wasn't until sometime in or around February of 2024 that the addendums in which Merrill inserted were made available for the public to view; § 20-70 (g)(1)(n).

13.     On April 2, 2024, Merrill issued to Affiant five citations: U91387; U91386; U91384; U91383; and U91382. Then on June 17, 2024, Merrill issued over $20,000 in citations against this Affiant; (Dkt. No. 65, Ex. C). Merrill scheduled the trial for these citations on June 21, 2024; see **Exhibit  G  (Email correspondence with Katie Dahlheim, Legal Assistant).** Merrill reaffirmed that he wrote the insurance policy into §20-70 and that Mallery Scheer instructed him to fine Affiant $3,300 per day. Affiant has a discovery motion to Ms. Dahlheim on this video; it has to date not been provided.

14.     Affiant learned that Board Member A. Peter Shahid, who introduced the boating permit plan before the Board on May 9, 2023, is also a Municipal Judge at the CoCHS Livability Court.

15.     The Affiant has discovered that the CoCHS Livability Court (Livability) has no rules, no statutes, or anything to go by.  Examples:

     a.     Affiant has over $20k in citations and when he questioned the Senior Clerk at Livability concerning the jurisdiction of the Court regarding SC Municipal Court Rule SC Code § 14-25-65  which caps the amount at $500, the Senior Clerk stated that "We don't go by those rules."  SC Code § 22-3-10 in Magistrate Court provides a jurisdictional amount of $7,000.  Everytime Affiant telephones the Livability Court he asks the receiving Clerk what kind of court is this? On every call the speaking clerk states, "This is a municipal court."  The envelope in **Exhibit A**  states "Municipal".

     b.     On July 15, 2024, a hearing was held at Livability wherein Affant asked the Judge what the appellate process is and the Judge answered, "We will discuss that when the time comes."  Incidentally, this hearing was scheduled by a voicemail from Armstrong four days prior.

     c.     Merrill issued over $20k in fines on June 17, 2024, with the trial scheduled for the 21st of June; and he stated that more daily fines of $3,300 per day would be issued.

     d.     Following the July 15, 2024, hearing Affiant requested from Clerk Brenda Armstrong (Armstrong) a copy of the Affiant's case Docket Sheet and she said, "You have to get that through a FOIA request." Through the Legal Department at 50 Broad St. Affiant confirmed, and Armstrong  replied, "Yes."

d.     Affiant forwarded a FOIA request to the Legal Department of Charleston at 50 Broad St. via a Certified Letter; see **Exhibit H  (Certified letter requesting a Docket Case Sheet through a FOIA request concerning Affiant's own case).**

e.     Sixteen days later this Affiant still cannot acquire a Docket Case Sheet of his own case; see **Exhibit  I  (Email Correspondence with CoCHS Legal Dept. concerning acquiring a Case Docket Sheet ).**

f.     On July 30, 2024, Affiant went to Livability and questioned Armstrong about his inability to acquire a copy of the July 15, 2024, transcript from the telephone number in which she provided on July 16, 2024.  Armstrong provided a Contact sheet for VERITEXT; see **EXHIBIT D.**  Over two weeks and no comprehension on how to acquire a Docket Sheet or a transcript of the proceedings.

g.     Also, during the above meeting at ¶ f. Affiant asked Armstrong about the date of the trial, questioning whether or not she mailed the package , **EXHIBIT A,** to the Affiant; and she answered in the affirmative stating, "You don't have to show up on August 5th, your trial is scheduled for September 23, 2024." Also, during the hearing of July 15th the Judge said that the trial would be in the third week of September.  However, on July 31, 2024, Affiant Googled the Livability's Court scheduling, **EXHIBIT B,** and saw that Affiant's court date is on August 5, 2024.  Affiant telephoned the Clerk's Office and asked to speak with Armstrong and he was connected to her voicemail; whereupon Affinat left a voicemail at 9:37 a.m. concerning the case docket scheduling.  At 11:20 a.m. Affiant called back to the Livability Clerk's Office in an effort to speak with Armstrong, but received assistance through another clerk  who stated, "....No, your trial is scheduled for August 23rd.  You must have misunderstood her. I'm looking

at the computer screen right now and you asked for a jury trial correct? It's scheduled for the 23rd of August."

      h.       Affiant, following the above conversation in ¶ g, observed the letter in which Armstrong stated that she had forwarded to Affiant, **EXHIBIT A,** and realized that NO NAME exists on the envelope or letter.

      i.       Affiant Googled the Livability and cannot find any rules, regulations, standards, but did find one complaint to the Supreme Court of SC against the Constitutionality of its existence and found an article between Adele V. Harrell of the Urban Institute with Real Audio between Mr. Kojo Nnamdi from WAMU at American University, Mr. William Dressel, and Mr. Michael Molony; see **Exhibit J (Livability Courts for Problem-Solving and Mediation) and Exhibit K (Ord. # 1702)** which was the creation of the Livability. Affiant has submitted to this Court the Corporate Expansion of Livability through 2023-097 into and overriding federal regulations and jurisdiction.

## IRREPARABLE HARM

**I.**       No monetary award could ever cure the injuries in which Affiant will sustain in a court that has no set written rules, guidelines, or structure for any person to proceed; the result, due to Affiant's indigence, is incarceration and upon exiting from incarceration all of Affiant's personal property is forever lost; no monetary ward could fix this as his personal effects would be destroyed.

II.      Exiting incarceration without any money would as well prevent this Affinat from any successful litigation and therefore such is not an option.  Destitute people cannot proceed through litigation, even if the costs are waived.

III.     Affiant has petitioned the Secretary and USCG in an effort to acquire the eastern side of the Ashley River as a Special Needs Anchorage Area as Affiant, and others, cannot travel the distance to the present Federal Anchorage.

IV.     Forced into incarceration by an unlawful and unconstitutional ordinance § 20-70 substantiates an irreparable injury of which Affiant has no other remedy to address the matter except that this Court, which has jurisdiction over the federal waters, could and can resolve the matter on whether the CoCHs can expand their corporate boundaries into the federal waters exceeding SC Code 5-7-30 and 5-7-140(B) which stops their jurisdiction at the "low tide mark."

V.      The Livability Court requires a bond for full expenses in order to appeal; thus, their unlawful attack against Affiant, wherein they have purposely increased the cost into the tens of thousands of dollars, prevents this Affiant  an opportunity to appeal from a Court which moves through an unlawful and unconstitutional ordinance; leaving Affiant with absolutely no available State remedy.

Affiant has prepared this Affidavit on his sailboat and typed such at the public library wherein he is forced to spend all of his time in legal research, which prevents him in finding gainful employment.  The Affiant sayeth not more at this time.  The above Affidavit with lettered

paragraphs and subparts fulfills the requirement of Rule 65, FRCP, to adjoin the City of

charleston's Livability Court from further encroachments under this Affiant.  This concludes

Affinat David Anthony Babb's Affidavit for Injunctive relief under the laws of both State and

Federal laws of penalty of perjury and pursuant to 28 U.S.C. § 1746, Affiant declares under

penalty of perjury that the above stated paragraphs are true and correct.


Executed on this 2nd day of August, 2024.


David Anthony Babb
P.O. Box 522
Charleston, SC  29402

**EXHIBIT D**

**(Email correspondence with VERITEXT)**



*Brenda Armstrong*

## Mount Pleasant, SC
- 28 Bridgeside Boulevard
Suite 205
Mount Pleasant, SC 29464
- 800-808-4958
- 800-743-3376 Scheduling
- Scheduling

A. William Roberts Jr. & Associates is now part of Veritext!

July 15, 2024

Sept. 23, 2024

 Gmail

DAB DAB <dabistic@gmail.com>

## Hearing

**cs-southeast@veritext.com** <cs-southeast@veritext.com>          Wed, Jul 31, 2024 at 9:13 AM
Reply-To: cs-southeast@veritext.com
To: "dabistic@gmail.com" <dabistic@gmail.com>

Good morning,

I received your request to order a hearing from 07/15/2024.  Can you provide me with either the assignment number of the case caption?

Thank you,

Your feedback matters.  Would you recommend us?  Please take a few moments to fill out this brief survey to let my manager know how I'm doing.  *1-minute survey*

**Kimberley Carter**
Client Services Associate
------------------------------------------------------
**VERITEXT LEGAL SOLUTIONS**

**Note: Effective 2/1/21 all remote videoconference links will be sent ONLY to the caller who schedules the assignment, and they will be responsible for forwarding the connection info to all other parties in the case.**

 Gmail

**DAB DAB <dablstic@gmail.com>**

## Hearing

**dab** <dabistic@gmail.com>                                                      Wed, Jul 31, 2024 at 9:23 AM
To: cs-southeast@veritext.com

The Clerk, Brenda Armstrong,  has affixed this case no.: U91384. The hearing was on July 15th at 2 p.m., however my case didn't commence until around 2:15 p.m.

[Quoted text hidden]

 Gmail

**DAB DAB <dabistic@gmail.com>**

## Hearing

**cs-southeast@veritext.com <cs-southeast@veritext.com>**
Reply-To: cs-southeast@veritext.com
To: dab <dabistic@gmail.com>

Wed, Jul 31, 2024 at 10:19 AM

I am unable to find this hearing. Can you provide me with the case caption?

Your feedback matters. Would you recommend us? Please take a few moments to fill out this brief survey to let my manager know how I'm doing. *1-minute survey*

**Kimberley Carter**
Client Services Associate
-------------------------------------------------
**VERITEXT LEGAL SOLUTIONS**

**Note: Effective 2/1/21 all remote videoconference links will be sent ONLY to the caller who schedules the assignment, and they will be responsible for forwarding the connection info to all other parties in the case.**

On July 31, 2024 at 9:23 AM EDT dabistic@gmail.com wrote:

This message has originated from an **External Source**. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

The Clerk, Brenda Armstrong, has affixed this case no.: U91384. The hearing was on July 15th at 2 p.m., however my case didn't commence until around 2:15 p.m.

On Wed, Jul 31, 2024, 9:18 AM dab <dabistic@gmail.com> wrote:
[Quoted text hidden]

 Gmail

**DAB DAB <dabistic@gmail.com>**

## Hearing

**dab** <dabistic@gmail.com>                                 Wed, Jul 31, 2024 at 11:12 AM
To: cs-southeast@veritext.com

City of Charleston Livability Court v. David A. Babb
[Quoted text hidden]

 Gmail

**DAB DAB <dabistic@gmail.com>**

## Hearing

Shelby Schnadelbach <cs-southeast@veritext.com>                     Wed, Jul 31, 2024 at 12:39 PM
Reply-To: cs-southeast@veritext.com
To: dab <dabistic@gmail.com>

Good afternoon,

Can you please let me know which firm you are with?

We would be happy to help you with this project. Would you please upload the files below, so we can evaluate them?

https://veritext.egnyte.com/ul/7LYU75SVtp

Please be sure to upload the file in a .mp3 or .wav file.

To provide the most accurate transcription, would you kindly provide the following information:

1.    Is this transcript for Court of Appeals?
2.    Taking attorney's name (For billing)
3.    Speakers, their roles and any proper name spellings or unusual terms stated in the audio
4.    Indicate what timestamps you wish the transcription to start and end, especially if there are multiple  audio files
5.    Will the transcript be used in court
6.    Requested date of delivery (we have a standard 10 business day turnaround)

**Shelby Schnadelbach**
Client Scheduling Specialist
-------------------------------------------------
**VERITEXT LEGAL SOLUTIONS**

*Your feedback matters!  Would you recommend us?*
*Please take a few moments to fill out this brief survey and let me how we're doing!* **1-minute survey**



On July 31, 2024 at 12:04 PM EDT dabistic@gmail.com wrote:

> This message has originated from an **External Source**. Please use proper judgment and caution when opening
> attachments, clicking links, or responding to this email.

Allow me to start over. I had a hearing on July 15, 2024 at 2 p.m.    My case was heard around 2:15 p.m.  I requested a copy of the trial/ hearing (RECORDER) from the Clerk. A phone number was provided; I immediately called and left my

 Gmail

DAB DAB <dabistic@gmail.com>

## Hearing

cs-southeast@veritext.com <cs-southeast@veritext.com>                Wed, Jul 31, 2024 at 11:48 AM
Reply-To: cs-southeast@veritext.com
To: dab <dabistic@gmail.com>

We are not showing that we took this hearing.

Your feedback matters. Would you recommend us? Please take a few moments to fill out this brief survey to let my manager know how I'm doing. *1-minute survey*

**Kimberley Carter**
Client Services Associate
---------------------------------------------------
**VERITEXT LEGAL SOLUTIONS**

**Note: Effective 2/1/21 all remote videoconference links will be sent ONLY to the caller who schedules the assignment, and they will be responsible for forwarding the connection info to all other parties in the case.**

On July 31, 2024 at 11:12 AM EDT dabistic@gmail.com wrote:

This message has originated from an **External Source**. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

City of Charleston Livability Court v. David A. Babb

On Wed, Jul 31, 2024, 10:19 AM cs-southeast@veritext.com <cs-southeast@veritext.com> wrote:
[Quoted text hidden]

 Gmail

**DAB DAB <dabistic@gmail.com>**

## Hearing

**dab** <dabistic@gmail.com>                                                              Wed, Jul 31, 2024 at 12:03 PM
To: cs-southeast@veritext.com

Allow me to start over. I had a hearing on July 15, 2024 at 2 p.m.    My case was heard around 2:15 p.m. I requested a
copy of the trial/ hearing (RECORDER) from the Clerk. A phone number was provided; I immediately called and left my
message. No returned response was received,  so I revisited the Livability Court in person and again explained this to
Clerk Brenda Armstrong who provided to me this agency.  Correct- You nor your agency was there; only the Court's
recording device. The Clerk stated that your agency is who they work with, and that I would have to acquire the transcript
through this agency. Thank you for your assistance
[Quoted text hidden]

 Gmail

**DAB DAB <dabistic@gmail.com>**

## Hearing

**dab** <dabistic@gmail.com>                                        Wed, Jul 31, 2024 at 2:55 PM
To: cs-southeast@veritext.com

I am not an attorney. I am the Defendant in the Livability Court in Charleston, SC; it is a kangaroo court by all standards.
It has no rules, no regulations, and when I asked the Judge for instructions for appellate process, during the hearing of
which I'm trying to get transcribed, I was told that we will discuss that when the time comes. So, I was instructed by the
Clerk Ms. Brenda Armstrong that in order to acquire a copy of the hearing transcript of July 15, 2024, at 2:15 p.m.,
addressing my case, that I would have to contact this agency. Please acquire the recording, transcribe it, and bill me. Or
contact the Clerk, get them to forward to you the digital copy and then inform me of the cost. Thank you
[Quoted text hidden]
--
www.dabistic.com

≡  M Gmail          🔍 Search mail                                                      ⇶

Compose

Inbox          64
Starred                        ✉
Snoozed                   Hearing      Inbox ×
Important
Sent                      cs-southeast@veritext.com
Drafts          7         Good morning, I received your request to order a hearing from 07/15/2024. Can you provide me with either the assignment number of the
Categories
More                      ⑧

Labels                    CS    Shelby Schnadelbach
                                to me
[Imap]/Drafts
Personal                        We do not request the audio from the court. You will need to request the audio for transcription from the court. Once you have the audio,
Sent Messages
More                            Thank you

                                **Shelby Schnadelbach**
                                Client Scheduling Specialist
                                -----------------------------------------------------
                                **VERITEXT LEGAL SOLUTIONS**

                                *Your feedback matters!  Would you recommend us?*
                                *Please take a few moments to fill out this brief survey and let me know how we're doing!* *1-minute survey*



                          On July 31, 2024 at 2:55 PM EDT dablstlc@gmail.com wrote:

**EXHIBIT E**

**(Photographs taken of engineers at SHM on July 11, 2024)**






ENGINEERS ARRIVAL AT SAFE HARBOR MARINA, LOCKWOOD DRIVE, CoCHS

**EXHIBIT F**

**(Dkt. No. 12, Ex. A with descriptive notes)**



1.    SC Harbor (federal) Wildlife Bird and Fowl Sanctuary

2.    USCG FEDERAL LAND

3.    FEDERAL CHANNEL

4.    THE AREA BENEATH THE CHANNEL IS THE FEDERAL ICW.

**EXHIBIT G**

**(Email correspondence with Katie Dahlheim, Legal Assistant)**



DAB DAB <dabistic@gmail.com>

---

## Livability Court 6/24

7 messages

---

**Dahlheim, Katie** <Dahlheimk@charleston-sc.gov>  Fri, Jun 21, 2024 at 3:13 PM
To: "Armstrong, Brenda" <ARMSTRONGB@charleston-sc.gov>
Cc: "Merrill, Michael" <MERRILLM@charleston-sc.gov>, "dabistic@gmail.com" <dabistic@gmail.com>

Ms. Armstrong – The City would like to move all of Mr. Babb's cases from the docket on Monday 6/24 to the jury trial docket day of July 22nd so that Mr. Babb does not have to appear at both dates. I believe that several of the tickets with these parties are already on the jury trial docket. Officer Merrill is unavailable for testimony this Monday, but will be present in court on July 22nd.

Thank you,

Katherine J. Dahlheim

Assistant Corporation Counsel

City of Charleston | Legal Department

50 Broad Street|Charleston, SC 29401

T: 843-724-3730 | F: 843-724-3706 | dahlheimk@charleston-sc.gov | www.charleston-sc.gov



***CONFIDENTIAL COMMUNICATION*** The information contained in this message may contain legally privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are notified that any dissemination, distribution or duplication of this transmission is strictly prohibited. If you have received this communication in error, please notify us by telephone or email immediately and return the original message to us and destroy all printed and electronic copies. Nothing in this transmission is intended to be an electronic signature or to constitute an agreement of any kind under applicable law unless otherwise expressly indicated. Intentional interception or dissemination of electronic mail not belonging to you may violate federal or state law.

***IRS CIRCULAR 230 NOTICE*** Any federal tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending any transaction or matter addressed in this communication.

---

**dab** <dabistic@gmail.com>                                                      Fri, Jun 21, 2024 at 3:56 PM
To: "Dahlheim, Katie" <Dahlheimk@charleston-sc.gov>

I never received notice that I had a court date this Monday. I certainly would appreciate notice of my trial date. Three days notice is not adequate notice as mandated by law.

[Quoted text hidden]

**2 attachments**


**Image001.png**
50K


**Image001.png**
50K

---

**dab** <dabistic@gmail.com>                                                      Fri, Jun 21, 2024 at 4:01 PM
To: "Dahlheim, Katie" <Dahlheimk@charleston-sc.gov>

In furtherance the judge said to have all discovery completed by June, and trial would be in July. I have not yet forwarded my requests to Ms. Sheer. I've only acquired Officer Merrill's body cam videos wherein he admits to writting the laws regarding my charges for possession of algae. My address is P. O. Box 522, CHARLESTON SC 29402, and this is my email

[Quoted text hidden]

---

**dab** <dabistic@gmail.com>                                                      Fri, Jun 21, 2024 at 4:09 PM
To: "Dahlheim, Katie" <Dahlheimk@charleston-sc.gov>

Sorry for my misunderstanding.  I see you are referring to Merrill's additional fines. I failed to notice that his issuing such on the 17th had a court date in under seven days. I'll be certain to bring this to the federal courts attention in my 28 USC 2283

[Quoted text hidden]

---

**Dahlheim, Katie** <Dahlheimk@charleston-sc.gov>                                Fri, Jun 21, 2024 at 5:31 PM
To: dab <dabistic@gmail.com>

Good afternoon,

I am the new prosecutor for Livability Court. Ms. Scheer is no longer with the City.

My understanding is that there are two groups of cases pending. For group 1, you have requested a jury trial and those will be heard the week of July 22, 2024.

The group 2 charges are set for a bench trial on Monday, June 24, 2024. By my email earlier, I was notifying the court and you that Officer Merrill will not be available to give testimony on Monday, June 24th.  On Monday, the City will be asking to continue the group 2 charges to August 5th.

If you decide to request a jury trial on the group 2 charges, they can be heard on July 22nd as well.

Best,
Katie Dahlheim

Get Outlook for iOS

**From:** dab <dabistic@gmail.com>
**Sent:** Friday, June 21, 2024 4:09:55 PM
**To:** Dahlheim, Katie <Dahlheimk@charleston-sc.gov>
**Subject:** Re: Livability Court 6/24

[Quoted text hidden]

dab <dabistic@gmail.com>                                    Fri, Jun 21, 2024 at 6:56 PM
To: "Dahlheim, Katie" <Dahlheimk@charleston-sc.gov>

Thank you.
[Quoted text hidden]

dab <dabistic@gmail.com>                                    Fri, Jun 28, 2024 at 4:28 PM
To: "Dahlheim, Katie" <Dahlheimk@charleston-sc.gov>

Wanted to touch base with you. The Judge requested that discovery be completed by June, however that was before the multitude of tickets that Merrill issued me on the 17th. I will file a motion for a flash drive of his video cam recording of the 17th. Presently I cannot see any other evidence that I will need in advance. Thank you. I will email motion next week
[Quoted text hidden]

**EXHIBIT H**

**(Certified letter requesting a Docket Case Sheet through a FOIA request concerning Affiant's own case)**

July 23, 2024        CERTIFIED MAIL RECEIPT NUMBER
                              9589 0710 5270 0315 4259 22

City of Charleston Legal Team
50 Broad St.
Charleston, SC 29401

RE: Freedom of Information Act (FOIA)

To Whom This May Concern:

I have a case and/or cases before the City of Charleston's Livability Court wherein it has miraculously extended your corporate boundaries from SC Code § 5-7-140(B) , without notice to the public and without the required readings before City of Council Members Board of Charleston's meetings as is required by the SC Attorney General in adopting an "identical" ordinance as the modified SC Code § 50-21-30 mandates. Charleston's version has even allowed for their MPO OFFICER Mike Merrill to write in his own insurance policy. Nevertheless, these are matters that the proper Court will address.

Meanwhile, this FOIA request is pursuant to the provisions as are set forth in the information act to acquire **a simple docket sheet**. I went to the Charleston Livability Court and requested for such, but was instructed that it can only be obtained via a FOIA request to this department. The case is State of South Carolina/City of Charleston Police Dept. Officer Mike Merrill, MPO Harbor Patrol, Plaintiff v. David A. Babb, Defendant with Citation Numbers ranging from 91397-23849 which exceeds $20K and continuing.

However, since I'm moving before this department on such an absurd course of action to acquire a simple docket sheet. **Please also provide the names** of the legal team who participated in scratching words out of the 2023-097 ordinance which was mentioned by Council Member Shahid in the May 9, 2023 Council Member Board Meeting. The Cardinal Rule of Statute intent with the SC Legislators was that the statute was intended for "Abandoned Vessels" and at least Council Member Shahid has maneuvered to alter SC Legislators intent regarding SC Code § 50-21-30 as amended in their 124th Session to allow for all vessel to become assaulted and or harassed; all within the selectivity of Officer Merrill.

Last, please know that when I pointed out to the head Clerk at the Livability Court that the amount in controversy exceeds the municipal court's jurisdiction by SC Code in Title 14 I was informed by him that the Livability Court does not go by the SC Municipal Court Rules; during the hearing of July 15, 2024, I was informed by the acting judge that the Livability Court of Charleston goes by the SC Supreme Court rules; odd, since lower court's are generally

appealed to higher courts. **Thus, what are the rules, statutes, and codes in which the Livability Court of the City Charleston uses or relies on?**

I am soon filing an Injunction against the Charleston Livability Court in Federal Court as it moves in bad faith over federal waters and would like to show to the federal court such things as their acts in controlling federal anchorages by commanding liability insurance of $300k, issuing citations of $3,300 daily, and creating all with no notice to the public; bizarre.

**I would request that the Docket Sheet get immediately forwarded, and that the other two requests which will require much manipulation on this department's behalf can be forwarded separately at a later date in a separate package.**

Thank you for your time in this matter,


Sincerely,

A friend of the court,

Respectfully and truly yours,


David A. Babb, pro se
P.O. Box 522
Charleston, SC  29402

## **EXHIBIT I**

**(Email Correspondence with CoCHS Legal Dept. concerning acquiring a Case Docket Sheet).**

 Gmail

**DAB DAB <dabistic@gmail.com>**

---

## FOIA Request :: F005363-073024

---

**dab** <dabistic@gmail.com>                                             Tue, Jul 30, 2024 at 7:44 PM
To: Charleston Citizen Support Center <charlestonsc@mycusthelp.com>

The Docket Sheet is concerning my quasi-criminal case in the Charleston Livability Court. The Clerk stated that I can only acquire a docket sheet concerning my case through this office by way of a FOIA request. I was issued citations on April 2, 2024, by Officer Merrill and immediately filed Motions For Dismissal, and numerous other motions. The case citation number for our scheduled trial is U91384; Ms. Brenda Armstrong is the Clerk over my case. I merely am asking for the Docket Sheet concerning my case to include a listing of all that has been filed. Thank you for your assistance in this matter

On Tue, Jul 30, 2024 at 3:32 PM Charleston Citizen Support Center <charlestonsc@mycusthelp.com> wrote:

--- Please respond above this line ---



RE: FOIA REQUEST of July 30, 2024, Reference # F005363-073024

Dear David Babb,

The City of Charleston received a FOIA request from you on July 30, 2024 for the following records:

"See Attachment asking for Docket Sheet."

This letter is to request clarification from you about the information you are seeking from the City of Charleston. Please provide the following clarifications:

**-Please provide the date of the docket you are requesting.**

If you would like for the City of Charleston to proceed with your FOIA request, please provide the requested clarifications as soon as possible. We are unable to begin processing your FOIA request until we have received the requested clarifications from you.

Please provide your response to the City of Charleston by replying to this email.

Upon receipt of your clarification, the City of Charleston will process your FOIA request as required by law, including providing you with a formal acknowledgement regarding availability of the records and an estimate of costs associated with producing the requested records.

You may reply to this email if you have any questions.

Sincerely,
City of Charleston

To monitor the progress or update this request please log into the FOIA Records Request Center.

--

RE: FOIA REQUEST of July 30, 2024, Reference # F005363-073024

Dear David Babb,

The City of Charleston received a FOIA request from you on July 30, 2024 for the following records:

"See Attachment asking for Docket Sheet."

This letter is to request clarification from you about the information you are seeking from the City of Charleston. Please provide the following clarifications:

**-Please provide the date of the docket you are requesting.**

If you would like for the City of Charleston to proceed with your FOIA request, please provide the requested clarifications as soon as possible. We are unable to begin processing your FOIA request until we have received the requested clarifications from you.

Please provide your response to the City of Charleston by replying to this email.

Upon receipt of your clarification, the City of Charleston will process your FOIA request as required by law, including providing you with a formal acknowledgement regarding availability of the records and an estimate of costs associated with producing the requested records.

You may reply to this email if you have any questions.

Sincerely,
City of Charleston

Thank you for submitting a records request to the City of Charleston, South Carolina to be processed under the South Carolina Freedom of Information Act (FOIA). Your request was received on July 30, 2024, and is being processed in accordance with S.C. Code Ann. § 30-4-10, et seq. Your request has been assigned the reference number F005363-073024 for tracking purposes.

Records Requested: **See Attachment asking for Docket Sheet.**

The City of Charleston will provide a formal acknowledgment within 10 business days informing you of the availability of the non-exempt "public records" that you have requested and providing a time and cost estimate to make those public records available to you. For records more than 24 months old, the City has 20 business days to respond on availability and cost. We do not guarantee that a records search will result in any responsive records being located.

Fulfillment of FOIA requests is subject to fees for search, retrieval and redaction, as well as fees for providing copies of documents. A deposit of twenty-five (25%) percent of the total reasonably anticipated cost for fulfilling the request may be required prior to searching for or making copies of records. The full amount of the total cost must be paid at the time of the production of the request.

If the request is granted, the records will be furnished or made available for inspection or copying no later than thirty (30) calendar days from the date on which the formal acknowledgement was provided, unless the records are more than two (2) years old, in which case they will be made available no later than thirty-five (35) calendar days from the date on which the formal acknowledgement was provided. If a deposit is required, the records will be furnished or made available for inspection or copying no later than thirty (30) calendar days from the date on which the deposit is received, unless the records are more than two (2) years old, in which case they will be made available no later than thirty-five (35) calendar days from the date on which the deposit was received to fulfill the request. The City may impose reasonable rules concerning time and place of access to records.

* Please note that pursuant to S.C. Code Ann. §30-2-50, obtaining or using public records for commercial solicitation directed to any person in this State is prohibited. A person who knowingly violates this section is guilty of a misdemeanor and, upon conviction, must be fined an amount not to exceed five hundred dollars or imprisoned for a term not to exceed one year, or both.

We do not make public, and will not produce in response to your request, those records that are exempt from disclosure under S.C. Code Ann. § 30-4-40 or other state and federal laws.

You can monitor the progress of your request at the FOIA Records Request Center. You'll receive a formal acknowledgment e-mail from the City within 10 business days (or within 20 business days for records more than 24 months old) when availability and cost have been determined.

Sincerely,

City of Charleston South Carolina

# **EXHIBIT J**

## **(Livability Courts for Problem-Solving and Mediation)**

· · · · **U R B A N · I N S T I T U T E** · E L E V A T E · T H E · D E B A T E

# Livability Courts for Problem-Solving and Mediation

Urban Institute, Adele V. Harrell

**Mr. Kojo Nnamdi:** From WAMU, at American University in Washington, this is Public Interest. I'm Kojo Nnamdi. It's something we know almost instinctively, that what we see and hear in our neighborhoods affects how we feel in and about those neighborhoods. It affects our comfort level or, put another way, the livability of the neighborhood or the community.

> **Listen in Real Audio**
>
> Listen to this 🔊audio program in the Real Audio format. The Real Audio player is required and can be downloaded and installed for free from the Real Audio Web site.

Document date: May 24, 2002
Released online: May 24, 2002

So, what do you do when someone or some family is doing something to make your community less livable? You try to talk it through, it doesn't work; you enlist the cooperation of other neighbors, it still doesn't work. So, what's left? Livability court, that's what. No, you don't have to be on a television show where the judge or the lawyers are the stars, and the fines get paid by the show itself. Livability court is what actually exists in Charleston, South Carolina.

And joining us to tell us more about it and others, in this ongoing series with the Urban Institute, is Adele Harrell, who is director of the Justice Policy Center of the Urban Institute. Good to have you here.

**Ms. Adele Harrell:** Thank you.

**Kojo Nnamdi:** Joining us from the studios of KUNR in—where is KUNR? I have to find out—in Reno, Nevada, is William Dressel, president of the National Judicial College. Judge Dressel, welcome.

**Mr. William Dressel:** Good morning.

**Kojo Nnamdi:** Good to have you here. Joining us by telephone is Michael Molony, who is an associate municipal judge in Charleston, South Carolina, where the livability court exists. Judge Molony, welcome.

**Mr. Michael Molony:** Hey, how are you, Mr. Nnamdi?

**Kojo Nnamdi:** Pretty good. Could you tell us a little bit about how this court got started, whose brainchild was it, and how was it created?

**Michael Molony:** Sure. It actually was started—we started working on it about a year and a half ago, and I'd have to say that the mayor was probably the most responsible for the creation of the court. At that time, I was working on what we call the revenue recovery court, and it became apparent to me that we had a serious enforcement problem here in the City of Charleston, and we needed to do something to address that.

So, we began inquiring around the various cities—started, of course, with ones closest to us and then branched out to places as far away as California and borrowed from different ideas and came up with the concept of a livability court, which was started in January of this year. And what we do is we hold it every other Monday, and the first Monday of the month, we hear zoning, housing, and business license cases, and then the following Monday, we hear sanitation, animal control, and tourism cases.

We really weren't able to use any one specific model to do this, so we had to borrow from various places because of the unique problems we have here in the City of Charleston. But so far, knock on wood, for the first almost six months now, we've had, you know, great success with the court, gotten a lot of notoriety for it, and frankly, I think we've made a difference here in the quality of life for our people living in the City of Charleston.

**Kojo Nnamdi:** Judge Dressel, to what extent is this a trend? And we heard Judge Molony say it occurred to him that because of what he was seeing in other courts that they had some different kinds of problems that needed to be handled in a different way. To what extent are we seeing that phenomenon become a trend across the country?

**William Dressel:** To a very significant degree. Usually it starts, as the judge said—there's a problem that

needs to be addressed, and then, they're trying to look for different ways to address it. Many of these so-called livability issues do not fall within the regular dispute resolution mechanism, and as you indicated, you do try first to have mediation to get it resolved. Usually, there's a government agency that sees a problem, whether it's the zoning department or something else, and tries to get the people to work it out.

And in all the other arenas, usually, there's someone that tries to say, let's see if you can work it out. But if it can't be, then where do you go? The court system, as the judge has indicated, then came into it, and we see it in a lot of places—the community court in New York, whether you consider drug courts, some of the mental health courts, others that have come up. But in this area, it's a quasi, you know, civil, trying to work out between people, with some criminal overtones, but the focus more is on trying to solve a problem.

**Kojo Nnamdi:** Adele Harrell, the idea of creating a new type of court brings us to the idea of what role the court really should play in our lives. We heard the comparison to drug courts and other kinds of courts; is this where you would see livability court falling?

**Adele Harrell:** Well, I think livability court falls in a class of courts that's coming to be known as problem-solving courts, and there's a lot of variation in problem-solving courts, from drug courts to livability courts. The key thing behind, I think, is this sense of communities that they need to have a relationship with justice agencies; they have certain expectations from justice agencies that relate to community problems, in terms of fairness and accountability.

And the underlying rationale for all of this, I think, came from something called Broken Windows, a Kelling hypothesis that when you see social disorder and physical decay, it sets up expectations that it's okay to do crime in this neighborhood, and that has brought both policing and courts into this arena.

**Kojo Nnamdi:** We'll take your telephone calls at 1-800-433-8850, that's 1-800-433-8850. Judge Molony, tell us a little bit more. I was fascinated when, among the topics you mentioned that you deal with on different Mondays, is tourism. Talk a little bit about that.

**Michael Molony:** Well, yeah. As you know, we are quite proud of our reputation as being the best mannered city in the United States of America. We've earned that moniker for that last several years. And we have quite a bit of tourists who come here for things. We just kicked off the Spoleto Festival, for example. That starts today and it runs for about three weeks. And we have a variety of other attractions here.

Of course, the first shot of the Civil War was fired here on Fort Sumter. And so, a great deal of our business and economy is geared around the tourism industry itself. And downtown Charleston, where tourism is most prevalent, we have a lot of carriage companies, walking tours, and things like ghost walks, and that sort of thing. And, of course, we have some friction between those activities, those commercial activities, and residential activities.

And it's been sort of my philosophy that, as a downtown resident myself, and having been born here and raised here, and hopefully, my children will be born and raised and die here, too, that the commercial activity has to take a back seat to the residential activity. And so, we try to be sensitive to the needs of the commercial vendors for the tourist businesses here in Charleston, but at the same time, we have to make sure that the residents don't lose a quality of life that really makes Charleston so special and unique.

**Kojo Nnamdi:** And prior to the existence of livability court, how were those kinds of issues resolved?

**Michael Molony:** Well, that's probably one of the main reasons we created the livability court. And I don't want to be, you know, trite about this, but I think that a lot of times, the court, the municipal court, the traditional mechanism was simply find someone, and they would almost treat it as a cost of doing business and just move on and never really get the problem addressed and resolved.

What we do now is we take a totally different approach, and we aren't focused on punishing people; we're trying to focus on the compliance with the existing tourism regulations, which are excellent. We have a tourism commission that is comprised of citizens and representatives of the tourism industry, and they develop these regulations in concert with each other. And we were able to deal with educating the tour guides, informing them of when they can and cannot be on the streets, and we have a system set up here, like they do in New York; we have medallions that are placed on the carriages so that we don't overload one particular residential area.

And it gets a little complex and difficult to enforce all of that, so with the livability court, we have our own officer who's assigned to handle the oversight of the court and its enforcement orders, and other activities. And he does that in concert with the regular tourism officials. That's something we didn't have before we created the livability court, and this worked quite well.

**Kojo Nnamdi:** We're talking about livability courts this hour on Public Interest, in our ongoing series with the Urban Institute. You can join our conversation by way of e-mail. Send your questions or comments to pi@wamu.org, that's pi@wamu.org. Adele Harrell, is this one of the differences between livability courts and, say, a criminal court? I mean, that is that livability courts can be specifically designed according to the needs of that community.

**Adele Harrell:** I don't know that it distinguishes it from criminal courts, because criminal courts—some of the livability courts in other areas, while they don't call themselves that, they tend to be called community courts, have definitely entertained minor misdemeanors as well as ordinance violations.

**Kojo Nnamdi:** In the case of livability courts, Judge Dressel, is it necessary that if a community is going to establish a livability court, a community, say, in which there is not a great deal of tourism, and that might not

be an issue in that community, that it has to be shaped according to the specific issues that are prevalent in that community?

**William Dressel:** There are common elements that need to be brought into it, and you used the word community. And I think anyone would use—Adele and the judge would say it's the community, and it's their courts, their involvement. What you're doing is taking the court system and bringing to focus and participate to resolve a problem. It's picking its features from a variety of approaches, whether it's restorative justice, whether you want to call it problem solving.

To answer your question, there needs to be a problem or a focus that people in this community say we don't want it, whether it's crime, petty crime in the street, like Adele talked about, or whether it's, you know, issues of the imposition of tourist activities on the people that live there. They're looking at, what are the issues that are making this community concerned, and how do they want to address it? And that's how the court comes into it. It's a different concept, and I know that some people have concern about it; others see it as a way to get a solution.

**Kojo Nnamdi:** William Dressel is president of the National Judicial College. He is a retired judge. He joins us by way of studio KUNR in Reno, Nevada. Michael Molony is an associate municipal judge in Charleston, South Carolina. He joins us by telephone. And in our Washington studio, Adele Harrell, director of the Justice Policy Center of the Urban Institute. We're talking about livability courts.

Adele, is the court evolving to address these kinds of issues necessarily a good thing? Some people could just see this as resorting to what's becoming the American way of taking someone to court just because you can't agree with them.

**Adele Harrell:** Ideally, the court would try to resolve problems and cut down on issues coming back into the court. It could be, what we call in the profession, net widening, bringing more people into court if, in fact, it didn't work with the citizens and didn't really set up solutions that had longer-term impact.

**Kojo Nnamdi:** Well, should courts be involved in problem solving? People tend to think of courts, Judge Molony, as being places where you can get a decision made about who's right and who's wrong, and the offender pays a penalty. Does this mean that the role of courts is evolving, and should they?

**Michael Molony:** That question was for me, I assume?

**Kojo Nnamdi:** Yes.

**Michael Molony:** Yeah. I certainly do see it evolving, and I think they should. To follow up a little bit on what Adele said, what we're doing here in Charleston is we're taking a proactive approach to a lot of these problems. I mentioned that we have an officer that's assigned at the livability court; he happens to be sitting here with me. And what he does is, when we identify a problem, he goes out before the case is ever even brought, before the summons is ever issued, and attempts to resolve it informally.

In a way, it's sort of like a—even though we're dealing [with] the criminal side of the court system, it's kind of like a mediation process, which we're seeing more and more of in the civil side of the courts. And I found that is a very effective way of warding off a problem before it even gets to the stage where it's brought before me.

**Kojo Nnamdi:** Judge Molony, you raise an intriguing issue in my mind, and that is if indeed the officer is sitting next to you, after we take this short break, would it be possible for me to have a few words with that officer so he could tell us how he proceeds with an investigation after somebody makes a complaint and decides whether or not that complaint should, in fact, be handled in livability court? Is that something we can do?

**Michael Molony:** Oh, absolutely. His name is Dan Uriccio, and he's right here. He'd be glad to talk to you.

**Kojo Nnamdi:** Okay, Dan Uriccio, after this short break, we will be coming back to you and our other guests, Adele Harrell, and William Dressel, and Judge Michael Molony, and, of course, those of you who want to join us by way of the telephone. 1-800-433-8850 is the number to call on this edition of Public Interest, as we talk about livability court. We'll be back after this short break.

[Program Break]

**Kojo Nnamdi:** Welcome back to our conversation about livability courts, and we're talking about the kind of situation that gets resolved in livability court, which exists in Charleston, South Carolina, and the police officer who works with that court, specifically, assigned to it, is Dan Uriccio. Dan Uriccio, thank you for joining us.

**Mr. Dan Uriccio:** Thank you. It's nice to be here.

**Kojo Nnamdi:** Good to have you. Now, I have neighbors whose dog keeps me awake all night long, whose children have absolutely no control over themselves, and in addition to that, they're throwing trash and garbage all over the place, and there's weeds nine or ten feet tall in their yard, and I call up the livability court and say, "I would like to file suit against this neighbor," or whatever that procedure is, "I would like to have you resolve this problem." What do you do in that situation?

**Dan Uriccio:** Well, basically, I try to mediate between the person filing the complaint and the person who is causing the problem. I'll go into the community, respond to the residents, and get as much information as I can. Then, I'll go to the person who called in the problem and try to come up with some resolutions that we can try to make it a little bit easier between the two neighbors.

**Kojo Nnamdi:** What if the person who is causing the problem says to you, "The only thing I want to do to resolve this situation is to go punch that Kojo Nnamdi in the mouth," the neighbor?

**Dan Uriccio:** Well, I would try to ease his mind and tell him that we're not here to cause any problems, that the neighbor doesn't want to cause any problems. We certainly don't want that to happen. I would also inform him that although we would not want to, but if he didn't take care of the problems that he was causing, we would have to bring him into the livability court. And by that I mean we would give him an ample amount of time to correct the problem, which usually is about five working days.

And if—within that period, I'll make some spot checks to see if the individual is starting to comply, and on that fifth working day, I make contact with the individual again, and if compliance is not made, and then he is given a summons and brought into court.

**Kojo Nnamdi:** So that it is up to you to decide whether or not there has been compliance, and up to you to make the recommendation as to whether or not this case should got to livability court.

**Dan Uriccio:** Yes, that's correct, but I also coordinate between the individual departments. Animal control would be the one handling the dog barking complaint; sanitation department would be the ones handling the overgrowth and trash at that residence. So, I would basically, in concert with those two departments, make the determination of whether they will come to court or not.

**Kojo Nnamdi:** Dan Uriccio, thank you very much for joining us.

**Dan Uriccio:** Thank you very much.

**Kojo Nnamdi:** We will return to Judge Michael Molony, who is the associate municipal judge of the Charleston, South Carolina, court. And Judge Molony, if you are back within hearing distance and can speak with me again, after Dan Uriccio brings that complaint to you and the case is filed, what's the process after that?

**Michael Molony:** Well, from that point forward, we, of course, will have a scheduled hearing, and I'll advise the defendants of their rights. The case is presented by the city, usually in concert with residents and other neighbors, and I'll listen to the case. And this is where your skill comes in. You know, Judge Dressel would be the first to tell you that you just develop some skills over the years of how to deal with folks.

I'll hear the evidence, and if I feel that there is no alternative but to simply find the defendant guilty, I'll do that and move forward with an appropriate sentence. But oftentimes, what we do is we will come up with some sort of a resolution to the problem, which I reduce to a written court order. A copy is served to the defendants so they know exactly what's required of them, and when. A copy is kept by the court and, of course, a copy is given to the livability court officer.

At that point in time, he's now working under a court order, so it takes a lot of pressure off of him and a lot of the decisionmaking responsibility, and he's there now to simply enforce the order that I have issued. And if it's not complied with, then we'll have parameters set up in the order that the individual will have to comply with and be brought back in front of me to ensure that whatever the problem is, is corrected.

**Kojo Nnamdi:** Adele Harrell, what's the difference between that and simple court ordered mediation?

**Adele Harrell:** Simple court ordered mediation is not binding. This is almost like the difference between mediation and arbitration: it's binding.

**Kojo Nnamdi:** Judge William Dressel, to what extent the process that was just outlined by Dan Uriccio and Judge Molony is the process that is essentially being followed in such courts around the country?

**William Dressel:** It's very, very close to it. If you heard what Judge Molony was saying, he's using a different set of skills. Some people would call them like a medi-arbitration type of approach, instead of the tradition of saying Side A, tell me your story, Side B, tell me your story, okay, here's the decision. It's taking the concept of rule of law, bringing the people into it more, allowing the community to hear their concerns.

And as the process moves along, as Judge Molony says, you're using a different set of skills rather than just listening and imposing. You're trying to get them to examine it and to look at it. This is the same thing you're doing in a drug court, a mental health court, these other problem-solving courts, because you're now focusing on what the problem is, the person's involvement, and you're using the person as a resource to come up with a solution.

So, the elements are all there, they're just used in different ways, depending on the problem that you're trying to solve.

**Kojo Nnamdi:** You, too, can join this conversation. Just call us at 1-800-433-8850. Here's Karen in Indianapolis, Indiana. Karen, your turn.

**Caller:** Thank you for taking my call. The word livability made me think that maybe this would be appropriate. What I find particularly affects the quality of my life is when I see so many people who keep their dogs on chains 24-7, year in, year out, in every kind of weather. I know that this has a lot to do with the barking problem, but since it's legal, you know, there's no way of challenging this kind of ethic.

But I know that the Humane Society of the United States says that there's at least 13 communities who have ordinances against keeping animals chained as a means of continual confinement. And I was wondering, maybe, how someone would go about getting ordinances passed through a livability court or community

awareness effort, or I don't know.

**Kojo Nnamdi:** Is that the kind of issue, Judge Dressel, that could be dealt with in a livability court, or would it depend on the nature of the ordinances in that particular community?

**William Dressel:** Right. What's got to be important is it is still a rule of law. There needs to be a law in place, an ordinance that the people have decided defines a crime or a situation that the governor can declare is inappropriate. It is then, when you have that in place, then the court is there. You don't want to be creating courts to stand alone or create their own laws. There needs to be something upon which is in existence that you're using this mechanism to help solve.

And one thing to keep in mind, before I forget, is that you're not going to solve 100 percent of these conflicts in a manner that is going to be suitable. You're looking, hopefully, to solve a great majority of them, and I think that's what would be interesting to Judge Molony, over time, as to how many of these disputes are able to be settled in a way that the parties accept it, go out, that you don't have to use post-judgment enforcement.

Because that's going to be the key to the problem solving: Have you solved the problem? There are always going to be some that you need to have the enforcement later, and without the mechanism, as described by Judge Molony, of course, the court's not going to have any force. You're trying to use the influence and power of the court in a positive way.

**Kojo Nnamdi:** Judge Molony, that means that—how much flexibility can you have in creating a court? As Judge Dressel pointed out, you have to be responding to ordinances that have already been passed; there have to be some standards involved.

**Michael Molony:** That's correct. And one of the things, I think, that was important in Charleston is we were very sensitive to the fact that we didn't want to go out and create a new court, spend more tax dollars, pass a variety of new ordinances. In fact, one of the things that we're very proud of saying is that we haven't spent an additional penny in public resources to fund the court, nor have we passed any additional ordinances as a result of the court being in existence.

We've used the existing ordinances. For example, we have an ordinance that deals with cruelty to animals, as described by the recent caller. And I hear cases like that all the time, and it's simply a matter of focusing on those existing ordinances in a way that, instead of hearing 150 cases in a court session, we may hear, say, 20 cases, but devote the same amount of time to them.

And I've found that, in these high-volume courts, like a municipal or a magistrate's court here in South Carolina, you tend to not be able to give the case the attention it needs. And that's what we're trying to do with the livability court, to really focus on the issues, to let the residents and let the potential offenders know that we're there to try to resolve these problems, but to do it, as the judge said, in a court with the rule of law, which we have plenty of here in Charleston, and it's just a matter of seeing to it that they're enforced in a fair and equitable and proper way.

**Kojo Nnamdi:** Karen, thank you for your call.

**Caller:** Thank you.

**Kojo Nnamdi:** We got an e-mail from Seth, who says, or asks, "Isn't livability court just a PR ploy? It seems to me like these issues could all be resolved before municipal courts. Does the livability court have its own judge, or is it governed by a municipal judge?" Judge Molony?

**Michael Molony:** Yeah, we have our own judge, and, of course, for years, we did deal with these problems in the regular municipal court system. And as I just described, that was the problem. We had way too many cases here in Charleston on the regular court docket. In these types of cases, we're not getting, as the mayor calls it, the traction that they deserve to get resolved.

And over the last 20 years, I've seen an incredible transformation here in Charleston. We've gone from an economy which was primarily based on the navy base we just now closed down, to an economy that's almost exclusively based on the tourism industry we have here, at least in the downtown area. So, our problems have changed. We've got a significant number of people here, we have traffic problems, we have environmental problems with the restaurants we have, we have noise problems, and concerns of that nature.

So, we needed a specific different court. It's definitely not a PR ploy. I have enjoyed working on the court. I am specifically assigned to deal with the court, and I think that the focus that I have now has enabled me to be a better judge in resolving these problems and doing what we try to do with the livability court.

**Kojo Nnamdi:** Adele Harrell, but it's difficult to conceive of the creation of a new court, as Judge Molony pointed out, that doesn't cost the taxpayers any more money than already exists for the existing court system. It sounds as if livability court should cost more money.

**Adele Harrell:** Well, the only court of this type that has received a real cost benefit analysis, I believe, is the Midtown Community Court in Manhattan, and it did cost additional funds. What Judge Molony may be saying is that it's a redirection of existing court resources towards this. And so, you could count that as a cost because his time is not being devoted to something else. So it's a matter of priorities.

And what's very important about it here is the community's allowed to set those priorities, what kind of crimes are we going to devote—in the last 20 years, we've seen an explosion of cases, and by no means have court

resources kept up. They've fallen way behind in the time available per case.

**Kojo Nnamdi:** Adele Harrell is director of the Justice Policy Center at the Urban Institute, with whom Public Interest does this ongoing series of editions.

William Dressel is the president of the National Judicial College and a retired judge, and Michael Molony is associate municipal judge in Charleston, South Carolina. This is Public Interest. I'm Kojo Nnamdi.

Judge Dressel, getting back to the issue of cost, does that vary from jurisdiction to jurisdiction, or is the general tendency to do as Judge Molony pointed out they did in Charleston, South Carolina, and that is redirecting funds?

**William Dressel:** Usually, there is a cost that has to be absorbed somewhere. There is an analysis as to what are the resources that you have. Some of the jurisdictions will do a shifting of resources and say, okay, now we are concerned about, i.e., say, a juvenile problem, and so we're going to put more resources over there. You may enlist schools, create teen courts that are being used as a problem-solving court, and without a lot of other additional cost.

Your district attorney may have a specialist; your school will have a juvenile specialist. Other courts will say, okay, with this problem, we need more resources, and they will try to get a federal grant, or they'll look at how state funds might be available that's being applied towards maybe corrections and moving money from one area to another. But, usually, there is some degree of cost.

Charleston is being very innovative, and they've taken a look at their priorities and said, based upon the resources we have, this problem, here's how we're going to devote our resources. But most of these problem-solving courts have required some additional resources to start them. The issue we're going to be facing in the future is, how are these courts going to maintain, where are the resources going to come from? Because as Adele said, the dockets continue to grow without other resources being added to them.

And once the specialty court or the problem-solving court gets established, they need to be looking to be made part of the regular way of doing business, and that's where the difficulty's going to come in.

**Kojo Nnamdi:** We'll take your telephone calls at 1-800-433-8850, your e-mails at pi@wamu.org. On the phone is Garnett in Seabrook, Maryland. Garnett, you're on the air; go ahead, please.

**Caller:** Yes, this is Garnett. I'm calling concerning a neighbor that lives in front of me, has not cut her grass this year at all. It's about 30 inches high. And we went through this last summer; she only cut it twice the whole year. And all the neighbors are very, very upset about this, and we want to know what we can do about it. The county, we have talked with them. The inspector, I called him yesterday, and he said that they gave her a citation, that she should cut the grass, I guess, the 26th is when the citation is, which is tomorrow, I think.

If she doesn't cut it, then, you know, I thought there would be someone who would come out and cut it, and he said, no, they don't have the manpower to do that.

**Kojo Nnamdi:** Your point, though, Garnett, is that if she doesn't cut it, nothing really happens to her.

**Caller:** No, nothing happens. And the awful thing about it is all the neighbors around us offered to cut it. She doesn't want anybody on her property.

**Kojo Nnamdi:** Well, interestingly enough, she might not want it cut. I was watching a television show the other day in which there was a guy—it might have been one of the network shows—who does these kinds of things specifically to irritate his neighbors. He sees himself as the rebel in that community and insists on living in that way. Is this, Adele Harrell, the kinds of things that municipal courts would normally solve? Obviously, where Garnett is calling from, there is no such thing as a livability court.

**Adele Harrell:** I think regulations are on the books and ordinances are on the books in most communities for most of these issues. The problem is enforcement and allocation of the court time to address them, and they get lost because we've seen this explosion in serious crime and in drug crime, and they've gotten pushed to the bottom of the barrel.

**Kojo Nnamdi:** Judge Molony, how would Garnett's problem be handled in your court?

**Michael Molony:** Well, we've had innumerable situations almost identical to the one she's described. And quite honestly, if this call would have taken place before the livability court was created, there wouldn't have been a solution for her. I would have been a municipal judge answering the question—well, you'll have to go through the normal process.

Now, what we do is, the first thing, is we send the officer out, and he'll inspect the area and question and contact the neighbor, try to work with the neighbors. We've had cases here in Charleston where that very situation has occurred. In fact, we had one that I can recall, where we had to actually send a county work crew out to do the work. Now, we did it with permission of the homeowner; we didn't have to deal with the issue of the homeowner not allowing us to enter the property. But in that instance, the gentleman was elderly, couldn't do it himself—

**Kojo Nnamdi:** Judge Molony, allow me to interrupt. We're going to have to take a short break. We'll be right back.

[Program Break]

**Kojo Nnamdi:** A conversation about livability court is what we're having here on this edition of Public Interest, with William Dressel, president of the National Judicial College; Adele Harrell, director of the Justice Policy Center of the Urban Institute; and Michael Molony, associate municipal judge in Charleston, South Carolina, who I interrupted when he was telling us the story of an individual who would not cut his grass, and because he was an elderly gentleman, you essentially had to get somebody from the city to go cut that person's grass, right Judge Molony?

**Michael Molony:** That's correct. And you know, knock on wood, so far, that problem has not resurrected itself. And you know, we just looked at an innovative and creative way to try and address the problem, and we were able to do it in that instance.

**Kojo Nnamdi:** Speaking of innovation and creativity, what happens when a person simply refuses to pay a fine?

**Michael Molony:** We've had those situations too, unfortunately, and there are—one of the commentators earlier mentioned that. Some cases, you're not going to resolve; I mean, it's just an intractable problem, and that is a difficult situation for us. Fortunately, that's been the exception rather than the rule here in Charleston. And I've found that persistence oftentimes will pay off with that. So far I haven't had to really get to the point where we've had to invoke the ultimate penalty, which would be the possibility of incarceration.

But you know, we've done the best we could with that. And as I said, with rare exception, we've been able to get these problems resolved through the court. And I think that as long as the majority of your cases are being resolved, then the court has to consider itself a success.

**Kojo Nnamdi:** Adele.

**Adele Harrell:** Would you or could you hold them in contempt? What's the final backup?

**Michael Molony:** Yeah, that ultimately is what it would be, Adele. You know, again, I'm very careful and cautious in using that in this setting. It's very different than in the regular court setting, where you've got a traditional charge, where there may be an assault, or something of that nature. So, you have to be much more cognizant of the rights of the individuals that are before you. But that would be the ultimate penalty that we would use.

**Kojo Nnamdi:** Speaking of innovation, William Dressel, are there livability courts that use a variety of methods of trying to make sure that enforcement actually works without necessarily going as far as incarceration?

**William Dressel:** Yes, absolutely. What you're doing, as Judge Molony brought out, what must always be kept in mind is you're balancing the rights of the individual with that of society. One of the things that the National Judicial College is doing is we've got a grant, and we're going to be putting on a program, bring judges from around the country, and look at different types of livability courts, problem-solving courts, what are the elements.

And what I find to be really interesting about this movement is it's probably the one court movement that I've seen that is also taking a look [at] what is wrong or could be wrong, because there's a real concern about abuse of due process. So, as this movement begins and blossoms, there are a lot of people saying, let's not overreact, let's take it very carefully, look at what are the appropriate elements, what defines a court, how do you make enforcement of orders.

There are a variety of issues that have been brought out, and the way to get people to think in this fashion, to solve a problem, is we try to bring together judges from all over the country, all type of courts, get them in a course and have people who lead them to look at, you have a problem in your community, how can you adapt a court system to solve it?

**Kojo Nnamdi:** Indeed, Judge Molony, in creating Charleston's livability court, you contacted quite a few different courts. What kind of information were you looking for?

**Michael Molony:** Well, for example, we contacted a court in Durham, North Carolina, which, as you may know, is the home of Duke University, Wake Forest, and the University of North Carolina.

**Kojo Nnamdi:** Well, you should know, of course, that you're talking to people who are close to the home of the University of Maryland. Duke is not a good word to bring up in this conversation.

**Michael Molony:** (Laughs.) Oh, excuse me. We're now in the southeastern conference in South Carolina, so I apologize. But I spoke with a judge there, because we do have a large college presence here in Charleston, and we've got some interesting ideas about how to address those issues related to noise and some of the underage drinking problems we have here in the city.

We have the College of Charleston, the Citadel. So we were able to borrow that piece from them, and then we talked to some folks in Savannah, which is a sister city to Charleston, about tourism issues. I remember talking to someone out in California about some environmental issues, refuse collection, and things of that sort. And if I'm not mistaken, we also contacted the National Judicial College for some information that we used.

And, of course, I've attended courses at the National Judicial College over the years, and it's a great resource for judges. And I think what we've done is we fashioned something that really works for us, and I see this as a trend that more and more cities will be looking into. Just today, for example, I e-mailed information to an

assemblyman in New York about this. So, rarely ever does a week go by that we don't get two or three requests for information.

**Kojo Nnamdi:** Here's Dave in Columbia, Maryland. Dave, you're on the air. Go ahead, please.

**Caller:** Hi. Great show, Kojo.

**Kojo Nnamdi:** Thank you.

**Caller:** The judge in Charleston actually addressed the reason I called. I have two children in college in Charleston, and they've been there now for three years, love Charleston. And I am very appreciative of the police presence in Charleston; I think there is a real good balance there with the students. And I guess the question is, how has it worked with the student population, because there's a lot of kids in that town?

**Kojo Nnamdi:** Well, I should add to that, Judge Molony, that we got an e-mail from Francine in Washington, D.C., who says, "We in Washington, and probably many other cities with a large number of universities, have a serious problem regarding student behavior in neighborhood communities. These students come in for only one or two years, and it's very difficult to work with people who will be leaving eventually, and who have no interest in being part of the community." Judge Molony, how do you handle that?

**Michael Molony:** That is a very tough problem, but the way we've dealt with it here is we've gone to the college, they've assigned an individual on the faculty to work with the city on some of these, what we call, town and gown issues. And the students are briefed on all this when they start out school here at the college. Charleston has freshmen, and we remind them that what they're doing here is they are, in effect, visitors here for the time that they're spending in the college, and this is a home to the residents in Charleston, and they have to respect that.

They're in our neighborhoods. And you know, we have had problems, there's no question about that, but the way we deal with them here is to try to co-opt the students rather than looking them up and punishing them for what they've done, just remind them that they're in a very historic city, a city that relies on tourism for a large part of its economy, and to keep the noise down.

And if you are going to be a persistent problem, we've looked at the issue—in fact, we're addressing this now with landlords to put in the leases here in Charleston some language that will give the city some more enforcement over, you know, problems that we have in a particular [area] around the college, or around the Citadel, around the medical university.

**Kojo Nnamdi:** Okay, thank you very much for your call, Dave. On to Gary in Charlotte, North Carolina. Gary, you're on the air. Go ahead, please.

**Caller:** Yes, Kojo, I appreciate the opportunity. I wanted to present an alternate viewpoint. You know, many parts of the country are under the influence of drought conditions, and have been encouraged to convert lawns, which are environmentally unfriendly, to naturalized areas, which are environmentally friendly. And one person's naturalized area is another person's overgrown lawn. And it seems to me against the principles of this country to get the government involved in dictating what private property owners have on their property.

**Kojo Nnamdi:** Gary, are you suggesting that if you save water by allowing your lawn to grow longer than six or eight inches, then the government should not be able to interfere with your right to do what you see as your patriotic duty?

**Caller:** Well, I'm talking about a naturalized area, you know; I'm not talking about Kentucky 31 (inaudible). I'm talking about wildflowers and naturalized—

**Kojo Nnamdi:** I see what you're saying. Judge Dressel, have any response to Gary?

**William Dressel:** Well, usually, if you look at the ordinances—because I got here in Reno, we're high desert, and there is native grasses and native flowers, and that's part of what's allowed. As a matter of fact, it's encouraged that you put in that type of landscape and you xeriscape it and use drip systems, because our water is limited to what we get out of the Sierras.

Then, it's a question of getting the citizens involved in the community to come up with having them look at their ordinances, and that's a different process than from that of the court. I bet you Judge Molony would indicate that they'll find out what type of landscaping, and if it's one of those issues, they'll look at it and attempt to reach a resolution. But that's an issue of what does the ordinance say or allow.

**Kojo Nnamdi:** Judge Molony.

**Michael Molony:** Yeah, I think the judge is correct. Of course, in Charleston, we have a different problem than the judge has out in Nevada and, for that matter, in Charlotte. It's a little warm down here, and we have difficulty in growing the type of grass that they grow up in Charlotte. But we do have ordinances here. For example, we have a very comprehensive tree ordinance that has been modified—has been modified, as a matter of fact, as recently as three or four months ago.

And that is a process, as the judge explained, that's totally separate from what we did in livability court. And there have been occasions where I have mentioned to council members that they may want to look at certain ordinances like, for example, our tourism ordinance, which is constantly having to be amended and modified to meet some of the changing conditions here in the tourism industry.

So it's not a static process; it's something that has to continue to evolve over time. But the caller from Charlotte, I'm certainly sensitive to what he's saying. And I've had issues, not directly presented to me the way he's couched it, but you know, one man's trash is another man's treasure, and you have to be sensitive to that. And what I try to do is just read the ordinance in its plain, ordinary, commonsense way, and if it doesn't seem to fit the situation, then make recommendations for how that process should be implemented and changed.

**Kojo Nnamdi:** Gary, thank you very much for your call. This is Public Interest. I'm Kojo Nnamdi.

**Adele Harrell:** I had a question there. Have you ever had the experience of being able to work with the person bringing the complaint, to have them redefine the issue for themselves rather than having the offender bear the brunt of the ordinance? I'm interested in the grass example that was raised. Do you ever have complainants who can be seen, who can reevaluate the seriousness of their complaint?

**Michael Molony:** Yeah, absolutely. We've had that happen a lot of times. The most common area it happens is in the situation with animal control. I think one of the callers mentioned the fact about dogs barking, that sort of thing. Charleston is a very densely populated area. Even in the suburban areas, we have a fairly dense population, so people who live next door to each other are fairly close.

And I've had complainants come in. In fact, we've done on-site visits when problems just haven't been resolved, and I've had to admonish some of the complainants—say, look, this problem is not as serious as you think, and you need to rethink the real motive behind your bringing the livability court into this issue, and then dismiss the complaint, frankly.

**Kojo Nnamdi:** Judge Dressel, if a jurisdiction wanted to create a livability court, are there certain issues that that jurisdiction needs to pay particular attention to?

**William Dressel:** Yes, most definitely. There's a real process you need to go through. And what we usually try to do at the National Judicial College with these issues is to get them to bring a team out, a representative of the community, because the court is not going to do it alone, the city council is not going to do it alone, and it's sort of the model that's been adopted that these are community problems, and so you sit down and you have representatives from the various sectors, including those who are going for the rights of the individual.

And then, you start looking at what makes up a problem-solving court. First of all, you know what your laws are, you focus on your problem, where in the community. Usually, we try to have these as part of the community. In Judge Molony's case, because of the city, it's right there in there. The last thing you want is to have the court removed from the issue, and that's where the Manhattan Midtown Court is a great example. And, yes, there are other elements, and it really becomes something that the community wants to address.

**Kojo Nnamdi:** Here's Lyn in Ashburn, Virginia. Lyn, you're on the air. Go ahead, please.

**Caller:** Yes, thank you, Kojo. I would like to ask your guests if they could comment, perhaps, on the impact of homeowners associations. They seem to be on the rise in popularity over the past 20 years. And have they helped, you know, solve these problems?

**Kojo Nnamdi:** You know, I was thinking about that in relation to Gary's call. I was saying Gary might want to do that, but if he's in a homeowners association, he might be in trouble. Judge Molony, how do you deal with homeowners associations?

**Michael Molony:** Well, of course, the homeowners association is generally comprised of folks who have a contractual obligation to each other, and we're dealing with a situation where I have an ordinance that's been passed by city council. Here in Charleston, we have what's called neighborhood associations; I believe we have over 70 of them here in the city, which, in effect, are similar to the homeowners associations, although they don't have the contractual obligations between the neighbors.

And we frequently will have neighborhood representatives in court—the president, maybe a member of the board—presenting the cases on behalf of the neighborhoods. And it's worked quite well, frankly, because it gives me a sense of what's going on in that particular neighborhood in terms of resolving that problem.

**Kojo Nnamdi:** And thank you very much for your call, Lyn. Michael Molony is associate municipal judge in Charleston, South Carolina; William Dressel is the president of the National Judicial College; Adele Harrell is director of the Justice Policy Center for the Urban Institute, with whom we have been bringing you this series on Public Interest. Thank you all for joining us.

[END OF SEGMENT]

## Other Publications by the Authors

- Urban Institute
- Adele V. Harrell

---

Usage and reprints: Most publications may be downloaded free of charge from the web site and may be used and copies

made for research, academic, policy or other non-commercial purposes. Proper attribution is required. Posting UI research papers on other websites is permitted subject to prior approval from the Urban Institute—contact publicaffairs@urban.org.

If you are unable to access or print the PDF document please contact us or call the Publications Office at (202) 261-5687.

***Disclaimer:*** *The nonpartisan Urban Institute publishes studies, reports, and books on timely topics worthy of public consideration. The views expressed are those of the authors and should not be attributed to the Urban Institute, its trustees, or its funders. Copyright of the written materials contained within the Urban Institute website is owned or controlled by the Urban Institute.*

Source: The Urban Institute, © 2012 | http://www.urban.org

**<u>EXHIBIT K</u>**

**<u>(Ord. # 1702)</u>**

Ord. #1702

**Adopted 10/25/11**

### AN ORDINANCE

**TO AMEND PART II OF THE CHARLESTON COUNTY CODE OF ORDINANCES SO AS TO ESTABLISH A CHAPTER 3 ENTITLED "LIVABILITY," COMPRISED OF THE FULL PROVISIONS OF THE EXISTING CHAPTER 3, "ANIMALS AND FOWL" AND ADDITIONAL PROVISIONS AS ESTABLISHED BY THIS ORDINANCE; TO ENACT ADDITIONAL PROCEDURES AND REQUIREMENTS FOR ANIMALS AND FOWL KEPT ON RESIDENTIAL PROPERTIES, INCLUDING PROVISIONS RELATED TO NOISE FROM ANIMALS AND FOWL; TO REPEAL ARTICLE III OF CHAPTER 14.5, CONTAINING THE PROVISIONS OF ORD. 1138 OF 2000 ("NOISE ORDINANCE") AND REPEAL §§14.5-2 AND 14.5-3 RELATED TO LOUD AND UNNECESSARY NOISES AND SOUND AMPLIFICATION DEVICES; AND TO ENACT NEW PROVISIONS AND REQUIREMENTS MAKING UNLAWFUL CERTAIN OFFENSES RELATED TO NOISE THAT DISTURBS THE PEACE AND TRANQUILITY OF CITIZENS OF THE COUNTY; AND TO MAKE CERTAIN TECHNICAL CORRECTIONS AND AMENDMENTS TO THE EXISTING CODE OF ORDINANCES CONSISTENT WITH STATE LAW AND CURRENT PRACTICE.**

**WHEREAS**, County Council finds that excessive noise and other nuisances compromises the public welfare and impairs the livability and enjoyment of private property; and

**WHEREAS**, in order to allow for the peaceful enjoyment of private property, certain nuisances and sources of undue and excessive noise, whether from animal, human, mechanical, or electrical sources, must be regulated ; and

**WHEREAS**, Ord. 875 of 1993 and Ord. 1138 of 2000 were enacted in order to achieve these goals with regard to noise, but these two Ordinances are in potential conflict with each other, as well as insufficient to achieve the fair and equitable enforcement of offenses related to undue and excessive noise; and

**WHEREAS**, it is in the interest of the County, its citizens, and the various officials charged with the enforcement of laws to enact a comprehensive and equitable set of procedures, policies, and offenses related to livability and the enjoyment of private property.

**NOW, THEREFORE, BE IT ORDAINED** by County Council in a meeting duly assembled as follows:

**SECTION I.  FINDINGS INCORPORATED**

The above-referenced recitals and findings are incorporated herein by reference and made a part of this Ordinance.

**SECTION II. PURPOSE**

The purpose of this Ordinance is to amend the Charleston County Code of Ordinances so as to establish a Chapter 3 of Part II entitled "Livability," comprised of the full provisions of the existing Chapter 3, "Animals and Fowl"; to enact additional procedures and requirements for animals and fowl kept on residential properties, including provisions related to noise from animals and fowl; to repeal Article III of Chapter 14.5, containing the provisions of  Ord. 1138 of 2000 ("Noise Ordinance") and repeal §§14.5-2 and 14.5-3 related to loud and unnecessary noises and sound amplification devices; and to enact new provisions and requirements making unlawful certain offenses related to noise that disturbs the peace and tranquility of citizens of the County.

**SECTION III.  LIVABILITY**

The title of Chapter 3 of Part II of the Charleston County Code of Ordinances is hereby retitled "Livability," and the full provisions of the existing Chapter 3 related to animal and fowl are incorporated in full and without amendment, except as may be provided for hereafter.

**SECTION IV.  ADDITIONAL PROVISIONS RELATED TO ANIMALS AND FOWL**

Chapter 3 of Part II of the Charleston County Code of Ordinances is hereby amended so as to add the following provisions:

**Sec. 3-17. –Identification of Dogs and Cats**

    A.  Any person who owns or keeps a dog or cat three (3) months of age or older shall affix and maintain a durable metal or plastic identification tag on the collar of the animal which has permanently stamped or printed thereon the owner's address and phone number(s).  The tag shall be maintained in such a condition as to make the stamped or printed information clearly legible.  Microchip technology or tattooing as otherwise provided by law may be used in lieu of a collar tag, provided that owner identification and contact information remains current.

    B.  The provisions of Section A are not applicable when:
        1.  The animal is participating in any organized exhibition, field trial, competition or is in training for these events, or is undergoing grooming;

2. the dog or cat is confined in a boarding kennel, grooming facility or veterinary hospital, in which case the identification tag information shall be recorded and readily available; or

3. When a licensed veterinarian orders in writing that the identification tag and/or collar be removed for reasons of the animal's health, in which case the animal shall be confined within an enclosed building, fenced area or kennel at all times until the veterinarian permits the collar and tag again to be placed on the animal.

**Sec. 3-18. –Nuisances**

A. It shall be unlawful for any person to own, keep, possess, or maintain an animal in such a manner as to constitute a public nuisance or a nuisance to neighbors. By way of example and not of limitation, the following acts or actions of an owner, harborer or possessor of an animal are hereby declared to be a public nuisance and therefore unlawful:

B.

1. Having an animal that disturbs the rights of, threatens the safety of, or damages a member of the general public, or interferes with the ordinary use and enjoyment of their property, or public property; or

2. Allowing or permitting an animal to damage the property of anyone other than its owner, including, but not limited to, turning over garbage containers or damaging gardens, flowers or vegetables, or repeatedly defecating upon the property of another; or

3. Maintaining animals in an environment of unsanitary conditions or lack of cleanliness which results in offensive odor or is dangerous to the public health, welfare or safety, or a failure to maintain a condition of good order and cleanliness which reduces the probability of transmission of disease; or

4. Maintaining property that is offensive, annoying or dangerous to the public health, safety or welfare of the community because of the number, type, variety, density or location of the animals on the property; or

5. Allowing or permitting an animal to bark, whine or howl in an excessive, continuous or untimely fashion so as to interfere with the reasonable use and enjoyment of neighboring premises; or

6. Maintaining an animal that is diseased and dangerous to the public health; or

7. Maintaining an animal that habitually or repeatedly chases, snaps at, threatens, attacks or barks at pedestrians, joggers, dogs walked on a leash by owners, bicycles, or vehicles; or

8. Failing to confine a female dog or cat, while in season, in a building or secure enclosure in such a manner that she cannot come into contact with another dog or cat or creates a nuisance by attracting other animals; provided this section shall not be construed to prohibit the intentional breeding of animals within an enclosed, concealed area on the premises of the owner of an animal which is being bred.

C. In addition to the right of the County to bring an enforcement action for violations of this section, any individual who is specifically damaged by any violation may, in addition to other remedies, institute an appropriate civil action or other proceeding in the Magistrate Court or Circuit Court to abate or prevent the nuisance.

## SECTION V. NOISE OFFENSES

Chapter 3 of Part II of the Charleston County Code of Ordinances is hereby amended so as to add the following provisions:

### Sec. 3-40. –Definition

A. As used below, "plainly audible" means any sound that can be detected by a person using his or her unaided hearing facilities.

### Sec. 3-41. –Noise-Amplified Sound from Vehicles

It shall be unlawful for any person to play, operate, or cause to be played or operated, any radio or other vehicular music or sound amplification or reproduction equipment in such a manner as to be plainly audible at a distance of fifty (50) feet in any direction from the vehicle or plainly audible within the residential dwelling of another. The detection of the rhythmic bass component of the music or sound is sufficient to constitute a plainly audible sound. Prohibitions contained in this section shall not be applicable to emergency or public safety vehicles for sound emitted during job-related operation.

### Sec. 3-42. –Noise-Amplified Sound in General

It shall be unlawful for any person to play, operate, or cause to be played or operated, any radio or other music or sound amplification or reproduction equipment upon real property in such a manner as to be plainly audible within any residential dwelling of another. The detection of the rhythmic bass component of the music or sound is sufficient to constitute a plainly audible sound.

### Sec. 3-43. –Noise-Excessive, Unnecessary or Unreasonable Noise.

A. Any excessive, unnecessary, or unreasonable sound that is plainly audible as set forth in §§ 3-41 and 3-42 of this Code which endangers or injures the safety or health of humans or animals, or annoys or disturbs a reasonable person of normal sensibilities is prohibited.

B. The following shall be exempt from the prohibition contained in section A, supra:

1. Church bells or other activities of organized religious services.
2. Any siren, whistle, or bell lawfully used by emergency vehicles or any other alarm systems used in any emergency situation, provided, however, that burglar alarms not terminating within fifteen (15) minutes after being activated shall be unlawful.
3. Warning devices required by state or federal regulations.
4. Farming equipment or farming activity.
5. Timber harvesting and milling during daylight hours.
6. Noise from domestic power equipment including but not limited to chain saws, sanders, grinders, lawn and garden tools or similar devices operated during daylight hours.
7. Noise generated by any construction, demolition equipment, or mineral extraction (including crushing, screening, or segregating) operated during daytime hours as per local, state, or federal law or regulation, or as otherwise provided for by permit or variance, whichever is more restrictive.
8. Emergency maintenance, construction or repair work.
9. Noise created by any government-sponsored events or privately organized sports, recreation, or athletic events.
10. Emergency or extraordinary situations.
11. A business may use an outside sound system to notify patrons waiting to pick up an order, obtain a table, or to be able to participate in the activities of the business, provided that such sound does not create an excessive, unnecessary or unreasonable noise.
12. Noise from any idling vehicles at a commercial establishment in the process of loading or unloading merchandise for the establishment, or waiting for the opportunity to do the same.

### Sec. 3-44. –Penalty

Any person who violates the provisions of this chapter shall be guilty of a misdemeanor and, upon conviction, shall be subject to a fine of not more than $500.00 or not more than 30 days in jail, or both.

### Sec. 3-45. –Noise-Private Action

In addition to the right of the County to bring an enforcement action for violations of this section, any individual who is specifically damaged by any violation of this Chapter related to noise may, in addition to other remedies, institute an appropriate civil action or other proceeding in the Magistrate Court or Circuit Court to abate or prevent the nuisance.

## SECTION VI. TECHNICAL CORRECTIONS AND AMENDMENTS

1. Sections 3-14 and 3-15 are hereby repealed and said sections reserved for future use.

## SECTION VII. TECHNICAL CORRECTIONS AND AMENDMENTS

1. The following provisions of the Charleston County Code of Ordinances are hereby repealed:
   A. Part II, Chapter 11, Article IV, "Memorial Hospital"
   B. Part II, Chapter 11, Article V, "Emergency Medical Board"
   C. Part II, Chapter 11, Article VI, "Medical Examiner Commission"
   D. Part II, Chapter 11, Article VII, "Indoor Clean Air"
   E. Part II, Chapter 11, Article VIII, "Transportation of Nuclear Material"

2. Section 11-151 of the Charleston County Code of Ordinances ("Alcohol and Other Drug Abuse Department) is amended in part so as to provide that the director "shall be hired and fired by the County Administrator *or the Administrator's designee*…" The italicized portion herein reflects additional text.

3. Section 11-158 of the Charleston County Code of Ordinances ("Alcohol and Other Drug Abuse Department) is amended so as to replace the reference to section 61-5-320(b) of the South Carolina Code of Laws with section 61-12-20.

4. Section 11-153 of the Charleston County Code of Ordinances ("Alcohol and Other Drug Abuse Department) is amended in part so as to delete the phrase "Mini-bottle revenues will be received by the county, and" and insert "Revenues disbursed by the State and received by the County pursuant to Chapter 12 of Title 61 of the S.C. Code of Laws…"

5. Section 11-151 of the Charleston County Code of Ordinances ("Alcohol and Other Drug Abuse Department) is amended so as to add the following as the last sentence of said section: "The county alcohol and other drug abuse department is authorized to use the metonym "Charleston Center" in its daily operations and educational materials and any reference to "Charleston

Center" shall be interchangeable with the county alcohol and other drug abuse department."

6. The caption of Part II, Chapter 10, Article I is hereby amended so as to delete the phrase "BEAUTIFICATION OF PROPERTY BY" with the new caption being "REGULATION OF WEEDS, RANK VEGETATION, AND SOLID WASTE."

## SECTION VIII. SEVERABLITY

If any section, subsection, sentence, clause, phrase or portion of this Ordinance is for any reason held invalid or unconstitutional by any court of competent jurisdiction, such portion shall be deemed a separate, distinct and independent provision and such holding shall not affect the validity of the remaining portion of this Ordinance.

## SECTION IX. EFFECTIVE DATE

This Ordinance shall take effect upon third reading by County Council.